Christopher A. Jones (Bar# VA030)
Whiteford Taylor & Preston L.L.P
3190 Fairview Park Drive, Suite 800
Falls Church, VA 22042
(703) 280-9263 (telephone)
Email: cajones@whitefordlaw.com

*Counsel for Square Funding, LLC*

Shanna M. Kaminski, Esq.
Kaminski Law, PLLC
*Court Admission Pending*
P.O. Box 247
Grass Lake, MI 49240
(248) 462-7111 (telephone)
Email: skaminski@kaminskilawpllc.com

**IN THE UNITED STATES BANKRUPCY COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 23-378-ELG |
| BROUGHTON CONSTRUCTION CO., LLC, | ) | Chapter 7 |
| | ) | |
| _____ | ) | |
| | ) | |
| WENDALL WEBSTER, in his official Capacity as chapter 7 trustee and assignee of Industrial Bank and Nationwide Mutual Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 25-10054-ELG |
| | ) | |
| SQUARE FUNDING, LLC d/b/a SQUARE ADVANCE, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

### DEFENDANT SQUARE FUNDING LLC'S RESPONSE TO THE TRUSTEE'S MOTION FOR SUMMARY JUDGMENT

Defendant, Square Funding LLC ("**Square**"), by and through undersigned counsel, for its

*Response to the Trustee's Motion for Summary Judgment*, states as follows:

**INTRODUCTION**

Prepetition, Square and the Debtor entered into a series of transactions (collectively, the "**Agreements**"), under which the Debtor sold a percentage of its future accounts receivable to Square in exchange for immediate business capital.

After the Debtor filed for Chapter 7 bankruptcy relief in this Court on December 15, 2023, the Trustee initiated the above-captioned adversary proceeding asserting claims against Square under 11 U.S.C. §§ 548 and under DC Code § 28-3105 pursuant to 11 U.S.C. § 544 (Counts I through III, referred to collectively as the "**Avoidance Claims**" in this Response). The Trustee also asserted a conversion claim (Count IV) and an unjust enrichment claim (Count V) under District of Columbia common law.

The Trustee now seeks summary judgment on all claims (except for the conversion claim)[1] based on the theory that the transactions are somehow usurious loans. The Court must deny the Trustee's Motion for Summary Judgment as to all claims because the Trustee is barred from asserting that the transactions are loans under applicable law. And, even if the Trustee could somehow assert usury in contravention with settled state law, there are several issues of material fact regarding the nature of the transactions that prevent the Court from granting summary judgment, as Square will demonstrate in this Response.

The Trustee further contends that, even if the transactions are not recharacterized as loans, he is entitled to summary judgment on the Avoidance Claims based on the absence of reasonably equivalent value. However, the determination of what constitutes reasonably equivalent value is a fact-intensive determination that is best left for trial, as demonstrated by the fact that there are

---

[1] Though the Trustee's Motion for Summary Judgment is not labeled as "partial," the Trustee does not address or mention the conversion claim at all in his Motion. Based on the Motion for Summary Judgment, the Trustee is not seeking summary judgment on the conversion claim. Accordingly, Square does not address the conversion claim in this Response.

genuine issues of material fact as to whether the transactions provided reasonably equivalent value to the Debtor.

As such, the Court must deny the Trustee's Motion for Summary Judgment as to all claims.

## SUMMARY JUDGMENT STANDARD

A motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56 is made applicable to an adversary proceeding pursuant to Federal Rule of Bankruptcy Procedure 7056. The Court cannot grant summary judgment unless "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if its resolution might affect the outcome of the case under governing law, and a dispute is "genuine" if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (U.S. 1986). The substantive law determines which facts are material, and the court should only consider "facts that might affect the outcome of the suit under the governing law [that] will preclude the entry of summary judgment." *Id.*

Under the burden-shifting framework established by the Supreme Court in *Celotex Corp. v. Catrett*, the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. 477 U.S. 317, 323 (1986). Once that burden is met, the nonmoving party must come forward with specific facts demonstrating that a genuine issue exists for trial. *Id.* In evaluating a motion for summary judgment, the court must view the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. 242 at 255; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 578, 588 (1986) (citation omitted). It is not for the judge "to weigh the evidence and to determine the truth

of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. 242 at 249.

<h3 align="center"><u>STATEMENT OF MATERIAL FACTS</u></h3>

In addition to the evidence in the record, this Statement of Material Facts is based on the Dancour Declaration, attached hereto as **Exhibit A**, which is fully incorporated by reference herein.

1.      On June 14, 2022, Square and the Debtor entered into a Standard Merchant Cash Advance Agreement ("**June Agreement**"), under which the Debtor sold, assigned, and transferred to Square $699,500 of Receivables, defined as

> all of each Merchant's future accounts, [c]ontract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SA.

June Agreement, attached hereto as **Exhibit B**, at ¶ 1.

2.      Under the June Agreement, the Debtor was to deliver the purchased Receivables to Square by allowing Square to debit 25% ("**Specified Percentage**") of the Receivables from an account pre-approved by Square ("**Designated Account**") weekly. June Agreement, Exhibit B, at p. 1; Dancour Declaration, Exhibit A, at ¶ 9. The Initial Estimated Payment to be debited, defined in the June Agreement as $29,145, was meant to be an initial estimate of the Specified Percentage of the Debtor's weekly Receivables based on historical revenue information provided to Square by the Debtor during underwriting, and was subject to reconciliation pursuant to Paragraph 4 of the June Agreement. June Agreement, Exhibit B, at p. 1, ¶ 4; Dancour Declaration, Exhibit A, at ¶ 10.

3.   The June Agreement expressly provides that the term of the agreement is "indefinite" and that the Debtor's obligation to remit the Receivables was "conditioned upon [the Debtor's] sale of products and services and the payment therefor by each [of the Debtor's] customers." June Agreement, Exhibit B, at ¶¶ 7, 15. Also, the June Agreement did not provide for a fixed term within which the Debtor had to remit the purchased Receivables because the amount of time necessary to do so could vary based on how many times the Initial Estimated Payment was reconciled pursuant to Paragraph 4 of the June Agreement. June Agreement, Exhibit B, at ¶ 4; Dancour Declaration, Exhibit A, at ¶ 7.

4.   Square assumed the risk of non-collection of the Receivables and did not have recourse if the Debtor declared bankruptcy because declaring bankruptcy does not constitute an Event of Default under the June Agreement. June Agreement, Exhibit B, at ¶ 34; Dancour Declaration, Exhibit A, at ¶ 14.

5.   Pursuant to the June Agreement, Square paid the Purchase Price less applicable fees, which amount equaled $487,500, to the Debtor shortly after execution of the June Agreement. *See* Dancour Declaration, Exhibit A, at ¶ 17.

6.   The Debtor remitted a total of $349,749.96 of $699,500 in Receivables purchased by Square under the June Agreement. *See* June Agreement Transaction History, attached hereto as **Exhibit C**.

7.   On September 8, 2022, Square and the Debtor entered into another Standard Merchant Cash Advance Agreement ("**September Agreement**"), under which the Debtor sold, assigned, and transferred $775,500 of its Receivables to Square in exchange for a Purchase Price of $550,000. September Agreement, attached hereto as **Exhibit D**, at p. 1.

8. Apart from certain dollar amounts on Page 1, the July 2019 Agreement contains the same terms as the June Agreement, such that the remittance amount could be reconciled upon request by the Debtor, the agreement had an indefinite term, and Square did not have recourse in bankruptcy. *See id*.

9. Pursuant to an addendum on page 18 of the September Agreement, the outstanding Receivables under the June Agreement, in the amount of $349,750.04, were credited to Square under the September Agreement, such that $349,750.04 in Receivables was deducted from the net Purchase Price, resulting in the Debtor receiving $187,750 shortly after execution of the September Agreement. *See* September Agreement, Exhibit D, at p. 18; June Agreement Transaction History, Exhibit C; Dancour Declaration, Exhibit A, ¶ 19.

10. The Debtor remitted a total of $420,062.50 of $775,500 in Receivables purchased by Square under the September Agreement. *See* September Agreement Transaction History, attached hereto as **Exhibit E**.

11. On December 9, 2022, the Debtor entered into an additional Standard Merchant Cash Advance Agreement with Square ("**December Agreement**"), under which the Debtor sold, assigned, and transferred $846,000 of its Receivables to Square in exchange for a Purchase Price of $600,000. December Agreement, attached hereto as **Exhibit F**, at p. 1.

12. Apart from certain dollar amounts on Page 1, the December Agreement contains the same terms as the June Agreement, such that the remittance amount could be reconciled upon request by the Debtor, the agreement had an indefinite term, and Square did not have recourse in bankruptcy. *See id*.

13. The outstanding Receivables under the September Agreement, in the amount of $355,437.50, were credited to Square under the December Agreement, such that $355,437.50 in

Receivables was deducted from the net Purchase Price, resulting in the Debtor receiving $232,062.50 shortly after execution of the December Agreement. *See* December Agreement, Exhibit F, at p. 18; September Agreement Transaction History, Exhibit E; Dancour Declaration, Exhibit A, ¶ 21.

14.     The Debtor remitted a total of $522,545.40 of $846,000 in Receivables purchased by Square under the December Agreement, with the Debtor making one last remittance on May 30, 2023. *See* December Transaction History, attached hereto as **Exhibit G**. During the course of the December Agreement, the Debtor stopped Square's debits (the debit retuned a "R08" code) ten (10) times. *See id.*

15.     The Debtor filed for Chapter 7 bankruptcy relief in this Court on December 15, 2023 ("**Petition Date**"), six (6) months after making its last Remittance to Square under the December Agreement. *See id.*

16.     In consideration for the Receivables sold to CFG by the Debtor during the two (2) years prior to the Petition Date, Square paid the Debtor a total of $907,312.50, broken down as follows:

- Square paid the Debtor a net Purchase Price of $487,500 under the June Agreement;

- Square paid the Debtor a net Purchase Price of $187,750 under the September Agreement;

- Square paid the Debtor a net Purchase Price of $232,062.50 under the December Agreement;

*See* Agreements, Exhibits B, D, and F, at p. 1; Dancour Declaration, Exhibit A, at ¶¶ 17, 19, 21.

17.     In the two (2) years prior to the Petition Date, the Debtor remitted a total of $1,292,357.86 to Square, broken down as follows:

- The Debtor remitted a total of $349,749.96 of $699,500 in Receivables purchased by Square under the June Agreement;

- The Debtor remitted a total of $420,062.50 of $775,500 in Receivables purchased by Square under the September Agreement;

- The Debtor remitted a total of $522,545.40 of $846,000 in Receivables purchased by Square under the December Agreement;

*See* June Agreement Transaction History, Exhibit C; September Agreement Transaction History, Exhibit E; December Agreement Transaction History, Exhibit G; Agreements, Exhibits B, D, and F, at p. 1; Dancour Declaration, Exhibit A, at ¶¶ 18, 20, 22.

## ARGUMENT

**I.     The Motion for Summary Judgment is Procedurally Improper and Prejudicial to Square and CFG Merchant Solutions, LLC**

As a threshold matter, the filing of the Motion for Summary Judgment by the Trustee is procedurally improper and prejudicial to Square. The Trustee's Motion for Summary Judgment is identical to the motion for summary judgment the Trustee filed in the adversary proceeding against CFG Merchant Solutions, LLC ("**CFG**") [Adv. Case No. 25-10055-ELG, D.I. 14], inclusive of all exhibits relating to both Square and CFG. The Trustee is acting as if Square and CFG were joint defendants in the same adversary proceeding when they clearly are not. Not only is this procedurally improper, but it is also prejudicial to both Square and CFG.

Each adversary proceeding is meant to constitute a separate and distinct proceeding with its own independent record. *See In re KZK Livestock, Inc.*, 221 B.R. 471, 475 (Bankr. C.D. Ill. 1998). As such, the Court cannot consider evidence that relates to CFG to adjudicate the Motion for Summary Judgment against Square, and vice versa. *See id.* Though all exhibits are now public record, the Trustee, in filing the same exact motions and exhibits in both adversary proceedings,

is seeking to have the Court consider evidence from both cases simultaneously, as if evidence against CFG was itself evidence against Square and vice versa. This is prejudicial to both Square and CFG, as fact issues that might exist in one case might not exist in the other. Square and CFG are two distinct entities with distinct agreements, procedures, and trade secrets. Because of this, having the Court consider the Trustee's Motion for Summary Judgment as if Square and CFG were joint defendants in the same case creates the danger that Square, CFG, or both will be prejudiced.

As such, Square submits that the Trustee's Motion for Summary Judgment is procedurally improper and that the Court should make independent findings based on the evidence presented by and against each defendant separately.

## II.     The Court Cannot Grant Summary Judgment on the Trustee's Avoidance Claims

Despite acknowledging that the nature of the transaction is irrelevant and does not affect the Avoidance Claims, the Trustee spends a significant amount of time arguing that the transactions are usurious loans. *See* Motion for Summary Judgment, p. 10 ("[T]he outcome of this case is *not* altered by a determination that the MCA Transactions are valid sales . . . .").

Square agrees with the Trustee that the nature of the transactions is irrelevant to the adjudication of the Avoidance Claims. As a matter of fact, the Trustee pled the Avoidance Claims in the alternative, exploring both scenarios – on one hand, the scenario where the Court finds the Agreements to be loans and, on the other, the scenario where the Agreements are sales:

> ***If the MCA transactions are, in fact, actual sales of future receivables***, each such transaction (and every payment made thereupon) is a constructively fraudulent conveyance . . . . ***If the MCA transactions are not, in fact, actual sales of future receivables***, each such transaction is a poorly-disguised usurious loan that . . . is wholly invalid.

*See* Complaint, ¶¶ 3–4 (emphasis added)); *see also* Complaint, ¶¶ 23, 29, 35, 40; Motion for Summary Judgment, p. 10 (admitting that the nature of the transaction does not alter the result of

the Avoidance Claims). The irrelevance of the nature of the transactions is further demonstrated by the fact that the Bankruptcy Court for the District of Maryland, in *In re Global Energy Services, LLC*, found the underlying agreement to be a sale yet allowed the trustee's avoidance claims to proceed, which undoubtedly shows that the nature of the transaction has no bearing in this case. No. 21-17305-NVA, 2025 WL 1012721, at *9 (Bankr. D. Md. Mar. 31, 2025).

Because of this, it is odd that the Trustee spent the bulk of his pages arguing that the transactions are usurious loan, while only cursorily arguing that the Debtor received less than reasonably equivalent value, which is the most important element the Trustee must prove to obtain summary judgment on the Avoidance Claims. As demonstrated further in the following sections, the Trustee has not met his burden of showing that there are no issues of material fact as to the elements of the Avoidance Claims, precisely because the Trustee has failed to bring forth evidence showing that less than reasonably equivalent value was received by the Debtor as a result of the transactions with Square. As such, despite the Trustee's creative arguments, the Court cannot grant summary judgment on the Avoidance Claims and should disregard the Trustee's recharacterization arguments.

But even if the nature of the transactions were somehow relevant (it is not), the Trustee is barred under New York law from asserting usury offensively on behalf of a corporation. And even if the Trustee could assert usury offensively (he cannot), the Court could not grant summary judgment on the Avoidance Claims because there are genuine issues of material fact as to the nature of the transaction.

As such, Square respectfully requests that this Court deny the Motion for Summary Judgment as to the Avoidance Claims.

10

**A.      Even if the Nature of the Transactions Were Relevant, the Trustee Is Barred from Asserting that the Transactions Are Usurious Loans Under New York <u>Law</u>**

Putting aside the fact that the transactions are not loans to which usury laws are even applicable, it is well settled that under New York law a corporation may only assert usury as a defense to an action seeking repayment of a loan, not as an affirmative claim for relief. *See, e.g.*, *Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d 319 (2d Dep't 2021) (reversing denial of summary judgment of usury based affirmative claim); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 179 N.E.3d 612 (2021) (reaffirming that usury is an affirmative defense to repayment on a note); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 2022 WL 4368114 (S.D.N.Y. Sept. 20, 2022) (holding that New York law prohibits a corporation from asserting usury as a basis for affirmative relief; usury may be raised only defensively in response to collection efforts).

Federal courts applying New York law routinely reject the idea that a corporation may invalidate a transaction by offensively asserting it is a usurious loan, reaffirming the well-settled principle that corporations are barred from asserting usury offensively under New York law. *See, e.g.*, *Ammirato v. Duraclean Int'l, Inc.*, 687 F. Supp. 2d 210, 220 (E.D.N.Y. 2010) (rejecting the argument that the loans were void as a matter of law because "the civil usury defense is unavailable" to corporations, which "may only assert criminal usury as a defense to repayment"); *Collins v. MCA Receivables, LLC*, 2024 WL 246111, at *5 (S.D.N.Y. Jan. 23, 2024) (dismissing a claim for declaratory judgment based on alleged usury); *Powercap Partners LLC v. Beaux Equities LLC,* 179 N.Y.S.3d 894 (Sup. Ct. 2023) (holding that the corporate defendant could "not bring an action seeking a declaratory judgment that the subject loans violate criminal usury law"); *Streamlined Consultants, Inc. v. EBF Holdings LLC*, 2022 WL 4368114, at *3 (S.D.N.Y. Sept. 20,

2022) ("Plaintiffs are barred from bringing affirmative claims for relief based on allegations of usury"); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237, 254 (S.D.N.Y. 2022) ("New York courts have uniformly . . . prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement"); *Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472 (S.D.N.Y. 2008) (dismissing a claim for declaratory judgment based on alleged usury); *Tender Loving Care Homes, Inc v. Reliable Fast Cash, LLC*, 76 Misc. 3d 314, 320, 172 N.Y.S.3d 335, 341 (N.Y. Sup. Ct. 2022) ("Plaintiffs' cause of action seeking affirmative relief in the form of a declaratory judgment that the agreement is actually a disguised usurious loan must be dismissed as a matter of law…").

In the Complaint and in the Motion for Summary Judgment, the Trustee does precisely what controlling case law (and the New York usury statute) forbids: he invokes usury to seek affirmative relief on behalf of a corporation. Because such a theory is foreclosed as a matter of law, summary judgment cannot be granted on the basis that the transactions are, somehow, usurious loans.

**B.      To the Extent that the Nature of the Transactions Is Relevant, There Are Genuine Issues of Material Fact That Prevent Summary Judgment**

As previously mentioned, to the extent that the Trustee is allowed to pursue the usury theory offensively in contradiction to settled New York law, the Court cannot grant summary judgment on the Avoidance Claims because the contested nature of the transactions constitutes a genuine issue of material fact that prevents summary judgment as a matter of law.

In *In re Anadrill Directional Services Inc.*, the Bankruptcy Court for the Southern District of Texas came to the same conclusion at the summary judgment stage in a case similar to the one at bar. No. 23-31199, 2026 WL 407859, at *1 (Bankr. S.D. Tex. Feb. 12, 2026). In that case, the chapter 7 trustee brought avoidance claims under 11 U.S.C. §§ 548 and 550 against a company

12

that purchased accounts receivable from the debtor. As in this case, the trustee in *Anadrill* argued that the transaction was a usurious loan and thus void and unenforceable. *See id.* at *7. The court denied the trustee's motion for summary judgment because the nature of the transaction was highly contested, creating a genuine issue of material fact that prevented summary judgment as a matter of law. *See id.* at *6. In this respect, the court stated:

> [T]here remains a genuine dispute of material fact as to whether the Agreement is a usurious loan or sale of future receivables, because the parties dispute what the terms of reconciliation are, whether the Agreement specifies a finite term for repayment, and whether the Agreement requires Anadrill to make a weekly payment for a set dollar amount or for a percentage of the total amount Anadrill owes to RDM. Based on the summary judgment evidence before the Court, this Court cannot conclude that RDM failed to make a showing sufficient to establish the existence of an element essential to its case that the Agreement was a sale rather than a loan.

*Id.*

As in *Anadrill*, this Court is barred as a matter of law from granting the Trustee's Motion for Summary Judgment. As will be demonstrated at length, the parties strongly disagree about the nature of the transactions and dispute all the essential terms of the Agreements. As such, the Trustee has failed to show that there are no issues of material fact and that summary judgment should be granted in his favor.

In fact, an analysis of the Agreements under applicable law clearly demonstrates that the transactions are sales. All the Agreements contain a choice of law provision designating New York law as the law governing the Agreements. *See* Agreements, Exhibits B, D, and F, at ¶ 38; Motion for Summary Judgment, ¶¶ 6, 11. Under New York law, the existence of a loan is a prerequisite to the application of usury law, thus sales of Receivables are not within the purview of New York's usury statute. *See IBIS Capital Group, LLC v. Four Paws Orlando LLC*, No. 608586/16, 2017 WL 1065071, at *1 (N.Y. Sup. Ct. Mar. 10, 2017) (stating "where there is no loan there can be no

usury"); *Seidel v. 18 E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992) ("Usury laws apply only to loans or forbearances, not investments."); *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017).

To determine whether a transaction is a loan subject to usury law or a sale of receivables, federal courts applying New York law examine the substance of the transaction to determine which party bore the risk of non-collection of the underlying receivables. *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F.Supp.3d 402, 452 (S.D.N.Y. 2022) (stating that "the root of the analysis involves the question of whether the transaction involves a transfer of risk") (internal citations omitted).

To assess the transfer of risk, courts applying New York law utilize the three-factor test enunciated in *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, which instructs courts to consider the following factors when determining whether a transaction is a sale or a loan: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." 122 N.Y.S.3d at 312; *also see, e.g.*, *In re Glob. Energy Servs., LLC*, No. 21-17305-NVA, 2025 WL 1012721, at *4–5 (Bankr. D. Md. Mar. 31, 2025) (adopting the three-factor test for determining whether a transaction is a sale or a loan for purposes of applying New York usury law). While these factors are "neither exclusive nor decisive," they provide a clear roadmap for evaluating whether the business's obligations are truly contingent on its collection of Receivables, as they would in a sale, or whether the funding company "is absolutely entitled to repayment under all circumstances," as it would under a loan arrangement. *See LG Funding*, 122 N.Y.S. 3d at 312 (internal citations omitted).

14

As explained further in the following sections, the Agreements are all, in form and in substance, sales of receivables under New York law because Square bore the risk of non-collection of Receivables and because the Debtor's obligation to remit any Receivables to Square was completely contingent on the Debtor actually being operational and collecting revenue. As such, there is a genuine issue as to the nature of the transaction and summary judgment must be denied.

### i.    *Reconciliation Provision*

The first factor considers whether the agreement between the parties contains a reconciliation provision. *See LG Funding*, 122 N.Y.S. 3d at 312. Here, all the Agreements contain a *mandatory* reconciliation provision. *See* Agreements, Exhibits B, D, and F, at ¶ 4. The reconciliation provision in the Agreements states, in its entirety, as follows:

> **4. Reconciliations.** Any Merchant may give written notice to SA requesting that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@SAfunding.com and such notice will be deemed to have been received if and when SA sends a reply e-mail (but not a read receipt). ***If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled within seven days thereafter***. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. ***SA will complete each such reconciliation within two business days after receipt of a written request or one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested***.

*Id.* (emphasis added). Based on the plain language of Paragraph 4 of the Agreements, Square was *required* to conduct a reconciliation if the documents provided by the Debtor showed that there had been a change in revenue such that the Initial Estimated Payment no longer aligned with the Specified Percentage. *See id.* Courts routinely uphold reconciliation provisions with such

mandatory language as evidence of a sale. *See, e.g.*, *In re Glob. Energy Servs.*, 2025 WL 1012721, at \*5 (finding a mandatory reconciliation provision stating the funding company "shall" reconcile the remittance amount to be evidence of a sale); *K9 Bytes*, 57 N.Y.S.3d at 632–33; *Colonial Funding Network*, 252 F. Supp. 3d at 281; *Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 22 WL 4368114, at \*4 (S.D.N.Y. Sept. 20, 2022).

Importantly, Square's reconciliation provision is not illusory because it ***required*** Square to perform a reconciliation (*i.e.*, Square had no discretion) and it did not require the Debtor to provide overly onerous documentation to request a reconciliation. *See US Info. Grp. LLC v. EBF Holdings, LLC*, No. 22-CV-6661 (PKC), 2023 WL 6198803, at \*3 (S.D.N.Y. Sept. 22, 2023) (finding reconciliation provision not illusory when there was mandatory reconciliation language).

While the Trustee attempts to argue that the reconciliation provision is discretionary because "Square is not bound to perform a reconciliation unless and until it responds to a reconciliation request," the operative language in the Agreements makes it clear that Square "***will***" perform a reconciliation, indicating that reconciliation is strictly mandatory. Motion for Summary Judgment, p. 21; Agreements, Exhibits B, D, and F, at ¶ 4. The fact that a reconciliation request was deemed received when Square replied to the e-mail request does not render the reconciliation provision illusory. Instead, it simply establishes a procedure to calculate the time period within which Square would perform a reconciliation. Agreements, Exhibits B, D, and F, at ¶ 4.

Further, the Trustee argues that the reconciliation provision is illusory because the Debtor could only provide Square with bank statements at the close of each month. Motion for Summary Judgment, p. 21. This argument is unfounded. In fact, the reconciliation provision did not only require the Debtor to provide all available bank statements, but also the login and password for the Designated Account. Agreements, Exhibits B, D, and F, at ¶ 4. Information that could not be

provided through bank statements (perhaps because a bank statement was not yet available for a given month) could be filled in with the information available in the Designated Account: Square required access to the Account so that it could view and take into consideration all payments made to the Debtor up until the date Square performed the reconciliation; at the same time, Square required all available bank statements to assess the Debtor's revenue as of the close of the previous months. This procedure does not render the reconciliation provision illusory; rather, it was established so that Square could have all the information needed to calculate the Specified Percentage and perform accurate reconciliations.

The reconciliation provision in the Agreements is also not illusory (particularly when the Agreements on their face show that Square did not have discretion to deny a reconciliation) because there is no evidence in the record showing that the Debtor requested and was denied reconciliation by Square. The Trustee devotes a substantial amount of time asserting in the Motion for Summary Judgment that the reconciliation provisions are illusory but does not allege any facts that would demonstrate the reconciliation provisions are illusory as a matter of law. The Debtor never requested a reconciliation at any time and, under New York law, a reconciliation provision cannot be challenged as illusory when the seller never requested and was denied a reconciliation. Dancour Declaration, Exhibit A, at ¶ 11. *See, e.g.*, *Diesel Funding, LLC v. Build Retail, Inc.*, 248 A.D.3d 1190, 1192 (N.Y. App. Div. 2026) ("[W]e note that defendants did not seek to engage in the agreement's reconciliation procedure, which precludes our review of the claim that the process was illusory." (citing *Apollo Funding Co. v. Dave Reilly Constr., LLC*, 241 A.D.3d 1508, 1509, 242 N.Y.S.3d 86, 88 (2025)); *Pirs Cap., LLC v. D & M Truck, Tire & Trailer Repair Inc.*, 129 N.Y.S.3d 734, 739–40 (N.Y. Sup. Ct.), *judgment entered sub nom. Pirs Cap., LLC v. D&M Truck, Tire & Trailer Repair Inc.* (N.Y. Sup. Ct. 2020) (declining to find reconciliation provision illusory

when the merchant did not allege that it ever requested a reconciliation); *In re JLK Constr., LLC*, No. 23-50034, 2025 WL 3681827, at \*6 (Bankr. W.D. Mo. Dec. 18, 2025) (finding a reconciliation provision is not illusory when a reconciliation never occurred and there are no allegations one was requested and denied); *Streamlined Consultants, Inc. v. EBF Holdings, LLC*, No. 21-CV-9528 (KMK), 2023 WL 5835748, at footnote 4 (S.D.N.Y. Sept. 8, 2023); *Colonial Funding Network, Inc. for TVT Cap., LLC v. Epazz, Inc.*, 252 F. Supp. 3d 274, 286 (S.D.N.Y. 2017).

Because the Agreements contain a mandatory reconciliation provision, the first factor weighs in favor of the transactions being sales. As the trustee argues instead that the reconciliation provisions are illusory, the practical application of the reconciliation provisions constitutes a genuine issue of material fact that prevents summary judgment in the Trustee's favor.

### ii.     *Finite Term*

The second factor considers whether the agreement has a finite term, which is indicative of a loan, or a variable term, which is indicative of a sale. *See LG Funding*, 122 N.Y.S. 3d at 312. Here, the Agreements expressly state that the Agreements had an "indefinite" duration because the Debtor's obligation to remit Receivables was conditioned upon the Debtor being operational and collecting revenue. *See* Agreements, Exhibits B, D, and F, at ¶¶ 7, 15. The duration of the Agreements was also automatically indefinite as a result of the reconciliation mechanism provided for under Paragraph 4. *See* Agreements, Exhibits B, D, and F, at ¶ 4. In fact, since the Agreements contain a genuine reconciliation provision, the Agreements necessarily have an indefinite term. *See In re Glob. Energy Servs.*, 2025 WL 1012721, at \*6 (stating the finite term factor "goes hand-in-glove with the reconciliation provision factor"); *Principis Cap., LLC v. I Do, Inc.*, 201 A.D.3d 752, 754, 160 N.Y.S.3d 325, 327 (2022) ("[A]s the amount of the monthly payments could change, the term of the agreement was not finite."). The Bankruptcy Court for the District of Maryland

explained the interplay between the presence of a reconciliation provision and the duration of an agreement for the sale of accounts, stating, "since the daily payment amount could be reconciled to more closely reflect [the seller's] actual receipts, and since those receipts depended on the generation of sales and payments from customers, the parties could not have known when the Agreement would terminate with full payment to [the buyer]." *In re Glob. Energy Servs.*, 2025 WL 1012721, at *6.

Thus, if the Debtor experienced a fluctuation in revenue, and the Debtor requested a reconciliation each time its revenue dropped (which it was entitled to do under the Agreements), the term of the Agreements would have been extended each time. *See* Agreements, Exhibits B, D, and F, at ¶ 4. ("Nothing herein limits the amount of times that such a reconciliation may be requested."). The natural fluctuation of the Debtor's revenue (*i.e.*, collection of Receivables), coupled with the mandatory reconciliation mechanism provided for under the Agreements, would have made it virtually impossible for the parties to determine the exact duration of the Agreements on the dates the Agreements were executed. This demonstrates that the Agreements did not have a finite term, which is further evidence that the transactions are sales, not loans, thus creating another fact issue that prevents summary judgment in the Trustee's favor.

### iii.    *Recourse in Bankruptcy*

The last factor considers whether the buyer of the Receivables has recourse against the seller if the seller declares bankruptcy. *See LG Funding*, 122 N.Y.S. 3d at 312. Courts have found agreements to be sales when the "declaration of bankruptcy does not constitute an event of default" under the terms of the agreement and when the agreement "does not contain any provisions establishing any recourse for [the funding company] should [the merchant] declare bankruptcy."

19

*See Streamlined Consultants, Inc. v. EBF Holdings LLC*, No. 21-CV-9528 (KMK), 2022 WL 4368114, at *5 (S.D.N.Y. Sept. 20, 2022).

Here, Paragraph 34 of the Agreements defines what constitutes an Event of Default under the Agreements. As is evident by that Paragraph, declaring bankruptcy does not constitute a Default under the Agreements. *See* Agreements, Exhibits B, D, and F, at ¶ 34. The Agreements also state that Square entered into the Agreements "knowing the risks that [the Debtor's] business may decline or fail, resulting in Square not receiving the Receivables Purchased Amount," further demonstrating that Square does not have recourse in bankruptcy. *See* Agreements, Exhibits B, D, and F, at ¶ 15. Furthermore, the Debtor's obligations to remit Receivables to Square was "conditioned upon" the Debtor collecting revenue, meaning that if the Debtor ceased business operations in the ordinary course, such as in the event of a Chapter 7 bankruptcy, Square has no recourse. *Id.*

The Trustee makes a creative argument that, under the Agreements, a Chapter 7 filing is an Event of Default because it constitutes "an interruption of a business' operations" and because of the things that occur by operation of law once a Debtor files for bankruptcy. Motion for Summary Judgment, p. 23. However, Square may only enforce its rights under the Agreements if the seller committed an Event of Default ***prior to the filing of the bankruptcy case***. For avoidance of doubt, an Event of Default can only occur pre-petition: an Event of Default does not occur when a debtor opens a new bank account after filing for bankruptcy or when the liquidation process begins under Chapter 7. *See* Dancour Declaration, Exhibit A, at ¶ 14. As such, all the things that occur by operation of law when a debtor filing for bankruptcy are not considered Events of Default under the Agreements. Further, the requirement that the seller notify Square of its intention to file for

Chapter 11 bankruptcy does not trigger any recourse because, again, declaring bankruptcy is not an Event of Default under the Agreements. *See* Agreements, Exhibits B, D, and F, at ¶ 34.

Based on the foregoing, all three factors weigh in favor of the transactions being sales, not loans, which demonstrates that there are several issues of material fact that prevent a grant of summary judgment for the Trustee.

<div align="center">

**iv.    *The New York Appellate Division Has Found the Same Agreement to be a Sale***

</div>

Recently, the New York Supreme Court Appellate Division of the Second Department reversed a judgment of the lower court, finding that the Standard Merchant Cash Advance Agreement at issue in that case (the same form agreement used by Square) was a sale, not a usurious loan. *Diesel Funding*, 248 A.D.3d at 1192. The court reasoned that the agreement was a sale because (1) the remittance amount was subject to a cap and to reconciliation, (2) the term was not finite because the remittance amount could vary, and (3) a declaration of bankruptcy did not constitute an event of default under the agreement. *Id.* The court further noted that the defendants could not assert that the reconciliation provision was illusory because they "did not seek to engage in the agreement's reconciliation provision." *Id.*

The agreement analyzed by the New York court in *Diesel Funding* contains the same provisions and the same language as the Square Agreements. *Compare* Diesel Agreement, attached hereto as **Exhibit H**, *with* Agreements, Exhibits B, D, and F.  In fact, the Square Agreements are identical to agreement analyzed in *Diesel Funding*. Thus, the same considerations expressed in *Diesel Funding* apply here, demonstrating that the Square Agreements are valid sales of accounts receivable under New York law.

The Trustee cites *Square Funding LLC v. Walsh Roofing Servs. of Tampa Bay, LLC* in support of his argument that the Agreements are, somehow, usurious loans. 2025 N.Y. Misc.

<div align="center">21</div>

LEXIS 737, at *4–5 (N.Y. Sup. Ct. Feb. 11, 2025); Motion for Summary Judgment, pp. 18–19. In that case, Square moved for summary judgment against the seller and the guarantor because the seller had breached the agreement. *Id.* at *3–4. The court scheduled a hearing and formulated a list of factual questions that Square needed to answer so that the court could make a ruling on the summary judgment motion. *Id.* at *4–6. This is the full extent of the case cited by the Trustee – the court did not issue a ruling regarding the nature of the transaction. *Id.* Yet the Trustee uses the *Walsh Roofing* opinion to draw conclusions that simply cannot be drawn from it. The Trustee argues that Square's ultimate dismissal of the lawsuit is somehow evidence that Square's agreements are usurious loans. *See* Motion for Summary Judgment, p. 19. But this conclusion is mere speculation — there might have been a host of other reasons why Square elected to dismiss the case.

In contrast, the *Diesel Funding* case clearly demonstrates that Square's Agreements, like Diesel's agreements, are valid sales. For these reasons, to the extent that the nature of the transaction is relevant to the claims asserted in this case, the Court should deny the Trustee's Motion for Summary Judgment because there are issues of material fact regarding the nature of the transactions.

<p align="center">v.       *The* Shoot the Moon *Factors Are Not Relevant to the Usury Analysis*</p>

In addition to the three (3) factors employed by New York courts when determining whether a transaction is subject to usury laws, the Trustee seeks to apply the factors used by the bankruptcy court for the District of Montana in *Cap Call, LLC v. Foster (In re Shoot the Moon, LLC)*, 635 B.R. 797 (Bankr. D. Mont. 2021). However, the *Shoot the Moon* factors are utilized to determine whether an agreement is a true sale or a secured financing, not to determine whether a transaction is a loan for the purpose of applying usury law. In fact, for example, the *Shoot the*

<p align="center">22</p>

*Moon* factors do not consider whether an agreement provides the buyer with an absolute right to repayment, which is the central question when determining whether an agreement is a sale or a usurious loan. *See, e.g.*, *Lateral Recovery*, 632 F.Supp.3d at 452.

As such, the *Shoot the Moon* factors are wholly inapplicable and irrelevant to the Avoidance Claims and should not be used to determine whether the Agreements are sales or loans. Nonetheless, even the application of the *Shoot the Moon* factors demonstrates that the transactions are true sales of Receivables as most factors weigh in favor of this conclusion:

1.    **Recourse against the seller:** Under the Agreements, Square does not have recourse against the seller if Square cannot ultimately collect the purchased Receivables because the seller's business slowed down or failed. *See* Agreements, Exhibits B, D, and F, at ¶ 15. Certainly, Square has recourse if the seller otherwise breaches the agreement, as is natural and common in all commercial transactions and cannot be a basis for recharacterizing the transactions as loans.

2.    **Servicing of accounts:** The Trustee is correct that the Agreements provide that the seller continues to service the accounts sold under the Agreements. However, this factor is not dispositive, on its own, to recharacterize the transaction as a loan.

3.    **Investigation by seller:** Prior to purchasing revenue from a company, it is Square's procedure to analyze the prospective seller's bank account statements to determine the seller's revenue stream and its sources to ensure that the seller has sufficient revenue to sustain the obligations, to determine how to best help the seller, and if a sale of accounts is the appropriate product for them. The transactions with the Debtor were no exception, as Square conducted a thorough investigation into the Debtor's business, its revenue, and its customers before entering into each Agreement. *See* Due Diligence Documents, attached hereto as **Exhibit I**. Specifically,

Square examined the Debtor's monthly bank statements, accounts receivable reports, and other existing obligations. *See id.*

4.      **Seller's right to excess collections:** To the extent that the Debtor collected more than expected in a day, Square, not the Debtor, had a right to the excess for that day, which is indicative of a sale. This is because Square purchased a percentage of the Debtor's Receivables, which is necessarily a variable amount, not a fixed amount. *See* Agreements, Exhibits B, D, and F, at 1.

5.      **Option to repurchase:** As admitted by the Trustee, the Agreements do not provide a mechanism for the Debtor to repurchase the accounts sold, which is indicative of a sale. Motion for Summary Judgment, p. 26.

6.      **Buyer's ability to unilaterally alter pricing terms:** Square had a right to unilaterally alter the pricing terms under the Agreements, which is evidence that the transactions are sales. This is demonstrated by the fact that the Agreements provide Square with the right to debit the Designated Account if Square realized, by looking at the Designated Account and at the Debtor's bank statements, that it had previously collected less than the Specified Percentage of Receivables. *See* Agreements, Exhibits B, D, and F, at ¶ 4.

7.      **Seller's ability to compromise the terms of the assets:** The Debtor had no ability to compromise the terms of the assets other than the right to request a reconciliation, which is obviously indicative of a sale. In fact, the Debtor's only obligation under the Agreements was to remit the Specified Percentage of Receivables as provided under the Agreements, which is consistent with Square holding property rights over the Receivables. *See* Agreements, Exhibits B, D, and F. Additionally, the Agreements expressly provide that the Debtor was to hold the Receivables in trust for Square, further demonstrating that Square, not the Debtor, owns the

24

Receivables. *See* Agreements, Exhibits B, D, and F, ¶ 1 (". . . [E]ach Merchant will hold Receivables in trust for SA in its capacity as fiduciary for SA.").

8.        **Language of the agreement and conduct of the parties:** The language of the Agreements expressly states that the agreements are sales, not loans:

> **15. Sale of Receivables.** Each Merchant and SA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price *is not intended to be, nor shall it be construed as a loan* from SA to any Merchant . . . . SA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created . . . . Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that *the transaction encompassed by this Agreement is not a loan and does not have an interest rate*.

*See* Agreements, Exhibits B, D, and F, at ¶ 15 (emphasis added). The Trustee suggests that Square acted in a "directly contradictory manner" when it conducted renewals of the Agreements. Motion for Summary Judgment, p. 27. However, renewals are perfectly consistent with the Agreements being sales. As previously mentioned, Square owned the Receivables it purchased under the June Agreement. When the Debtor approached Square expressing further need for immediate capital, Square performed a renewal to accommodate the Debtor's request: instead of collecting the Receivables outstanding under the June Agreement by debiting the Designated Account, Square deducted those Receivables from the Purchase Price. This way, Square collected all the Receivables it purchased, and the Debtor obtained additional immediate capital as requested. *See* Dancour Declaration, Exhibit A, at ¶¶ 19–21. Put simply, the fact that the Agreements were renewed does not suggest that the Agreements are loans.

On balance, even though the *Shoot the Moon* factors are designed to address a different situation and are irrelevant to the resolution of the issues of this case, most of the factors still weigh in favor of the Agreements being sales.

**C.**      **Regardless of the Nature of the Transactions, There Are Issues of Material Fact Regarding Whether the Debtor Received Less than Reasonably Equivalent Value**

Regardless of the nature of the transaction, the Trustee has the burden of bringing forth sufficient evidence to demonstrate that there are no issues of material fact preventing summary judgment in his favor. With respect to the Avoidance Claims, the Trustee has not presented sufficient evidence to show that the Debtor received less than reasonably equivalent value and has thus failed to meet his burden, preventing summary judgment as a matter of law.

**i.**      *The Usurious Loan Theory Is Not a Basis for Finding an Absence of Reasonably Equivalent Value*

The Trustee's main argument in support of the assertion that the Debtor received less than reasonably equivalent value rests on the notion that the Agreements are usurious loans. *See* Motion for Summary Judgment, pp. 35–38. However, as previously explained, the Trustee cannot assert usury offensively and the transactions are not usurious loans under applicable law. As such, there can be no absence of reasonably equivalent value on the basis that the transactions are, somehow, usurious loans. What's more, even if the Trustee could assert that the transactions are usurious loans (he cannot), this would not automatically translate into a finding that the Debtor received less than reasonably equivalent value because, under New York law, the sole remedy for usury "is to have the loan declared void in future enforcement actions brought by the lender," and no such action has been brought by Square against the Debtor. *In re Hill*, 589 B.R. 614, 622 (Bankr. N.D. Ill. 2018) (citing *DLJ Mortgage Capital, Inc. v. Smith*, 2007 N.Y. Slip Op. 32745(U) ¶ 3, 2007 WL 2814513 (N.Y. Sup. Ct. 2007)).

**ii.**      *Sales of Accounts Receivables Are Not Legal Impossibilities*

The Trustee further argues that the transactions did not provide the Debtor with reasonably equivalent value because sales of Receivables are legal impossibilities as future Receivables

26

cannot be sold. *See* Motion for Summary Judgment, pp. 38–44. Nevertheless, this argument has no weight as there is vast authority that disagrees with the Trustee's proposition. Critically, sales of accounts are expressly recognized under the Uniform Commercial Code ("UCC"), which defines "account" as "a right to payment of a monetary obligation." UCC §§ 9-109(a)(3), 9-102(a)(2). UCC § 9-204(a) further states that a party can acquire a security interest in "after-acquired collateral," or property that does not exist yet at the time of the agreement, demonstrating that future Receivables are assignable as property. Moreover, sales of accounts are recognized by New York state courts and federal courts alike. *See, e.g.*, *Diesel Funding*, 248 A.D.3d at 1192 (finding an agreement identical to the Square agreements to be a sale); *Lateral Recovery*, 632 F. Supp. 3d at 458 ("The Form Three agreements, by contrast, are agreements for the purchase of receivables when viewed in their totality."). Lastly, the parties clearly did not intend the transactions to be loans or purchases of securities, as evidenced by Paragraph 7 of the Agreements, which expressly states that each Agreement is "a true sale of Receivables and is not intended to be, nor shall it be construed as, a loan." *See* Agreements, Exhibits B, D, and F, at ¶ 15.

In light of the foregoing, the theoretical arguments advanced by the Trustee are baseless and do not address the crux of the Avoidance Claims, namely whether the transactions provided the Debtor with reasonably equivalent value. The reasonably equivalent value inquiry does not consider whether a transaction is a sale, a loan, or something else entirely; instead, it is an intensive factual inquiry that compares, as of the date that each obligation was incurred by the Debtor, the value of what the Debtor transferred to the value that the Debtor received in exchange. *See In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2008 WL 2037592, at *7 (Bankr. D.D.C. May 12, 2008) (stating that the crux of the analysis is "the fair market value of the consideration received in exchange for the transfer"). In addition to numerical comparisons, courts also look at "the

27

existence of an arm's-length relationship between the debtor and the transferee and good faith on the part of the transferee." *Id.* The Trustee has not addressed any of these issues, failing to meet his burden of proof as to the Avoidance Claims.

### iii. *The Court Cannot Grant Leave to Amend the Complaint Because the Trustee's Request is Procedurally Improper, Unduly Delayed, and Prejudicial to Square*

The Trustee further suggests that, because sales of accounts receivable are legally impossible, Square must have violated securities laws. Motion for Summary Judgment, p. 43. The Trustee even requests that leave to amend be afforded to bring additional claims for securities fraud should the Court not rule in his favor. Motion for Summary Judgment, pp. 43–44. However, the Trustee is barred from doing so for several reasons.

First, the Trustee's request is procedurally improper as a request to amend may not be made through a summary judgment motion — it must be made through a separate, written motion. *See, e.g.*, *Benoit v. U.S. Dep't of Agric.*, 608 F.3d 17, 21 (D.C. Cir. 2010) (stating a request for leave to amend "must be submitted in the form of a written motion," stating "with particularity the grounds for seeking the order and state the relief sought" (internal quotation marks omitted)); *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 256 (D.D.C. 2018) (stating a request for leave to amend must be in the form of a written motion and that a complaint cannot be amended through a summary judgment brief).

Second, it would be highly prejudicial to Square if the Trustee were allowed to amend the Complaint after discovery has been concluded and summary judgment fully briefed and resolved. The Trustee's should not be rewarded for his undue delay with an opportunity to amend the pleadings to include frivolous claims against Square. *See, e.g.*, *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 247 (D.C. Cir. 1987) (holding that denial of a request for

28

leave to amend is proper "if the amendment would result in delay or undue prejudice to the opposing party"). In *Williamsburg Wax Museum*, the DC Circuit affirmed a denial of a request for leave to amend when the request was made after the parties conducted "extensive discovery" and after summary judgment had been resolved, and when the amendment would "raise an entirely new issue." *Id.* In *Unique Indus., Inc. v. 965207 Alberta Ltd.*, the plaintiff sought leave to amend to add a claim to the complaint at the close of discovery and after the parties submitted summary judgment papers. 764 F. Supp. 2d 191, 207–08 (D.D.C. 2011). The District of DC denied leave to amend, finding that the other parties would be prejudiced and that the plaintiff's delay in seeking leave to amend was undue. *Id.* at 208. As in those cases, the Trustee's improper request for leave to amend must be denied as it would be highly prejudicial for Square to have to litigate and conduct additional discovery on an entire new claim when discovery is completed and the parties have already litigated the action through the summary judgment stage.

Lastly, an amendment of the Complaint to include claims for securities laws violations would be futile and a waste of the Court and the parties' time and resources. The Trustee's contention that Square violated securities laws derives from the erroneous assertion that sales of account receivables are legal impossibilities. As already demonstrated, sales of accounts are expressly recognized under the UCC and by ample case law, especially in the state of New York. The Agreements cannot violate securities laws because, by their own terms, they are sales and not assignments of securities. *See* Agreements, Exhibits B, D, and F, at ¶ 15 (stating the agreement is a "Sale of Receivables"). As such, new claims would be frivolous, and the Trustee should not be permitted to amend the Complaint.

In light of the foregoing, the Court cannot grant the Trustee leave to amend the Complaint.

####            iv.        *The Transactions Provided the Debtor with Reasonably Equivalent Value*

After making lengthy theoretical arguments that are irrelevant to the case, the Trustee merely offers a report by Lauren P. Berret (the "**Berret Report**," attached to the Trustee's Motion for Summary Judgment as Exhibit K) in support of his argument that the Debtor received less than reasonably equivalent value. As a threshold matter, an expert cannot make a legal conclusion regarding whether reasonably equivalent value was received. That is a legal conclusion that belongs solely to this Court. *See United States v. Sutton*, 642 F. Supp. 3d 57, 66 (D.D.C. 2022) (stating that the Federal Rules of Evidence are "not intended to allow experts to offer opinions embodying legal conclusions"). More importantly, the circumstances clearly show that the Debtor received reasonably equivalent value from its transactions with Square as the Debtor received substantial cash infusions from Square in exchange for which the Debtor had to remit a small percentage of its Receivables. *See* Agreements, Exhibits B, D, and F.

Under both 11 U.S.C. § 548 (Counts I and III) and DC Code § 28-3105 (Count II), the Trustee must demonstrate that the Debtor received less than "reasonably equivalent value" in exchange for incurring the obligations under the Agreements. 11 U.S.C. § 548(a)(1)(B)(i); DC Code § 28-3105(a). The transactions are sales, meaning that the "transfers" at issue, or, rather, the "obligations," are the Debtor's assignments of its accounts receivable to Square which occurred when Square paid the Purchase Price to the Debtor under each Agreement. Because of this, the presence or absence of reasonably equivalent value must be evaluated at the time each transaction was entered into, without the benefit of hindsight. *See In re Greater Se. Cmty. Hosp.*, 2008 WL 2037592, at *7 (explaining that the reasonably equivalent value issue "must be evaluated as of the date of the transaction"); *Alberts v. HCA, Inc.*, 496 B.R. 1, 15 (D.D.C. 2013) ("Whether a transfer was for reasonably equivalent value must be determined as of the date of the transaction.").

30

Reasonably equivalent value is found when "the debtor has received value that is substantially comparable to the worth of the transferred property." *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548 (1994). In this respect, this court has quoted Professor Jack F. Williams, stating:

> [I]t is hard to imagine the case where the parties acted in good faith, reaching a price through a willful sale at arm's length, and still conclude that the values exchanged shock the conscience. . . . . Therefore, ***as long as the divergence from the actual fair market value arises in an arm's length transaction and is attributable to good faith negotiations, then the transfer price is within the range of acceptable consideration, that is, reasonably equivalent value*** . . . . The functional approach to reasonably equivalent value recognizes that ***the purpose of fraudulent transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by arm's length negotiations. Such a transfer should not be a viable target of fraudulent transfer law.***

*In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2012 WL 589269, at *13 (Bankr. D.D.C. Feb. 22, 2012), *aff'd sub nom. Alberts v. HCA, Inc.*, 496 B.R. 1 (D.D.C. 2013) (quoting Jack F. Williams, *Revisiting the Proper Limits of Fraudulent Transfer Law*, 8 Bankr. Dev. J.55, 84–86 (1991) (emphasis added)).

First of all, the Berret Report does not evaluate reasonably equivalent value as of the date of each Agreement because it looks at the Agreements in hindsight, considering the remittance history and the Debtor's accounts receivable throughout the duration of the Agreements. *See* Berret Report, pp. 22–23, 26–27, 29–30. Nor does the Berret Report consider whether the parties acted in good faith, whether negotiations were conducted at arm's length, or whether the Purchase Prices aligned with the market value of the Receivables purchased, which are all important factors in determining reasonably equivalent value. *See* Berret Report; *In re Greater Se. Cmty. Hosp. Corp. I*, No. 02-02250, 2008 WL 2037592, at *7 (Bankr. D.D.C. May 12, 2008) (stating that courts consider fair market value, the existence of an arm's-length relationship, and good faith); *In re Greater Se. Cmty. Hosp. Corp. I*, 2012 WL 589269, at *13.

Instead, several factors show that the Debtor received reasonably equivalent value. First, Square and the Debtor entered into the transactions in good faith following several arm's length negotiations.

Second, in exchange for incurring the obligation to remit a percentage of its Receivables to Square, the Debtor received from Square a Purchase Price, which represented immediate and certain operating funds at a time when the Debtor needed them. A Debtor's need for the provided benefit as of the date of the transaction may reasonably increase the cost of the transaction without necessarily translating into an absence of reasonably equivalent value.

Third, the difference between the Purchase Price and the Receivables Purchased Amount reflected, among other things, the risk that Square was incurring by entering into the transactions (*i.e.*, the risk of non-collection). Said cost was reasonably incurred by the Debtor because the Debtor was in need of immediate capital, which should be taken into account when assessing whether reasonably equivalent value was given.

Lastly, by purchasing the Debtor's Receivables at a discount without imposing on the Debtor a duty of absolute repayment, Square was likely instrumental in delaying the Debtor's insolvency by providing immediate operating capital to the Debtor at a time when the Debtor was either unable or unwilling to obtain traditional financing. All these factors should be considered when determining whether the Debtor received less than reasonably equivalent value.

The reasonably equivalent value determination requires an inherently factual inquiry that cannot be made without full factual development of the record. Given the lack of adequate evidence presented by the Trustee, who carries the initial burden of showing that summary judgment is appropriate, the Court cannot grant summary judgment on the Avoidance Claims.

III.    <u>**Summary Judgment Is Not Appropriate on the Unjust Enrichment Claims**</u>

Lastly, the Trustee argues that summary judgment is appropriate on the unjust enrichment claim on the basis that the transactions were, again, usurious loans. *See* Motion for Summary Judgment, pp. 47–49. As fully demonstrated in the previous sections, the transactions are not loans, let alone usurious loans, under applicable law. What's more, the Trustee, again, is barred from asserting usury offensively as a basis of relief under New York law.

Throughout this Response, Square has demonstrated that there are numerous issues of material fact that prevent the court from recharacterizing the transactions as loans at the summary judgment stage. Because the Trustee's unjust enrichment claim is wholly based on the erroneous assumption that the transactions are usurious loans, the Trustee has failed to bring forth sufficient evidence to prove an essential element of the claim: that Square's retention of the "benefit" is "unjust." *See News World Commc'ns, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005) (listing the elements of an unjust enrichment claim under DC common law). In other words, because the transactions are sales of accounts, and because the Trustee is barred from asserting that the transactions are usurious loans, the Trustee has failed to provide *any* basis whatsoever to show that Square's retention of the Receivables remitted by the Debtor is unjust.

Under D.C. common law, the elements of an unjust enrichment claim are: "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *Glasgow v. Camanne Mgmt. Inc.*, 261 A.3d 208, 219 (D.C. 2021) (quoting *News World Comms.*, 878 A.2d at 1222).

Here, the Trustee's Motion for Summary Judgment lacks the most basic element of an unjust enrichment claim: the Trustee has not demonstrated that the Debtor conferred a "benefit" to Square. The Trustee merely states that the remittances made to Square (described in the Motion

33

for Summary Judgment as "payments") constitute a "benefit" because they were monetary payments. *See* Motion for Summary Judgment, pp. 47–48. However, in remitting the purchased Receivables, the Debtor did not "confer a benefit" to Square; rather, the Debtor was delivering to Square property that already belonged to Square, as expressly stated in the Agreements:

> Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SA and that each Merchant will hold Receivables in trust for SA in its capacity as fiduciary for SA.

Agreements, Exhibits B, D, and F, at ¶ 1. From the moment the Debtor received the Purchase Price from Square, the Specified Percentage of the Receivables became Square's property. As such, there cannot have been a transfer of a benefit by the Debtor to Square because Square owned the Receivables that the Trustee now seeks to identify as "benefit."

The elements of the unjust enrichment claim also require the Trustee to show that retention of the purported benefit by Square is "unjust" because the benefit "in justice and equity belongs to another." *Falconi-Sachs v. LPF Senate Square, LLC*, 142 A.3d 550, 556 (D.C. 2016) (quoting *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 63 (D.C. 2005)). Nevertheless, the Trustee cannot demonstrate that Square's retention of the Receivables is unjust for the same reasons that the Trustee cannot demonstrate that the Debtor conferred a benefit to Square: the remitted Receivables belong to Square and are not property of the Debtor, thus Square rightfully retains the Receivables because there can be no inequity in retaining one's own property.

Lastly, the unjust enrichment claim cannot stand as a matter of law because of the documented existence of express agreements that governed the conduct of the parties. *See* Agreements, B, D, and F. D.C. courts have held that "there can be no claim for unjust enrichment when an express contract exists between the parties." *See, e.g.*, *Schiff v. Am. Ass'n of Retired*

34

*Persons*, 697 A.2d 1193, 1194 (D.C. 1997). "[W]here the parties have a contract governing an aspect of the relation between themselves, a court will not displace the terms of that contract and impose some other duties not chosen by the parties." *Emerine v. Yancey*, 680 A.2d 1380, 1384 (D.C. 1996); *see also Wilderness Soc. v. Cohen*, 267 A.2d 820, 822 (D.C. 1970) (holding that the plaintiff could not recover via an unjust enrichment claim when the conduct of the parties "was expressly covered by the contract terms").

Here, the express terms of the Agreements governed the conduct of the parties, specifically the Debtor's remittance of the purchased Receivables. *See* Agreements, Exhibits B, D, and F, at ¶ 1 (governing methods of remittance). Other than attempting to invalidate the Agreements by recharacterizing them as usurious loans (a theory that New York law expressly prohibits), the Trustee has not presented sufficient facts to demonstrate that summary judgment is appropriate as to each element of the unjust enrichment claim. As such, the Trustee has failed to meet his burden, and summary judgment must be denied. Alternatively, to the extent that the Court finds that the Trustee has met his burden, the Court cannot grant summary judgment on the unjust enrichment claim because there are genuine issues of material fact regarding the nature of the transaction.

## CONCLUSION

There are several disputes of material fact that prevent this Court from granting summary judgment in favor of the Trustee.

First, the Trustee Motion for Summary Judgment is based on the erroneous assumption that the Agreements are usurious loans.

Second, the Trustee has not demonstrated that the Debtor received less than reasonably equivalent value as a result of entering into the Agreements with Square, which defeats the Avoidance Claims.

Third, the Trustee has not demonstrated that he is entitled to summary judgment on the unjust enrichment claim because the record shows that Square did not receive a benefit nor that it was unjust for it to retain it.

As such, Square respectfully requests that the Court deny the Trustee's Motion for Summary Judgment.

Dated: August 12, 2026                              Respectfully Submitted,

                                                    SQUARE FUNDING, LLC


                                                    */s/ Christopher A. Jones*
                                                    Christopher A. Jones (Bar# VA030)
                                                    Whiteford Taylor & Preston L.L.P
                                                    3190 Fairview Park Drive, Suite 800
                                                    Falls Church, VA 22042
                                                    (703) 280-9263 (telephone)
                                                    Email: cajones@whitefordlaw.com

                                                    Shanna M. Kaminski, Esq.
                                                    Kaminski Law, PLLC
                                                    *Court Admission Pending*
                                                    P.O. Box 247
                                                    Grass Lake, MI 49240
                                                    (248) 462-7111 (telephone)
                                                    Email: skaminski@kaminskilawpllc.com

                                                    *Counsel for Square Funding, LLC*

## Certificate of Service

I hereby certify that on this 12th day of August, 2026, a copy of the foregoing *Response to the Trustee's Motion for Summary Judgment* was filed and served via the Court's Electronic Case Filing System on all parties receiving such notification.

<div align="right">

/s/ *Christopher A. Jones*

</div>

**Exhibit A**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In re: | ) | Case No. 23-378-ELG |
| | ) | |
| BROUGHTON CONSTRUCTION CO., LLC | ) | (Chapter 7) |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| WENDELL WEBSTER, in his official capacity | ) | |
| As chapter 7 trustee and as assignee of Industrial | ) | Adv. Case No. 25-10054-ELG |
| Bank and Nationwide Mutual Insurance Company | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SQUARE FUNDING LLC | ) | |
| d/b/a SQUARE ADVANCE | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**DECLARATION OF MOSHE DANCOUR**

I, Moshe Dancour, hereby declare and state as follows:

1.      I am a Manager at Square Funding LLC ("Square"). As a Manger of Square, I have access to the books and records of Square kept in the ordinary course of Square's business. I make this Declaration based on my review of those records and from personal knowledge.

2.      Square specializes in providing working capital to businesses via revenue-based financing products.

3.      In 2022, Broughton Construction Co., LLC approached Square and filed an application to obtain working capital for its business. As a result, Broughton Construction Co., LLC entered into three (3) Standard Merchant Cash Advance Agreements ("Agreements") with Square during 2022.

4.      Under the Agreements, Broughton Construction Co., LLC sold, assigned, and transferred to Square a certain amount ("Receivables Purchased Amount") of "all of each Merchant's future accounts, [c]ontract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services," defined in the Agreements as "Receivables."

5.      The terms of each of the three (3) transactions are summarized as follows:

| Date | Receivables Purchased Amount | Purchase Price | Specified Percentage | Initial Estimated Payment |
|---|---|---|---|---|
| 6/14/2022 | $699,500 | $500,000 | 25% | $29,145.83/week |
| 9/8/2022 | $775,500 | $550,000 | 25% | $32,312.50/week |
| 12/9/2022 | $846,000 | $600,000 | 14% | $38,454.54/week |

6.      Under all three (3) Agreements, Broughton Construction Co., LLC was not obligated to make payments in specified amount to Square. There are also no payment terms either express or implied in the Agreements. Under the Agreements, the only obligation of Broughton Construction Co., LLC was to remit the Specified Percentage of Receivables weekly until the Receivables Purchased Amount was remitted to Square.

7.      There was no specific time period within which Broughton Construction Co., LLC had to remit the Receivables Purchased Amount. In fact, all three (3) Agreements state, in relevant part, that the Agreements had an "indefinite" duration and that Broughton Construction Co., LLC's obligation to remit Receivables was "conditioned upon" its sale of products or services and the payment to it by its customers.

8.      The obligation to remit the Specified Percentage of Receivables was completely contingent on Broughton Construction Co., LLC having Receivables in  a given week. If Broughton Construction Co., LLC had no Receivables, then it was not obligated to remit anything to Square and not making a remittance under such circumstances was not an Event of Default under the Agreements.

9.      Broughton Construction Co., LLC and Square agreed in the Agreements that the Receivables would be remitted by Square debiting via ACH debit a deposit account designated in the Agreements ("Account") into which all Receivables were to be deposited. The Account was meant to be held in trust by Broughton Construction Co., LLC for the benefit of Square, as stated in the Agreements at Paragraph 1.

10.      Broughton Construction Co., LLC and Square agreed in Agreements that initially, to obtain the Specified Percentage of Receivables, Square would ACH debit the Initial Estimated Payment each week. These amounts were determined to be the Specified Percentage of weekly Receivables by reviewing historical Receivables information, calculating an average of the weekly Receivables and then the Specified Percentage of the average weekly Receivables.

11.      At any time after the each of the three (3) Agreements was entered into, Broughton Construction Co., LLC had the right to request a reconciliation to "in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables" under the Agreements. The reconciliation process is summarized in detail in Paragraph 4 of the Agreements. If a request for a reconciliation had been made by Broughton Construction Co., LLC under the Agreements (no such request was ever made), Square was *required* to provide one within two (2) business days after receipt of such request and an accounting of how the reconciliation was performed would have been provided to it.

12.     While Broughton Construction Co., LLC agreed to remit the Receivables in the manner provided for in the Agreements (i.e. via ACH debits from the Account) that did not mean it was the only means for Square to collect the Receivables. The Agreements did not divest Square of right or ability to collect the Receivables directly from account debtors nor was Broughton Construction Co., LLC solely responsible to collect Receivables. Instead, Square had the right to direct customers or account debtors to make payments directly to Square if it chose to do so or if it was otherwise agreed by the parties that is how remittances would be made rather than via the ACH debits.

13.     There is no interest rate associated with the Agreements at all, nor can an interest rate be calculated because the Agreements do not have a finite term as there was no guarantee Receivables would be remitted each week to Square.

14.     Square did not have any recourse against Broughton Construction Co., LLC if Broughton Construction Co., LLC declared bankruptcy in the ordinary course unless Broughton Construction Co., LLC had committed one or more Events of Default under the Agreements prior to filing for bankruptcy.

15.     Casey Stringer executed a Guaranty of Performance of all the Agreements, which provides that he "guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to SA in the Agreement (the "Guaranteed Obligations")." There is nothing in the Agreements stating Mr. Stringer is liable to pay anything to Square, let alone that he has any immediate personal liability to pay anything to Square if Broughton Construction Co., LLC does not collect Receivables. Instead, Square could only bring a breach of contract claim against Mr. Stringer seeking damages for a breach of the Guaranty of Performance.

16.     Prior to entering into any transaction, Square conducts a thorough investigation of the seller's business, its revenue, and its account debtors to ensure that the seller has sufficient revenue to sustain the obligations under the agreement. Accordingly, Square conducted an investigation of Broughton Construction Co., LLC prior to entering into each of the Agreements and it determined, based on the information provided by Broughton Construction Co., LLC, that Broughton Construction Co., LLC had sufficient revenue to sustain its obligations under the Agreements.

17.     Square paid $487,500, which amount equaled the Purchase Price minus any fees outlined in the Agreement, to Broughton Construction Co., LLC to purchase the Receivables Purchased Amount under the Agreement executed on June 14, 2022 ("June Agreement").

18.     Broughton Construction Co., LLC remitted a total of $349,749.96 of $699,500 in Receivables purchased by Square under the June Agreement.

19.     Because Broughton Construction Co., LLC had not remitted the entire Receivables Purchased Amount under the June Agreement by the time a second Agreement was entered into on September 8, 2022 ("September Agreement"), Square collected the Receivables outstanding under the June Agreement by deducting them from the Purchase Price under the September Agreement, as explained in an Addendum to the September Agreement. Pursuant to the September Agreement, Square paid the Debtor $187,750 to purchase the Receivables Purchased Amount from Broughton Construction Co., LLC, which amount equaled the Purchase Price minus any fees outlined in the September Agreement and the Receivables outstanding under the June Agreement.

20.     The Debtor remitted a total of $420,062.50 of $775,500 in Receivables purchased by Square under the September Agreement.

21.     Because Broughton Construction Co., LLC had not remitted the entire Receivables Purchased Amount under the September Agreement by the time a third Agreement was entered into on December 9, 2022 ("December Agreement"), Square collected the Receivables outstanding under the September Agreement by deducting them from the Purchase Price under the December Agreement, as explained in an Addendum to the December Agreement. Pursuant to the December Agreement, Square paid the Debtor $232,062.50 to purchase the Receivables from Broughton Construction Co., LLC, which amount equaled the Purchase Price minus any fees outlined in the December Agreement and the Receivables outstanding under the September Agreement.

22.     The Debtor remitted a total of $522,545 of $846,000 in Receivables purchased by Square under the December Agreement.

23.     As of the date Broughton Construction Co., LLC filed for bankruptcy, Square had not collected $423,454.60 of Receivables purchased by Square under the Agreements.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Dated: August 12, 2026

_____
MOSHE DANCOUR

SQ-000001

# Exhibit B

**SQUARE ADVANCE LLC**
**90 E Halsey Rd, Parsippany, NEW JERSEY 07054**
**848.299.9005**

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated ___June 14, 2022___ by and between SQUARE ADVANCE LLC ("SA") and the merchant listed below (the" Merchant").

Merchant's Legal Name: BROUGHTON CONSTRUCTION COMPANY LLC

D/B/A:_____   Fed ID #: 11-3768300

Type of Entity: LIMITED LIABILITY COMPANY

Business Address: 4832 Nannie Helen Burroughs Ave NE   City: Washington   State: DC   Zip: 20019

Contact Address: 4832 Nannie Helen Burroughs Ave NE   City: Washington   State: DC   Zip: 20019

Email Address: cstringer@broughtonconstruction.com   Phone Number:_____

| | |
|---|---|
| **Purchase Price** <br> *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | **$500,000.00** |
| **Receivables Purchased Amount** <br> *This is the amount of Receivables (defined in Section 1 below) being sold.* | **$699,500.00** |
| **Specified Percentage** <br> *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | **25%** |
| **Net Funds Provided** <br> *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | **$487,500.00** |
| **Net Amount to Be Received Directly by Merchant(s)** <br> *This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to an Addendum to this Agreement.* | **$487,500.00** |
| **Initial Estimated Payment** <br> *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **$29,145.83** <br> **per WEEK** |

## TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to SA (making SA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, ontract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SA and that each Merchant will hold Receivables in trust for SA in its capacity as a fiduciary for SA.

The Receivables Purchased Amount shall be paid to SA by each Merchant irrevocably authorizing only one depositing account acceptable to SA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as SA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes SA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide SA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). SA is not responsible for any overdrafts or rejected transactions that may result from SA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER   Name:_____

Title: Owner   Title:_____

Date: June 14, 2022   Date:_____

1

## STANDARD MERCHANT CASH ADVANCE AGREEMENT      SQ-000002

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to SA for the following fees, where applicable:

A.   $12,500.00   - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee  Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default  $2,500.00  If SA considers an Event of Default to have taken place under Section 34.

D. UCC Fee  $195.00 – to cover SA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of SA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that SA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific ___WEEK___ will be capped at _____$29,145.83___ (the "Cap"). If the Specified Percentage of all Receivables for a specific ___WEEK___ is less than the Cap, then in addition to the Specified Percentage of Receivables for that ___WEEK___, SA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that ___WEEK___ does not exceed the Cap. The Cap is not applicable to make up for a business day on which SA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by SA to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to SA requesting that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@SAfunding.com and such notice will be deemed to have been received if and when SA sends a reply e-mail (but not a read receipt). If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled within seven days thereafter. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request or one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying SA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to SA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide SA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize SA and/or its agent(s) to deduct the amounts owed to SA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to SA by permitting SA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent SA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until SA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER          Name:

Title: Owner          Title:

Date: June 14, 2022          Date:

2

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**     **SQ-000003**

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to SA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes SA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to SA any bank or financial statements, tax returns, and other documents and records, as SA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. SA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** SA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between SA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for SA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.
SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of SA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. SA may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to SA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize SA, its agents and representatives, and any creditreporting agency engaged by SA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to SA under this Agreement or for SA's ability to determine any Merchant's eligibility to enter into any future agreement with SA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.
Authorization for soft pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information solely to conduct a pre-qualification for credit.
Authorization for hard pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide SA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by SA for monies owed to SA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by SA.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER

Title: Owner

Date: June 14, 2022

Name: _____

Title: _____

Date: _____

3

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**     **SQ-000004**

**14. No Liability.** In no event will SA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and SA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SA to any Merchant. SA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in SA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. SA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to SA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints SA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SA, or, if SA considers an Event of Default to have taken place under Section 34, to settle all obligations due to SA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SA; and (v) to file any claims or take any action or institute any proceeding which SA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by SA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

b) Any Merchant changes its arrangements with any Processor in any way that is adverse to SA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of SA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to SA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to SA at law, in equity, or otherwise available pursuant to this Agreement.

(f) SA considers any vent of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. SA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. SA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. SA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by SA, Merchant shall deliver to SA an executed assignment of lease of each Merchant's premises in favor of SA. Upon breach of any provision in this Section 17, SA may exercise its rights under such assignment of lease.

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| Name: CASEY BROUGHTON STRINGER | Name: |
| Title: Owner | Title: |
| Date: June 14, 2022 | Date: |

4

**STANDARD MERCHANT CASH ADVANCE AGREEMENT** **SQ-000005**

Protection 6. SA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. SA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to SA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to SA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints SA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to SA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes SA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against SA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of SA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by SA, including this Agreement and any other SA documents (collectively, "Confidential Information") are proprietary and confidential information of SA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of SA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that SA may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to SA, and future statements which will be furnished hereafter at the request of SA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise SA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain businessinterruption insurance naming SA as loss payee and additional insured in amounts and against risks as are satisfactory to SA and shall provide SA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without SA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to SA or change any place(s) of its business without prior written consent from SA.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER         Name:

Title: Owner         Title:

Date: June 14, 2022         Date:

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**       **SQ-000006**

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from SA to that Merchant, execute, acknowledge, and deliver to SA and/or to any other person or entity specified by SA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of SA, other than any for which SA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than SA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of SA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to SA under this Agreement and any future agreement with SA, each Merchant hereby grants to SA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accountsreceivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to SA under any other agreement between any Merchant or Guarantor and SA (the "CrossCollateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the CrossCollateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as SA deems necessary to perfect or maintain SA's first priority security interest in the Collateral and the CrossCollateral, including the execution of any account control agreements. Each Merchant hereby authorizes SA to file any financing statements deemed necessary by SA to perfect or maintain SA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to SA with respect to the Collateral and the CrossCollateral, and that any subsequent lienor may be tortiously interfering with SA's rights. Each Merchant shall be liable for and SA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by SA in protecting, preserving, and enforcing SA's security interest and rights. Each erchant further acknowledges that SA may use another legal name and/or D/B/A or an agent when designating the Secured Party hen SA files the abovereferenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

**I have read and agree to the terms and conditions set forth above:**

Name: _CASEY BROUGHTON STRINGER_____         Name:_____

Title: _Owner_____         Title: _____

Date: _June 14, 2022_____         Date: _____

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**   **SQ-000007**

(1) Any representation or warranty by any Merchant in any Agreement with SA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(2) Any Merchant changes the Account without providing written notice to SA within one business day thereafter;

(3) SA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(4) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by SA;

(5) Any Merchant causes any ACH debit to the Account by SA to be blocked or stopped without providing any advance written notice to SA, which notice may be given by e-mail to ;

(6) Any Merchant intentionally prevents SA from collecting any part of the Receivables Purchased Amount; or

(7) Any Merchant causes any ACH debit to the Account to be stopped that would result in an ACH Return Code of R08, R10 or R29 and that Merchant does not within two business days thereafter provide SA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to .

**35. Remedies.** In case any Event of Default occurs and is not waived, SA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of SA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by SA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, SA may elect that Merchant(s) be required to pay to SA 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by SA in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), SA will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to SA's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount. In addition to the foregoing, in case any Event of Default occurs and is not waived, SA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to a notice and hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order. .

**36. Required Notifications.** Each Merchant is required to give SA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give SA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SA, which consent may be withheld in SA's sole discretion. SA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER                    Name:

Title: Owner                                      Title:

Date: June 14, 2022                               Date:

### STANDARD MERCHANT CASH ADVANCE AGREEMENT    SQ-000008

From and after the effective date of any such assignment or transfer by SA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or SA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between SA and such assignee (the "Assignment Agreement"), have the rights and obligations of SA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, SA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, SA may disclose all information that SA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon SA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder to SA shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to 633 NE 167th Street, Suite 831, North Miami Beach, FL 33162 and shall become effective only upon receipt. All notices, requests, consents, demands, and other communications hereunder to Merchant(s) and Guarantor(s) shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| Name: CASEY BROUGHTON STRINGER | Name: |
| Title: Owner | Title: |
| Date: June 14, 2022 | Date: |

8

### STANDARD MERCHANT CASH ADVANCE AGREEMENT     SQ-000009

**46. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Merchant and each Guarantor irrevocably authorize and direct each of their respective financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Merchant's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**51. Waiver.** No failure on the part of SA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER                      Name:_____

Title: Owner_____       Title: _____

Date: June 14, 2022_____        Date: _____

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to SA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of SA. Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement.Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify SA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that SA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. SA will not be permitted to enforce any of its rights under this Agreement without the express written consent of Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

### SIGNATURES TO FOLLOW ON NEXT PAGE

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER            Name:_____

Title: Owner_____    Title: _____

Date: June 14, 2022_____    Date: _____

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**    **SQ-000011**

## EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER       Owner

     Print Name            Title            Signature

SS#:            Driver License Number:


**FOR THE MERCHANT/OWNER (#2)**

By:

     Print Name            Title            Signature

SS#:            Driver License Number:


Approved for SQUARE ADVANCE LLC by :

11

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**   **SQ-000012**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated ___June 14, 2022___, of the Standard Merchant Cash Advance Agreement, dated ___June 14, 2022___ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between SQUARE ADVANCE LLC  ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to SA in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Guarantor agrees that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**G3. Guarantor Waivers.** If SA considers any Event of Default to have taken place under the Agreement, then SA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or CrossCollateral SA may hold pursuant to this Guarantee or any other agreement or guarantee. SA does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) SA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to SA. In addition, SA may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to SA; (ii) if there is more than one Merchant, release a Merchant from its obligations to SA such that at least one Merchant remains obligated to SA; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to SA under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, SA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to notice and a hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER                    Name:

Title: Owner                                       Title:

Date: June 14, 2022                                Date:

12

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with SA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER    Name:_____

Title: Owner_____  Title: _____

Date: June 14, 2022_____ Date: _____

13

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

In case any Event of Default occurs and is not waived, each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Guarantor irrevocably authorizes and directs each of its financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Guarantor's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER                    Name:

Title: Owner                                       Title:

Date: June 14, 2022                                Date:

14

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE

**FOR THE MERCHANT/OWNER (#1)**

DocuSigned by:

By: CASEY BROUGHTON STRINGER        Owner
                                                                            636AA6CC0203478
        Print Name                        Title                              Signature

SS#.                            Driver License Number:


**FOR THE MERCHANT/OWNER (#2)**

By:

        Print Name                        Title                              Signature

SS#:                            Driver License Number:

15

# BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from Square Advance LLC. We look forward to being your funding partner.

You authorize Square Advance LLC to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

Square Advance LLC will require viewing access to your bank account, each business day.

Square Advance LLC will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of Bank: M&T Bank

Name of account:

Account number:                              Routing number:

Bank portal website:

Username:

Password:

Security Question/Answer 1:

Security Question/Answer 2:

Security Question/Answer 3:

Any other information necessary to access your account: N/A

Please note: In the event that we are unable to access your account, we will take a daily estimated payment.

If you have any questions, please feel free to contact us directly at 848.299.9005.

**DECLARATION OF ORDINARY COURSE OF BUSINESS**          **SQ-000017**

Each undersigned hereby declares the following:

1. I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___June 14, 2022___, between SQUARE ADVANCE LLC ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant") on behalf of Merchant.

2. This Declaration incorporates by reference the Agreement and every addendum to it.

3. I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4. I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5. I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6. I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7. I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8. I acknowledge that the payments to be made from any Merchant to SA under the Agreement are being made in the ordinary course of each Merchant's business.

9. I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.

10. **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**


Executed on          June 14, 2022
                          (Date)

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner
         Print Name                              Title                              Signature

**FOR THE MERCHANT/OWNER (#2)**

By:
         Print Name                              Title                              Signature

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT** SQ-000018
**FOR ADDITIONAL FEES**

This is an Addendum, dated June 14, 2022, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated June 14, 2022 between SQUARE ADVANCE LLC ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by SA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives SA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by SA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by SA or may be collected in addition to any other payment collected by SA under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner
　　　　Print Name                              Title                                    Signature
                                                                                    636AA6CC0203478...

**FOR THE MERCHANT/OWNER (#2)**

By: 
　　　　Print Name                              Title                                    Signature

18

DocuSign Envelope ID: 7B414E80-95A3-45B6-9E78-01F2573138CF

SQ-000019

### ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
### FOR ESTIMATED PAYMENTS

This is an Addendum, dated ___June 14, 2022___, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___June 14, 2022___ between SQUARE ADVANCE LLC ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement. Instead of debiting the ___25%___ Specified Percentage of Merchant's Receivables, SA may instead debit ___$29,145.83___ ("Estimated Payment") from the Account every ___WEEK___. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

Any Merchant may request that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under the Agreement. Any Merchant may request such a reconciliation by giving written notice of the request to SA. A reconciliation may also be requested by email to . If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of the Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER        Owner

DocuSigned by:

636AA6CC0203478...

| Print Name | Title | Signature |

**FOR THE MERCHANT/OWNER (#2)**

By:

| Print Name | Title | Signature |

# Exhibit C

| Deal ID | SQ225206 |
|---|---|
| Company | BROUGHTON CONSTRUCTION COMPANY LLC |
| Date | 6/14/2022 |
| Status | PAID IN FULL |
| | |
| Principal | $500,000.00 |
| Payback | $699,500.00 |
| Bank Fee | $12,500.00 |
| Type | MCA |
| | |
| Net | $487,500.00 |
| | |
| Paid | $699,500.00 |
| Paid % | 100.00% |
| Balance | $0.00 |

| Date | Description | Amount |
|---|---|---|
| 6/21/2022 | Square Advance SQ225206 B Jun 21 CCD | $29,145.83 |
| 6/27/2022 | Square Advance SQ225206 B Jun 27 CCD | $29,145.83 |
| 7/5/2022 | Square Advance SQ225206 B Jul 5 CCD | $29,145.83 |
| 7/12/2022 | Square Advance SQ225206 B Jul 12 CCD | $29,145.83 |
| 7/19/2022 | Square Advance SQ225206 B Jul 19 CCD | $29,145.83 |
| 7/26/2022 | Square Advance SQ225206 B Jul 26 CCD | $29,145.83 |
| 8/2/2022 | Square Advance SQ225206 B Aug 2 CCD | $29,145.83 |
| 8/9/2022 | Square Advance SQ225206 B Aug 9 CCD | $29,145.83 |
| 8/16/2022 | Square Advance SQ225206 B Aug 16 CCD | $29,145.83 |
| 8/23/2022 | Square Advance SQ225206 B Aug 23 CCD | $29,145.83 |
| 8/30/2022 | Square Advance SQ225206 B Aug 30 CCD | $29,145.83 |
| 9/6/2022 | Square Advance SQ225206 B Sep 6 CCD | $29,145.83 |
| 9/9/2022 | BROUGHTON CONSTRUCTION COMPANY LLC 2 Renew | $349,750.04 |

**SQ-000020**

# Exhibit D

**SQUARE**
ADVANCE

## SQUARE ADVANCE
**90 E Halsey Rd, Parsippany, NEW JERSEY 07054**
**848.299.9005**

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated ___September 08, 2022___ by and between SQUARE ADVANCE ("SA") and the merchant listed below (the" Merchant").

Merchant's Legal Name: BROUGHTON CONSTRUCTION COMPANY LLC

D/B/A: _____ Fed ID #: 11-3768300 _____

Type of Entity: LIMITED LIABILITY COMPANY

Business Address: 4832 Nannie Helen Burroughs Ave NE    City: Washington    State: DC    Zip: 20019

Contact Address: 4832 Nannie Helen Burroughs Ave NE    City: Washington    State: DC    Zip: 20019

Email Address: cstringer@broughtonconstruction.com    Phone Number: _____

| | |
|---|---|
| **Purchase Price**<br>*This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | **$550,000.00** |
| **Receivables Purchased Amount**<br>*This is the amount of Receivables (defined in Section 1 below) being sold.* | **$775,500.00** |
| **Specified Percentage**<br>*This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | **25%** |
| **Net Funds Provided**<br>*This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | **$537,500.00** |
| **Net Amount to Be Received Directly by Merchant(s)**<br>*This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to an Addendum to this Agreement.* | **$187,749.96** |
| **Initial Estimated Payment**<br>*This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **$32,312.50**<br>**per WEEK** |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to SA (making SA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, ontract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SA and that each Merchant will hold Receivables in trust for SA in its capacity as a fiduciary for SA.

The Receivables Purchased Amount shall be paid to SA by each Merchant irrevocably authorizing only one depositing account acceptable to SA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as SA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes SA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide SA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). SA is not responsible for any overdrafts or rejected transactions that may result from SA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

*Casey Broughton Stringer*
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER    Name: _____

Title: Owner    Title: _____

Date: September 08, 2022    Date: _____

1

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to SA for the following fees, where applicable:

A.    $12,500.00    - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee  Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default  $2,500.00  If SA considers an Event of Default to have taken place under Section 34.

D. UCC Fee  $195.00 – to cover SA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of SA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that SA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific    WEEK    will be capped at      $32,312.50     (the "Cap"). If the Specified Percentage of all Receivables for a specific    WEEK    is less than the Cap, then in addition to the Specified Percentage of Receivables for that    WEEK   , SA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that    WEEK    does not exceed the Cap. The Cap is not applicable to make up for a business day on which SA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by SA to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to SA requesting that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@SAfunding.com and such notice will be deemed to have been received if and when SA sends a reply e-mail (but not a read receipt). If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled within seven days thereafter. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request or one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying SA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to SA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide SA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize SA and/or its agent(s) to deduct the amounts owed to SA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to SA by permitting SA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent SA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until SA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
Casey Broughton Stringer
838AA6C60203478...

| | |
|---|---|
| Name: CASEY BROUGHTON STRINGER | Name: |
| Title: Owner | Title: |
| Date: September 08, 2022 | Date: |

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to SA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes SA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to SA any bank or financial statements, tax returns, and other documents and records, as SA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. SA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** SA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between SA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for SA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of SA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. SA may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to SA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize SA, its agents and representatives, and any creditreporting agency engaged by SA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to SA under this Agreement or for SA's ability to determine any Merchant's eligibility to enter into any future agreement with SA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

Authorization for soft pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information solely to conduct a pre-qualification for credit.

Authorization for hard pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide SA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by SA for monies owed to SA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by SA.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
*Casey Broughton Stringer*
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER     Name: _____

Title: Owner _____     Title: _____

Date: September 08, 2022 _____     Date: _____

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**14. No Liability.** In no event will SA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and SA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SA to any Merchant. SA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in SA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. SA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to SA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints SA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SA, or, if SA considers an Event of Default to have taken place under Section 34, to settle all obligations due to SA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SA; and (v) to file any claims or take any action or institute any proceeding which SA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by SA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

b) Any Merchant changes its arrangements with any Processor in any way that is adverse to SA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of SA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to SA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to SA at law, in equity, or otherwise available pursuant to this Agreement.

(f) SA considers any vent of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. SA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. SA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. SA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by SA, Merchant shall deliver to SA an executed assignment of lease of each Merchant's premises in favor of SA. Upon breach of any provision in this Section 17, SA may exercise its rights under such assignment of lease.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER

Title: Owner

Date: September 08, 2022

Name:_____

Title:_____

Date:_____

4

DocuSign Envelope ID: 01EDA74C-2575-438F-BGBF-DD92E1037AF9

### STANDARD MERCHANT CASH ADVANCE AGREEMENT    SQ-000024

Protection 6. SA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. SA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to SA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to SA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints SA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to SA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes SA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against SA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of SA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by SA, including this Agreement and any other SA documents (collectively, "Confidential Information") are proprietary and confidential information of SA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of SA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that SA may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to SA, and future statements which will be furnished hereafter at the request of SA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise SA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain businessinterruption insurance naming SA as loss payee and additional insured in amounts and against risks as are satisfactory to SA and shall provide SA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without SA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to SA or change any place(s) of its business without prior written consent from SA.

**I have read and agree to the terms and conditions set forth above:**

*Casey Broughton Stringer*
_____     _____
Name: CASEY BROUGHTON STRINGER                  Name:_____

Title: Owner_____          Title:_____

Date: September 08, 2022_____          Date:_____

5

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from SA to that Merchant, execute, acknowledge, and deliver to SA and/or to any other person or entity specified by SA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of SA, other than any for which SA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than SA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of SA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to SA under this Agreement and any future agreement with SA, each Merchant hereby grants to SA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accountsreceivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to SA under any other agreement between any Merchant or Guarantor and SA (the "CrossCollateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the CrossCollateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as SA deems necessary to perfect or maintain SA's first priority security interest in the Collateral and the CrossCollateral, including the execution of any account control agreements. Each Merchant hereby authorizes SA to file any financing statements deemed necessary by SA to perfect or maintain SA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to SA with respect to the Collateral and the CrossCollateral, and that any subsequent lienor may be tortiously interfering with SA's rights. Each Merchant shall be liable for and SA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by SA in protecting, preserving, and enforcing SA's security interest and rights. Each erchant further acknowledges that SA may use another legal name and/or D/B/A or an agent when designating the Secured Party hen SA files the aboverefenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

I have read and agree to the terms and conditions set forth above:

Casey Broughton Stringer

Name: CASEY BROUGHTON STRINGER       Name:_____

Title: Owner_____       Title: _____

Date: September 08, 2022_____       Date: _____

6

(1) Any representation or warranty by any Merchant in any Agreement with SA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(2) Any Merchant changes the Account without providing written notice to SA within one business day thereafter;

(3) SA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(4) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by SA;

(5) Any Merchant causes any ACH debit to the Account by SA to be blocked or stopped without providing any advance written notice to SA, which notice may be given by e-mail to ;

(6) Any Merchant intentionally prevents SA from collecting any part of the Receivables Purchased Amount; or

(7) Any Merchant causes any ACH debit to the Account to be stopped that would result in an ACH Return Code of R08, R10 or R29 and that Merchant does not within two business days thereafter provide SA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to .

**35. Remedies.** In case any Event of Default occurs and is not waived, SA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of SA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by SA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, SA may elect that Merchant(s) be required to pay to SA 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by SA in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), SA will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to SA's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount. In addition to the foregoing, in case any Event of Default occurs and is not waived, SAwill be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to a notice and hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order. .

**36. Required Notifications.** Each Merchant is required to give SA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give SA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SA, which consent may be withheld in SA's sole discretion. SA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part.

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER           Name: _____

Title: Owner _____ Title: _____

Date: September 08, 2022 _____ Date: _____

**STANDARD MERCHANT CASH ADVANCE AGREEMENT    SQ-000027**

From and after the effective date of any such assignment or transfer by SA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or SA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between SA and such assignee (the "Assignment Agreement"), have the rights and obligations of SA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, SA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, SA may disclose all information that SA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon SA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder to SA shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to 633 NE 167th Street, Suite 831, North Miami Beach, FL 33162 and shall become effective only upon receipt. All notices, requests, consents, demands, and other communications hereunder to Merchant(s) and Guarantor(s) shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER           Name:

Title: Owner                          Title:

Date: September 08, 2022              Date:

DocuSign Envelope ID: 01EDA74C-2575-438E-BCBE-DD92E1037AE9

### STANDARD MERCHANT CASH ADVANCE AGREEMENT    SQ-000028

**46. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Merchant and each Guarantor irrevocably authorize and direct each of their respective financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Merchant's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**51. Waiver.** No failure on the part of SA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
*Casey Broughton Stringer*
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER                     Name:

Title: Owner                                        Title:

Date: September 08, 2022                            Date:

9

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to SA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of SA. Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement.Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify SA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that SA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. SA will not be permitted to enforce any of its rights under this Agreement without the express written consent of Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

**SIGNATURES TO FOLLOW ON NEXT PAGE**

I have read and agree to the terms and conditions set forth above:

Name: CASEY BROUGHTON STRINGER                Name:_____

Title: Owner_____                Title: _____

Date: September 08, 2022_____                Date: _____

10

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**    **SQ-000030**

## EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER     Owner

Print Name            Title            Signature

SS#            Driver License Number:

**FOR THE MERCHANT/OWNER (#2)**

By:

Print Name            Title            Signature

SS#:            Driver License Number:

Approved for SQUARE ADVANCE  by :

11

STANDARD MERCHANT CASH ADVANCE AGREEMENT    **SQ-000031**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated ___September 08, 2022___, of the Standard Merchant Cash Advance Agreement, dated ___September 08, 2022___ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between SQUARE ADVANCE ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to SA in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Guarantor agrees that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**G3. Guarantor Waivers.** If SA considers any Event of Default to have taken place under the Agreement, then SA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or CrossCollateral SA may hold pursuant to this Guarantee or any other agreement or guarantee. SA does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) SA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to SA. In addition, SA may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to SA; (ii) if there is more than one Merchant, release a Merchant from its obligations to SA such that at least one Merchant remains obligated to SA; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to SA under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, SA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to notice and a hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

I have read and agree to the terms and conditions set forth above:

_Casey Broughton Stringer_
DocuSigned by:
833AA8C02C3478...

Name: CASEY BROUGHTON STRINGER          Name: _____

Title: Owner _____          Title: _____

Date: September 08, 2022 _____          Date: _____

12

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with SA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER _____    Name: _____

Title: Owner _____    Title: _____

Date: September 08, 2022 _____    Date: _____

13

*STANDARD MERCHANT CASH ADVANCE AGREEMENT*

In case any Event of Default occurs and is not waived, each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Guarantor irrevocably authorizes and directs each of its financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Guarantor's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**I have read and agree to the terms and conditions set forth above:**

Name: CASEY BROUGHTON STRINGER                     Name:

Title: Owner                                       Title:

Date: September 08, 2022                            Date:

14

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**    **SQ-000034**

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

**EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE**

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner

     Print Name                        Title               Signature

SS# _____          Driver License Number: _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____

     Print Name                        Title               Signature

SS#: _____          Driver License Number: _____

15

**SQ-000035**

## BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from SQUARE ADVANCE . We look forward to being your funding partner.

You authorize SQUARE ADVANCE to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SQUARE ADVANCE will require viewing access to your bank account, each business day.

SQUARE ADVANCE will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of Bank:___M&T Bank_____ _____

Name of account:_____ _____

Account number:_____ Routing number:_____

Bank portal website:_____

Username:_____

Password:_____

Security Question/Answer 1:_____ _____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Any other information necessary to access your account:___NA_____

Please note: In the event that we are unable to access your account, we will take a daily estimated payment.

If you have any questions, please feel free to contact us directly at 848.299.9005.

16

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1. I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___September 08, 2022___, between SQUARE ADVANCE ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant") on behalf of Merchant.

2. This Declaration incorporates by reference the Agreement and every addendum to it.

3. I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4. I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5. I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6. I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7. I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8. I acknowledge that the payments to be made from any Merchant to SA under the Agreement are being made in the ordinary course of each Merchant's business.

9. I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.

10. **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on        September 08, 2022
                            (Date)

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER        Owner
        Print Name                                      Title                                      Signature

*DocuSigned by:*
*Casey Broughton Stringer*
636AA6CC0203478...

**FOR THE MERCHANT/OWNER (#2)**

By:
        Print Name                                      Title                                      Signature

17

# ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated___September 08, 2022___, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___September 08, 2022___ between SQUARE ADVANCE ("SA") BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant").

Merchant(s) instruct SA to pay up to ___$349,750.04___ of the Purchase Price set forth in the Agreement to ___SQUARE ADVANCE___ instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____

_____

_____

_____

## FOR THE MERCHANT/OWNER (#1)

By: CASEY BROUGHTON STRINGER     Owner

| Print Name | Title | Signature |
|---|---|---|

## FOR THE MERCHANT/OWNER (#2)

By: _____

| Print Name | Title | Signature |
|---|---|---|

18

# ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT SQ-000038
## FOR ADDITIONAL FEES

   This is an Addendum, dated <u>September 08, 2022</u>, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated <u>September 08, 2022</u> between SQUARE ADVANCE ("SA") and <u>BROUGHTON CONSTRUCTION COMPANY LLC</u> ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

   Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by SA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives SA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by SA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by SA or may be collected in addition to any other payment collected by SA under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER     Owner

    Print Name         Title         Signature

**FOR THE MERCHANT/OWNER (#2)**

By:

    Print Name         Title         Signature

DocuSign Envelope ID: 01EDA74C-2575-438E-BCBF-DD92E1637AE9

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT** SQ-000039
**FOR ESTIMATED PAYMENTS**

    This is an Addendum, dated ___September 08, 2022___, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___September 08, 2022___ between SQUARE ADVANCE  ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement. Instead of debiting the ___25%___ Specified Percentage of Merchant's Receivables, SA may instead debit ___$32,312.50___ ("Estimated Payment") from the Account every ___WEEK___. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

    Any Merchant may request that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under the Agreement. Any Merchant may request such a reconciliation by giving written notice of the request to SA. A reconciliation may also be requested by email to . If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of the Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER      Owner

| CASEY BROUGHTON STRINGER | Owner | _Casey Broughton Stringer_ 636A6CC0203478... |
|---|---|---|
| Print Name | Title | Signature |

**FOR THE MERCHANT/OWNER (#2)**

By:

| | | |
|---|---|---|
| Print Name | Title | Signature |

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

This is an Addendum, dated 09/8/2022, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated 09/8/2022, between SQUARE ADVANCE ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the 25 % Specified Percentage of Merchant's Receivables, SA may instead debit $32,312.50 ("Estimated Payment") from the Account every Week. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

Upon one day's advance written notice to Merchant(s), SA may elect to change the frequency of the Estimated Payment from daily to weekly or from weekly to daily. If the frequency of the Estimated Payment is being changed from weekly to daily, then the amount of the daily Estimated Payment will be one fifth of the amount of the weekly Estimated Payment. If the frequency of the Estimated Payment is being changed from daily to weekly, then the amount of the weekly Estimated Payment will be five times of the amount of the daily Estimated Payment.

Any Merchant may request that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under the Agreement. Any Merchant may request such a reconciliation by giving written notice of the request to SA. A reconciliation may also be requested by e-mail to info@squareadvance.com. If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of the Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
### FOR ESTIMATED PAYMENTS

**FOR THE MERCHANT/OWNER (#1)**

By:_____ _____ _____
(Print Name)          (Print Title)          (Signature)

Casey Broughton Stringer      MANAGING MEMBER      *Casey Broughton Stringer*
636AA6CC0203478

**FOR THE MERCHANT/OWNER (#2)**

By:_____ _____ _____
(Print Name)          (Print Title)          (Signature)

# Exhibit E

SQ-000065

| Deal ID | SQ225312 | | Date | Description | Amount |
|---|---|---|---|---|---|
| Company | BROUGHTON CONSTRUCTION COMPANY LLC 2 | | 9/13/2022 | Square Advance SQ225312 B Sep 13 CCD | $32,312.50 |
| Date | | 9/8/2022 | 9/20/2022 | Square Advance SQ225312 B Sep 20 CCD | $32,312.50 |
| Status | PAID IN FULL | | 9/27/2022 | Square Advance SQ225312 B Sep 27 CCD | $32,312.50 |
| | | | 10/4/2022 | Square Advance SQ225312 B Oct 4 CCD | $32,312.50 |
| Principal | | $550,000.00 | 10/11/2022 | Square Advance SQ225312 B Oct 11 CCD | $32,312.50 |
| Payback | | $775,500.00 | 10/18/2022 | Square Advance SQ225312 B Oct 18 CCD | $32,312.50 |
| Bank Fee | | $12,500.00 | 10/25/2022 | Square Advance SQ225312 B Oct 25 CCD | $32,312.50 |
| Type | MCA | | 11/1/2022 | Square Advance SQ225312 B Nov 1 CCD | $32,312.50 |
| | | | 11/8/2022 | Square Advance SQ225312 B Nov 8 CCD | $32,312.50 |
| Net | | $537,500.00 | 11/15/2022 | Square Advance SQ225312 B Nov 15 CCD | $32,312.50 |
| | | | 11/22/2022 | Square Advance SQ225312 B Nov 22 CCD | $32,312.50 |
| Paid | | $775,500.00 | 11/29/2022 | Square Advance SQ225312 B Nov 29 CCD | $32,312.50 |
| Paid % | | 100.00% | 12/6/2022 | Square Advance SQ225312 B Dec 6 CCD | $32,312.50 |
| Balance | | $0.00 | 12/12/2022 | BROUGHTON CONSTRUCTION COMPANY LLC 3 Renew | $355,437.50 |

**SQ-000042**

# Exhibit F



## SQUARE ADVANCE
**90 E Halsey Rd, Parsippany, NEW JERSEY 07054**
**848.299.9005**

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated ___December 09, 2022___ by and between SQUARE ADVANCE ("SA") and the merchant listed below (the" Merchant").

Merchant's Legal Name: BROUGHTON CONSTRUCTION COMPANY LLC

D/B/A: _____  Fed ID #: 11-3768300

Type of Entity: LIMITED LIABILITY COMPANY

Business Address: 4832 Nannie Helen Burroughs Ave NE    City: Washington    State: DC    Zip: 20019

Contact Address: 4832 Nannie Helen Burroughs Ave NE    City: Washington    State: DC    Zip: 20019

Email Address: cstringer@broughtonconstruction.com    Phone Number: _____

| | |
|---|---|
| **Purchase Price** | **$600,000.00** |
| *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | |
| **Receivables Purchased Amount** | **$846,000.00** |
| *This is the amount of Receivables (defined in Section 1 below) being sold.* | |
| **Specified Percentage** | **14.00%** |
| *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | |
| **Net Funds Provided** | **$587,500.00** |
| *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | |
| **Net Amount to Be Received Directly by Merchant(s)** | **$232,062.50** |
| *This is the net amount being received directly by Merchant(s) after deduction of applicable fees listed in Section 2 below and the payment of any part of the Purchase Price elsewhere pursuant to an Addendum to this Agreement.* | |
| **Initial Estimated Payment** | **$38,454.54** |
| *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | **per WEEK** |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to SA (making SA the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, ontract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to SA. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by SA, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of SA and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for SA and that each Merchant will hold Receivables in trust for SA in its capacity as a fiduciary for SA.

The Receivables Purchased Amount shall be paid to SA by each Merchant irrevocably authorizing only one depositing account acceptable to SA (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as SA receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes SA to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide SA with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). SA is not responsible for any overdrafts or rejected transactions that may result from SA's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
*Casey Broughton Stringer*
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER    Name: _____

Title: Owner    Title: _____

Date: December 09, 2022    Date: _____

1

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to SA for the following fees, where applicable:

A.    $12,500.00    - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee  Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default  $2,500.00  If SA considers an Event of Default to have taken place under Section 34.

D. UCC Fee  $195.00 – to cover SA filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of SA's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that SA will collect from Merchant(s) towards the Receivables Purchased Amount during any specific    WEEK    will be capped at     $38,454.54    (the "Cap"). If the Specified Percentage of all Receivables for a specific    WEEK    is less than the Cap, then in addition to the Specified Percentage of Receivables for that    WEEK   , SA will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that    WEEK    does not exceed the Cap. The Cap is not applicable to make up for a business day on which SA is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by SA to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to SA requesting that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to info@SAfunding.com and such notice will be deemed to have been received if and when SA sends a reply e-mail (but not a read receipt). If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled within seven days thereafter. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request or one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying SA the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to SA, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide SA and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize SA and/or its agent(s) to deduct the amounts owed to SA for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to SA by permitting SA to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent SA's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until SA receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

*Casey Broughton Stringer*
DocuSigned by:
636AA6CC0203478...

| | |
|---|---|
| Name: CASEY BROUGHTON STRINGER | Name: |
| Title: Owner | Title: |
| Date: December 09, 2022 | Date: |

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to SA under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes SA and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to SA any bank or financial statements, tax returns, and other documents and records, as SA deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. SA is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** SA may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between SA and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for SA to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of SA's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. SA may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to SA. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize SA, its agents and representatives, and any creditreporting agency engaged by SA, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to SA under this Agreement or for SA's ability to determine any Merchant's eligibility to enter into any future agreement with SA. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

Authorization for soft pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information solely to conduct a pre-qualification for credit.

Authorization for hard pulls: Each Merchant and each Owner understands that by signing this Agreement, they are providing 'written instructions' to SA under the Fair Credit Reporting Act, authorizing SA to obtain information from their personal credit profile or other information from Experian, TransUnion, and Equifax. Each Merchant and each Guarantor authorizes SA to obtain such information in accordance with a merchant cash advance application.

**12. Transactional History.** Each Merchant authorizes its bank to provide SA with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by SA for monies owed to SA from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by SA.

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER    Name:_____

Title: Owner           Title:_____

Date: December 09, 2022     Date:_____

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

**14. No Liability.** In no event will SA be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and SA agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from SA to any Merchant. SA is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in SA not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. SA has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to SA in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints SA as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to SA, or, if SA considers an Event of Default to have taken place under Section 34, to settle all obligations due to SA from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to SA; and (v) to file any claims or take any action or institute any proceeding which SA may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by SA, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

b) Any Merchant changes its arrangements with any Processor in any way that is adverse to SA;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of SA and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to SA; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to SA at law, in equity, or otherwise available pursuant to this Agreement.

(f) SA considers any vent of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. SA may enforce the provisions of the Guarantee against Guarantor.

Protection 3. SA may enforce its security interest in the Collateral identified in Section 33.

Protection 4. SA may proceed to protect and enforce its rights and remedies by litigation or arbitration.

Protection 5. If requested by SA, Merchant shall deliver to SA an executed assignment of lease of each Merchant's premises in favor of SA. Upon breach of any provision in this Section 17, SA may exercise its rights under such assignment of lease.

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer

Name: CASEY BROUGHTON STRINGER                Name:

Title: Owner                                   Title:

Date: December 09, 2022                        Date:

4

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

Protection 6. SA may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. SA will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to SA of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to SA an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints SA and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to SA as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes SA to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against SA or any of its affiliates relating to any (i) investigation undertaken by or on behalf of SA as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by SA, including this Agreement and any other SA documents (collectively, "Confidential Information") are proprietary and confidential information of SA. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of SA to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that SA may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between SA and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to SA, and future statements which will be furnished hereafter at the request of SA, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise SA of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain businessinterruption insurance naming SA as loss payee and additional insured in amounts and against risks as are satisfactory to SA and shall provide SA proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without SA's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to SA or change any place(s) of its business without prior written consent from SA.

**I have read and agree to the terms and conditions set forth above:**

*Casey Broughton Stringer*
———636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER                Name:

Title: Owner                                  Title:

Date: December 09, 2022                       Date:

5

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**     **SQ-000047**

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from SA to that Merchant, execute, acknowledge, and deliver to SA and/or to any other person or entity specified by SA, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of SA, other than any for which SA has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than SA any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of SA.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to SA under this Agreement and any future agreement with SA, each Merchant hereby grants to SA a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accountsreceivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to SA under any other agreement between any Merchant or Guarantor and SA (the "CrossCollateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the CrossCollateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as SA deems necessary to perfect or maintain SA's first priority security interest in the Collateral and the CrossCollateral, including the execution of any account control agreements. Each Merchant hereby authorizes SA to file any financing statements deemed necessary by SA to perfect or maintain SA's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to SA with respect to the Collateral and the CrossCollateral, and that any subsequent lienor may be tortiously interfering with SA's rights. Each Merchant shall be liable for and SA may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by SA in protecting, preserving, and enforcing SA's security interest and rights. Each erchant further acknowledges that SA may use another legal name and/or D/B/A or an agent when designating the Secured Party hen SA files the abovereferenced financing statement(s).

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
Casey Broughton Stringer
038AA6C60203478...

Name: CASEY BROUGHTON STRINGER               Name:_____

Title: Owner_____ Title: _____

Date: December 09, 2022_____ Date: _____

(1) Any representation or warranty by any Merchant in any Agreement with SA that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(2) Any Merchant changes the Account without providing written notice to SA within one business day thereafter;

(3) SA is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(4) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by SA;

(5) Any Merchant causes any ACH debit to the Account by SA to be blocked or stopped without providing any advance written notice to SA, which notice may be given by e-mail to ;

(6) Any Merchant intentionally prevents SA from collecting any part of the Receivables Purchased Amount; or

(7) Any Merchant causes any ACH debit to the Account to be stopped that would result in an ACH Return Code of R08, R10 or R29 and that Merchant does not within two business days thereafter provide SA with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to .

**35. Remedies.** In case any Event of Default occurs and is not waived, SA may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of SA in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by SA after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In case any Event of Default occurs and is not waived, SA may elect that Merchant(s) be required to pay to SA 25% of the unpaid balance of the Receivables Purchased Amount as liquidated damages for any reasonable expenses incurred by SA in connection with recovering the unpaid balance of the Receivables Purchased Amount ("Reasonable Expenses"), SA will not be required to itemize of prove its Reasonable Expenses, and all Merchant(s) and all Guarantor(s) agree that the Reasonable Expenses bear a reasonable relationship to SA's actual expenses incurred in connection with recovering the unpaid balance of the Receivables Purchased Amount. In addition to the foregoing, in case any Event of Default occurs and is not waived, SAwill be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to a notice and hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order. .

**36. Required Notifications.** Each Merchant is required to give SA written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give SA at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of SA, which consent may be withheld in SA's sole discretion. SA may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part.

I have read and agree to the terms and conditions set forth above:

Name: CASEY BROUGHTON STRINGER       Name:_____

Title: Owner              Title: _____

Date: December 09, 2022        Date: _____

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**    **SQ-000049**

From and after the effective date of any such assignment or transfer by SA, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or SA) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between SA and such assignee (the "Assignment Agreement"), have the rights and obligations of SA under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, SA's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, SA may disclose all information that SA has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon SA's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder to SA shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to 633 NE 167th Street, Suite 831, North Miami Beach, FL 33162 and shall become effective only upon receipt. All notices, requests, consents, demands, and other communications hereunder to Merchant(s) and Guarantor(s) shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Choice of Law.** Each Merchant acknowledges and agrees that this Agreement was made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by this Agreement. This Agreement and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**40. Venue and Forum Selection.** Any litigation relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Agreement encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Agreement that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**41. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**42. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**43. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**44. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**45. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:

*Casey Broughton Stringer*

636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER              Name: _____

Title: Owner _____        Title: _____

Date: December 09, 2022 _____       Date: _____

**46. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**47. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**48. Arbitration.** Any action or dispute relating to this Agreement or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Merchant and each Guarantor irrevocably authorize and direct each of their respective financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Merchant's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

 Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated unless specified otherwise in this Agreement.

**51. Waiver.** No failure on the part of SA to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**I have read and agree to the terms and conditions set forth above:**

_Casey Broughton Stringer_
DocuSigned by: 636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER

Title: Owner

Date: December 09, 2022

Name:

Title:

Date:

9

DocuSign Envelope ID: 1784C876-7254-4E20-AC4A-2E8F147A2245

**SQ-000051**

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to SA by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of SA. Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement.Each Merchant and each Guarantor acknowledge that SA is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify SA and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that SA does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein. SA will not be permitted to enforce any of its rights under this Agreement without the express written consent of Gene Rosen's Law Firm.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

**SIGNATURES TO FOLLOW ON NEXT PAGE**

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer
636AA6CC0203478

Name: CASEY BROUGHTON STRINGER                    Name:

Title: Owner                                       Title:

Date: December 09, 2022                            Date:

10

DocuSign Envelope ID: 17846876-7254-4E20-AC4A-2E8F147A2245

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**    **SQ-000052**

### EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS AGREEMENT

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER                Owner

DocuSigned by:

Casey Broughton Stringer

638AA6CC0203478...

| Print Name | Title | Signature |

SS#:                                        Driver License Number:


**FOR THE MERCHANT/OWNER (#2)**

By:

| Print Name | Title | Signature |

SS#:                                        Driver License Number:


Approved for SQUARE ADVANCE  by :

11

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated ____December 09, 2022____, of the Standard Merchant Cash Advance Agreement, dated ____December 09, 2022____ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between SQUARE ADVANCE  ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to SA in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** SA may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives SA permission to call or send a text message to any telephone number given to SA in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives SA permission to communicate such information to them by e-mail. Each Guarantor agrees that SA will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that SA has no liability for any such charges.

**G3. Guarantor Waivers.** If SA considers any Event of Default to have taken place under the Agreement, then SA may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or CrossCollateral SA may hold pursuant to this Guarantee or any other agreement or guarantee. SA does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) SA's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to SA. In addition, SA may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to SA; (ii) if there is more than one Merchant, release a Merchant from its obligations to SA such that at least one Merchant remains obligated to SA; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to SA under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, SA will be entitled to the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without SA being required to furnish a bond or other undertaking in connection with the application. To the extent applicable, Merchant(s) and Guarantor(s) waive the right to notice and a hearing under Connecticut General Statutes sections 52-278a to 52-278g, inclusive, and consent to the issuance of a writ for a prejudgment remedy without securing a court order.

I have read and agree to the terms and conditions set forth above:

Name: CASEY BROUGHTON STRINGER _____        Name: _____

Title: Owner _____        Title: _____

Date: December 09, 2022 _____        Date: _____

12

## STANDARD MERCHANT CASH ADVANCE AGREEMENT

**G6. Choice of Law.** Each Guarantor acknowledges and agrees that the Agreement and this Guarantee were made in the State of New York, that the Purchase Price is being paid by SA in the State of New York, that the Receivables Purchased Amount is being delivered to SA in the State of New York, and that the State of New York has a reasonable relationship to the transactions encompassed by the Agreement and this Guarantee. This Guarantee and the relationship between SA, each Merchant, and each Guarantor will be governed by and construed in accordance with the laws of the State of New York, without regard to any applicable principles of conflict of laws.

**G7. Venue and Forum Selection.** Any litigation relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other must be commenced and maintained in any court located in the Counties of Nassau, New York, or Sullivan in the State of New York (the "Acceptable Forums"). The parties agree that the Acceptable Forums are convenient, submit to the jurisdiction of the Acceptable Forums, and waive any and all objections to the jurisdiction or venue of the Acceptable Forums. If any litigation is initiated in any other venue or forum, the parties waive any right to oppose any motion or application made by any party to transfer such litigation to an Acceptable Forum. The parties agree that this Guarantee encompasses the transaction of business within the City of New York and that the Civil Court of the City of New York ("Civil Court") will have jurisdiction over any litigation relating to this Guarantee that is within the jurisdictional limit of the Civil Court. In addition to the Acceptable Forums, any action or proceeding to enforce a judgment or arbitration award against any Merchant or Guarantor or to restrain or collect any amount due to SA may be commenced and maintained in any other court of competent jurisdiction.

**G8. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with SA.

**G9. Counterclaim Waiver.** In any litigation or arbitration commenced by SA, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G10. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against SA within one year of its accrual will be time barred.

**G11. Costs.** Each Merchant and each Guarantor must pay all of SA's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G12. Prejudgment and Postjudgment Interest.** If SA becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then SA will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G13. Legal Fees.** If SA prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay SA's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G14. Class Action Waiver.** SA, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving SA on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing.

**I have read and agree to the terms and conditions set forth above:**

*Casey Broughton Stringer*
636AA6CC0203476...

Name: CASEY BROUGHTON STRINGER

Title: Owner

Date: December 09, 2022

Name:

Title:

Date:

13

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

In case any Event of Default occurs and is not waived, each Guarantor consents to SA making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in SA's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to SA as a result of the Event of Default.Each Guarantor irrevocably authorizes and directs each of its financial institutions and account debtors to comply with any injunction, restraining order, or other equitable relief issued in SA's favor in arbitration under the terms of this Agreement, will hold harmless and indemnify SA and its employees, agents, attorneys, members, managers, officers, subsidiaries, affiliate entities, successors, and assigns from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to the making or enforcement of any application for the issuance of an injunction, restraining order, or other equitable relief in SA's favor to restrain each Guarantor's accounts and/or receivables, and will hold harmless and indemnify all financial institutions and account debtors from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) relating to compliance with any injunction, restraining order, or other equitable relief issued in favor of SA.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of SA.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to SA by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by SA demonstrating that SA was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**I have read and agree to the terms and conditions set forth above:**

Casey Broughton Stringer
636AA6CC0203478...

Name: CASEY BROUGHTON STRINGER                Name:

Title: Owner                                                          Title:

Date: December 09, 2022                                    Date:

14

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

### EACH UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner

DocuSigned by: *Casey Broughton Stringer*
038AA6C60203478...

| Print Name | Title | Signature |

SS: _____     Driver License Number: _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____

| Print Name | Title | Signature |

SS#: _____     Driver License Number: _____

15

## BANK INFORMATION

Dear Merchant,

Thank you for accepting this offer from SQUARE ADVANCE . We look forward to being your funding partner.

You authorize SQUARE ADVANCE  to collect the Receivables Purchased Amount under this Agreement by ACH debiting your bank account with the bank listed below.

SQUARE ADVANCE  will require viewing access to your bank account, each business day.

SQUARE ADVANCE  will also require viewing access to your bank account, prior to funding, as part of our underwriting process.

Please fill out the form below with the information necessary to access your account.

**\* Be sure to indicate capital or lower case letters.**

Name of Bank:_____M & T bank_____

Name of account._____        _____

Account number:_____                Routing number._____

Bank portal website:_____

Username:_____

Password:_____

Security Question/Answer 1:_____

Security Question/Answer 2:_____

Security Question/Answer 3:_____

Any other information necessary to access your account:_____N/A_____

Please note: In the event that we are unable to access your account, we will take a daily estimated payment.

If you have any questions, please feel free to contact us directly at 848.299.9005.

16

**DECLARATION OF ORDINARY COURSE OF BUSINESS**

Each undersigned hereby declares the following:

1. I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated <u>December 09, 2022</u>, between SQUARE ADVANCE  ("SA") and <u>BROUGHTON CONSTRUCTION COMPANY LLC</u> ("Merchant") on behalf of Merchant.

2. This Declaration incorporates by reference the Agreement and every addendum to it.

3. I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.

4. I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.

5. I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.

6. I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.

7. I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.

8. I acknowledge that the payments to be made from any Merchant to SA under the Agreement are being made in the ordinary course of each Merchant's business.

9. I am aware of each Merchant's right to request a reconciliation of the payments made under the Agreement at any time.

10. **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**


Executed on          December 09, 2022
                              (Date)

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner

       Print Name                                    Title                                    Signature

*DocuSigned by:*
*Casey Broughton Stringer*
030AA0CC0203470...

**FOR THE MERCHANT/OWNER (#2)**

By:

       Print Name                                    Title                                    Signature

### ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated ___December 09, 2022___, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___December 09, 2022___ between SQUARE ADVANCE  ("SA") BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant").

Merchant(s) instruct SA to pay up to ___$355,437.50___ of the Purchase Price set forth in the Agreement to ___SQUARE ADVANCE___ instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____

_____

_____

_____

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER        Owner

| Print Name | Title | Signature |

DocuSigned by:
*Casey Broughton Stringer*
636AA6CC0203478...

**FOR THE MERCHANT/OWNER (#2)**

By: _____

| Print Name | Title | Signature |

18

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT** SQ-000060
**FOR ADDITIONAL FEES**

This is an Addendum, dated December 09, 2022, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated December 09, 2022 between SQUARE ADVANCE ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by SA is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives SA advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by SA and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by SA or may be collected in addition to any other payment collected by SA under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner

      Print Name                                   Title                                   Signature

**FOR THE MERCHANT/OWNER (#2)**

By:

      Print Name                                   Title                                   Signature

19

DocuSign Envelope ID: 1784C876-73E4-4F20-A24A-2F8F147A2245

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT SQ-000061
### FOR ESTIMATED PAYMENTS

This is an Addendum, dated __December 09, 2022__, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated __December 09, 2022__ between SQUARE ADVANCE ("SA") and BROUGHTON CONSTRUCTION COMPANY LLC ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement. Instead of debiting the __14.00%__ Specified Percentage of Merchant's Receivables, SA may instead debit __$38,454.54__ ("Estimated Payment") from the Account every __WEEK__. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

Any Merchant may request that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under the Agreement. Any Merchant may request such a reconciliation by giving written notice of the request to SA. A reconciliation may also be requested by email to . If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of the Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

By: CASEY BROUGHTON STRINGER          Owner

| | | |
|---|---|---|
| Print Name | Title | Signature |

DocuSigned by:

*Casey Broughton Stringer*
636AA6CC0203478...

**FOR THE MERCHANT/OWNER (#2)**

By:

| | | |
|---|---|---|
| Print Name | Title | Signature |

**SQ-000062**

ver. 2/1/22

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

       This is an Addendum, dated ___12/9/2022___, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated ___12/9/2022___, between SQUARE ADVANCE ("SA") and __BROUGHTON CONSTRUCTION COMPANY LLC__ ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

       Instead of debiting the _14_ % Specified Percentage of Merchant's Receivables, SA may instead debit $_38,454.54_ ("Estimated Payment") from the Account every _Week_____. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage. The Estimated Payment is subject to any Cap imposed by Section 3 of the Agreement.

       Upon one day's advance written notice to Merchant(s), SA may elect to change the frequency of the Estimated Payment from daily to weekly or from weekly to daily. If the frequency of the Estimated Payment is being changed from weekly to daily, then the amount of the daily Estimated Payment will be one fifth of the amount of the weekly Estimated Payment. If the frequency of the Estimated Payment is being changed from daily to weekly, then the amount of the weekly Estimated Payment will be five times of the amount of the daily Estimated Payment.

       Any Merchant may request that SA conduct a reconciliation in order to ensure that the amount that SA has collected equals the Specified Percentage of Merchant(s)'s Receivables under the Agreement. Any Merchant may request such a reconciliation by giving written notice of the request to SA. A reconciliation may also be requested by e-mail to info@squareadvance.com. If such reconciliation determines that SA collected more than it was entitled to, then SA will credit to the Account all amounts to which SA was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that SA collected less than it was entitled to, then SA will debit from the Account all additional amounts to which SA was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all statements covering the period from the date of the Agreement through the date of the request for a reconciliation. SA will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

SQ-000063

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT
## FOR ESTIMATED PAYMENTS

**FOR THE MERCHANT/OWNER (#1)**

By:_____  _____  _____
    Casey Broughton Stringer      MANAGING MEMBER      *Casey Broughton Stringer*
      (Print Name)          (Print Title)           (Signature)

636AA6CC0203478...

**FOR THE MERCHANT/OWNER (#2)**

By:_____  _____  _____
      (Print Name)          (Print Title)          (Signature)

# Exhibit G

SQ-000066

| | | Date | Description | Amount |
|---|---|---|---|---|
| Deal ID | SQ225419 | 12/13/2022 | Square Advance SQ225419 B Dec 13 CCD | $6,142.04 |
| Company | BROUGHTON CONSTRUCTION COMPANY LLC 3 | 12/13/2022 | Square Advance SQ225312 B Dec 13 CCD | $32,312.50 |
| Date | 12/12/2022 | 12/20/2022 | Square Advance SQ225419 B Dec 20 CCD | $38,454.54 |
| Status | DEFAULT | 12/27/2022 | Square Advance SQ225419 B Dec 27 CCD | $38,454.54 |
| | | 1/3/2023 | Square Advance SQ225419 B Jan 3 CCD | $38,454.54 |
| Principal | $600,000.00 | 1/10/2023 | Square Advance SQ225419 B Jan 10 CCD | $38,454.54 |
| Payback | $846,000.00 | 1/17/2023 | Square Advance SQ225419 B Jan 17 CCD | $38,454.54 |
| Bank Fee | $12,500.00 | 1/24/2023 | Square Advance SQ225419 B Jan 24 CCD | $38,454.54 |
| Type | MCA | 1/31/2023 | Square Advance SQ225419 B Jan 31 CCD | $38,454.54 |
| | | 2/7/2023 | Square Advance SQ225419 B Feb 7 CCD | $38,454.54 |
| Net | $587,500.00 | 3/7/2023 | Square Advance SQ225419 B Mar 07 CCD | $38,454.54 |
| | | 3/14/2023 | Square Advance SQ225419 B Mar 14 CCD | $10,000.00 |
| Paid | $422,545.40 | 3/21/2023 | Square Advance SQ225419 B Mar 21 CCD | $10,000.00 |
| Paid % | 49.95% | 3/28/2023 | Square Advance SQ225419 B Mar 28 CCD | $10,000.00 |
| Balance | $423,454.60 | 3/30/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (March 28, 2023) Ending *4250 | ($10,000.00) |
| Bouncing # | 10 | 4/4/2023 | Square Advance SQ225419 B Apr 4 CCD | $10,000.00 |
| Bouncing Fee | $500.00 | 4/6/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (April 4, 2023) Ending *4250 | ($10,000.00) |
| Balance | $423,954.60 | 4/11/2023 | Square Advance SQ225419 B Apr 11 CCD | $10,000.00 |
| | | 4/13/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (April 11, 2023) Ending *4250 | ($10,000.00) |
| | | 4/14/2023 | WIRE FROM CASEY B STRINGER | $3,000.00 |
| | | 4/18/2023 | Square Advance SQ225419 B Apr 18 CCD | $10,000.00 |
| Default Fee | $2,500.00 | 4/20/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (April 18, 2023) Ending *4250 | ($10,000.00) |
| Balance | $425,954.60 | 4/25/2023 | Square Advance SQ225419 B Apr 25 CCD | $10,000.00 |
| | | 4/27/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (April 25, 2023) Ending *4250 | ($10,000.00) |
| | | 4/27/2023 | WIRE FROM BROUGHTON CONSTRUCTION | $5,000.00 |
| | | 5/2/2023 | Square Advance SQ225419 B May 2 CCD | $10,000.00 |
| | | 5/4/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (May 2, 2023) Ending *4250 | ($10,000.00) |
| | | 5/5/2023 | WIRE FROM BROUGHTON CONSTRUCTION | $5,000.00 |
| | | 5/9/2023 | Square Advance SQ225419 B May 9 CCD | $10,000.00 |
| | | 5/11/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (May 9, 2023) Ending *4250 | ($10,000.00) |
| | | 5/12/2023 | WIRE FROM BROUGHTON CONSTRUCTION | $5,000.00 |
| | | 5/16/2023 | Square Advance SQ225419 B May 16 CCD | $10,000.00 |
| | | 5/18/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (May 16, 2023) Ending *4250 | ($10,000.00) |
| | | 5/23/2023 | Square Advance SQ225419 B May 23 CCD | $10,000.00 |
| | | 5/25/2023 | SQ225419 BROUGH PAYMENT STOPPED---R08 (May 23, 2023) Ending *4250 | ($10,000.00) |
| | | 5/30/2023 | Square Advance SQ225419 B May 30 CCD | $10,000.00 |
| | | 6/1/2023 | SQ225419 BROUGH EN/RETURNED PER OFAC---R16 (May 30, 2023) Ending *4250 | ($10,000.00) |

**Exhibit H**

**80**

**Exhibit A – Standard Merchant Cash Advance Agreement, dated June 21, 2022 [80-100]**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM          INDEX NO. 523957/2022
DocuSign Envelope ID: F8C28C37-2765-40F6-8C8C-FFCDB28DEB10
NYSCEF DOC. NO. 23                                        RECEIVED NYSCEF: 03/25/2024

# DIESEL FUNDING LLC

### Tel: (786) 496-9501

### STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Agreement dated _____06/21/2022_____ by and between DIESEL FUNDING LLC ("DIESEL") and each merchant listed below (the "Merchant").

Merchant's Legal Name: BUILD RETAIL INC

D/B/A/: BUILD RETAIL

Fed ID #: ████████ / _____

Type of Entity:

☑ Corporation   ☐ Limited Liability Company   ☐ Limited Partnership   ☐ Limited Liability Partnership   ☐ Sole proprietor

Business Address: 103 GANNAWAY ST JAMESTOWN, NC 27282

Contact Address: 2336 CASTLELOCH HIGH POINT, NC 27265

Email Address: WCASHWELL@AOL.COM

| | |
|---|---|
| **Purchase Price** <br> *This is the amount being paid to Merchant(s) for the Receivables Purchased Amount (defined below).* | $ 850,000.00 |
| **Receivables Purchased Amount** <br> *This is the amount of Receivables (defined in Section 1 below) being sold.* | $ 1,274,150.00 |
| **Specified Percentage** <br> *This is the percentage of Receivables (defined below) to be delivered until the Receivables Purchased Amount is paid in full.* | 27 % |
| **Net Funds Provided** <br> *This is the net amount being paid to or on behalf of Merchant(s) after deduction of applicable fees listed in Section 2 below.* | $ 833,000.00 |
| **Initial Estimated Payment** <br> *This is only applicable if an Addendum for Estimated Payments is being signed. This is the initial amount of periodic payments collected from Merchant(s) as an approximation of no more than the Specified Percentage of the Receivables and is subject to reconciliation as set forth in Section 4 below.* | $ 7,432.18 <br> per ____DAY____ |

### TERMS AND CONDITIONS

**1. Sale of Future Receipts.** Merchant(s) hereby sell, assign, and transfer to DIESEL (making DIESEL the absolute owner) in consideration of the funds provided ("Purchase Price") specified above, all of each Merchant's future accounts, contract rights, and other obligations arising from or relating to the payment of monies from each Merchant's customers and/or other third party payors (the "Receivables", defined as all payments made by cash, check, credit or debit card, electronic transfer, or other form of monetary payment in the ordinary course of each merchant's business), for the payment of each Merchant's sale of goods or services until the amount specified above (the "Receivables Purchased Amount") has been delivered by Merchant(s) to DIESEL. Each Merchant hereby acknowledges that until the Receivables Purchased Amount has been received in full by DIESEL, each Merchant's Receivables, up to the balance of the Receivables Purchased Amount, are the property of DIESEL and not the property of any Merchant. Each Merchant agrees that it is a fiduciary for DIESEL and that each Merchant will hold Receivables in trust for DIESEL in its capacity as a fiduciary for DIESEL.

The Receivables Purchased Amount shall be paid to DIESEL by each Merchant irrevocably authorizing only one depositing account acceptable to DIESEL (the "Account") to remit the percentage specified above (the "Specified Percentage") of each Merchant's settlement amounts due from each transaction, until such time as DIESEL receives payment in full of the Receivables Purchased Amount. Each Merchant hereby authorizes DIESEL to ACH debit the specified remittances from the Account on a daily basis as of the next business day after the date of this Agreement and will provide DIESEL with all required access codes and monthly bank statements. Each Merchant understands that it will be held responsible for any fees resulting from a rejected ACH attempt or an Event of Default (see Section 2). DIESEL is not responsible for any overdrafts or rejected transactions that may result from DIESEL's ACH debiting the Specified Percentage amounts under the terms of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| Name: JAMES WESLEY CASHWELL | Name: _____ |
| Title: OWNER | Title: _____ |
| Date: 06/21/2022 | Date: 06/21/2022 |

1

**81**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM     INDEX NO. 523957/2022
NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**     RECEIVED NYSCEF: 03/25/2024

**2. Additional Fees.** In addition to the Receivables Purchased Amount, each Merchant will be held responsible to DIESEL for the following fees, where applicable:

A. _____$ 17,000.00_____ - to cover underwriting and the ACH debit program, as well as related expenses. This will be deducted from payment of the Purchase Price.

B. Wire Fee - Merchant(s) shall receive funding electronically to the Account and will be charged $50.00 for a Fed Wire or $0.00 for a bank ACH. This will be deducted from payment of the Purchase Price.

C. Blocked Account/Default - $2,500.00 - If DIESEL considers an Event of Default to have taken place under Section 34.

D. UCC Fee - $195.00 – to cover DIESEL filing a UCC-1 financing statement to secure its interest in the Receivables Purchased Amount. A $195.00 UCC termination fee will be charged if a UCC filing is terminated.

E. Court costs, arbitration fees, collection agency fees, attorney fees, expert fees, and any other expenses incurred in litigation, arbitration, or the enforcement of any of DIESEL's legal or contractual rights against each Merchant and/or each Guarantor, if required, as explained in other Sections of this Agreement.

**3. Cap on Collection of the Receivables Purchased Amount.** The amount that DIESEL will collect from Merchant(s) towards the Receivables Purchased Amount during any specific _____DAY_____ will be capped at _____$ 7,432.18_____ (the "Cap"). If the Specified Percentage of all Receivables for a specific _____DAY_____ is less than the Cap, then in addition to the Specified Percentage of Receivables for that _____DAY_____, DIESEL will be permitted to collect any Receivables it did not previously collect due to the Cap such that the total amount collected during that _____DAY_____ does not exceed the Cap. The Cap is not applicable to make up for a business day on which DIESEL is closed and does not ACH debit the Account, to subsequent attempts to collect a rejected or blocked ACH payment, or for the collection of any of the fees listed in Section 2 or if any Event of Default listed in Section 34 is considered by DIESEL to have taken place.

**4. Reconciliations.** Any Merchant may give written notice to DIESEL requesting that DIESEL conduct a reconciliation in order to ensure that the amount that DIESEL has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A reconciliation may also be requested by e-mail to Info@dieselfunding.com and such notice will be deemed to have been received if and when DIESEL sends a reply e-mail (but not a read receipt). If such reconciliation determines that DIESEL collected more than it was entitled to, then DIESEL will credit to the Account all amounts to which DIESEL was not entitled within seven days thereafter. If such reconciliation determines that DIESEL collected less than it was entitled to, then DIESEL will debit from the Account all additional amounts to which DIESEL was entitled within seven days thereafter. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. DIESEL will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**5. Prepayments.** Although there is no obligation to do so, any Merchant may prepay any amount towards the Receivables Purchased Amount. There will be no penalty for any prepayment made by any Merchant. Any Merchant may elect to terminate this Agreement by prepaying DIESEL the amount of the balance of the Receivables Purchased Amount at that time.

**6. Merchant Deposit Agreement.** Merchant(s) shall appoint a bank acceptable to DIESEL, to obtain electronic fund transfer services and/or "ACH" payments. Merchant(s) shall provide DIESEL and/or its authorized agent with all of the information, authorizations, and passwords necessary to verify each Merchant's Receivables. Merchant(s) shall authorize DIESEL and/or its agent(s) to deduct the amounts owed to DIESEL for the Receivables as specified herein from settlement amounts which would otherwise be due to each Merchant and to pay such amounts to DIESEL by permitting DIESEL to withdraw the Specified Percentage by ACH debiting of the account. The authorization shall be irrevocable absent DIESEL's written consent.

**7. Term of Agreement.** The term of this Agreement is indefinite and shall continue until DIESEL receives the full Receivables Purchased Amount, or earlier if terminated pursuant to any provision of this Agreement. The provisions of Sections 4, 6, 7, 8, 10, 11, 13, 14, 15, 17, 18, 19, 22, 23, 28, 31, 32, 33, 34, 35, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and 58 shall survive any termination of this Agreement.

**I have read and agree to the terms and conditions set forth above:**

ECDABAE76FF6439...

| | |
|---|---|
| Name: JAMES WESLEY CASHWELL | Name: _____ |
| Title: OWNER | Title: _____ |
| Date: 06/21/2022 | Date: 06/21/2022 |

2

**82**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

INDEX NO. 523957/2022

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**8. Ordinary Course of Business.** Each Merchant acknowledges that it is entering into this Agreement in the ordinary course of its business and that the payments to be made from each Merchant to DIESEL under this Agreement are being made in the ordinary course of each Merchant's business.

**9. Financial Condition.** Each Merchant and each Guarantor (Guarantor being defined as each signatory to the Guarantee of this Agreement) authorizes DIESEL and its agent(s) to investigate each Merchant's financial responsibility and history, and will provide to DIESEL any bank or financial statements, tax returns, and other documents and records, as DIESEL deems necessary prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable for release of financial information. DIESEL is authorized to update such information and financial profiles from time to time as it deems appropriate.

**10. Monitoring, Recording, and Electronic Communications.** DIESEL may choose to monitor and/or record telephone calls with any Merchant and its owners, employees, and agents. By signing this Agreement, each Merchant agrees that any call between DIESEL and any Merchant or its representatives may be monitored and/or recorded. Each Merchant and each Guarantor grants access for DIESEL to enter any Merchant's premises and to observe any Merchant's premises without any prior notice to any Merchant at any time after execution of this Agreement.

DIESEL may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Merchant(s), Owner(s) (Owner being defined as each person who signs this Agreement on behalf of a Merchant), and Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Merchant, each Owner, and each Guarantor gives DIESEL permission to call or send a text message to any telephone number given to DIESEL in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Merchant, each Owner, and each Guarantor also gives DIESEL permission to communicate such information to them by e-mail. Each Merchant, each Owner, and each Guarantor agree that DIESEL will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Merchant, each Owner, and each Guarantor acknowledge that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that DIESEL has no liability for any such charges.

**11. Accuracy of Information Furnished by Merchant and Investigation Thereof.** To the extent set forth herein, each of the parties is obligated upon his, her, or its execution of the Agreement to all terms of the Agreement. Each Merchant and each Owner signing this Agreement represent that he or she is authorized to sign this Agreement for each Merchant, legally binding said Merchant to its obligations under this Agreement and that the information provided herein and in all of DIESEL's documents, forms, and recorded interview(s) is true, accurate, and complete in all respects. DIESEL may produce a monthly statement reflecting the delivery of the Specified Percentage of Receivables from Merchant(s) to DIESEL. An investigative report may be made in connection with the Agreement. Each Merchant and each Owner signing this Agreement authorize DIESEL, its agents and representatives, and any credit-reporting agency engaged by DIESEL, to (i) investigate any references given or any other statements obtained from or about each Merchant or any of its Owners for the purpose of this Agreement, and (ii) pull credit report at any time now or for so long as any Merchant and/or Owners(s) continue to have any obligation to DIESEL under this Agreement or for DIESEL's ability to determine any Merchant's eligibility to enter into any future agreement with DIESEL. Any misrepresentation made by any Merchant or Owner in connection with this Agreement may constitute a separate claim for fraud or intentional misrepresentation.

**12. Transactional History.** Each Merchant authorizes its bank to provide DIESEL with its banking and/or credit card processing history.

**13. Indemnification.** Each Merchant and each Guarantor jointly and severally indemnify and hold harmless each Merchant's credit card and check processors (collectively, "Processor") and Processor's officers, directors, and shareholders against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by Processor resulting from (a) claims asserted by DIESEL for monies owed to DIESEL from any Merchant and (b) actions taken by any Processor in reliance upon information or instructions provided by DIESEL.

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| Name: JAMES WESLEY CASHWELL | Name: _____ |
| Title: OWNER | Title: _____ |
| Date: 06/21/2022 | Date: 06/21/2022 |

3

**83**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

INDEX NO. 523957/2022

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**14. No Liability.** In no event will DIESEL be liable for any claims asserted by any Merchant under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect, or consequential damages, each of which is waived by each Merchant and each Guarantor.

**15. Sale of Receivables.** Each Merchant and DIESEL agree that the Purchase Price under this Agreement is in exchange for the Receivables Purchased Amount and that such Purchase Price is not intended to be, nor shall it be construed as a loan from DIESEL to any Merchant. DIESEL is entering into this Agreement knowing the risks that each Merchant's business may decline or fail, resulting in DIESEL not receiving the Receivables Purchased Amount. Each Merchant agrees that the Purchase Price in exchange for the Receivables pursuant to this Agreement equals the fair market value of such Receivables. DIESEL has purchased and shall own all the Receivables described in this Agreement up to the full Receivables Purchased Amount as the Receivables are created. Payments made to DIESEL in respect to the full amount of the Receivables shall be conditioned upon each Merchant's sale of products and services and the payment therefor by each Merchant's customers in the manner provided in this Agreement. Although certain jurisdictions require the disclosure of an Annual Percentage Rate or APR in connection with this Agreement, those disclosures do not change the fact that the transaction encompassed by this Agreement is not a loan and does not have an interest rate.

**16. Power of Attorney.** Each Merchant irrevocably appoints DIESEL as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to DIESEL, or, if DIESEL considers an Event of Default to have taken place under Section 34, to settle all obligations due to DIESEL from each Merchant, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral (which is defined in Section 33); (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents, or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign each Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to DIESEL; and (v) to file any claims or take any action or institute any proceeding which DIESEL may deem necessary for the collection of any of the unpaid Receivables Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Receivables Purchased Amount.

**17. Protections Against Default.** The following Protections 1 through 7 may be invoked by DIESEL, immediately and without notice to any Merchant in the event:

(a) Any Merchant takes any action to discourage the use of methods of payment ordinarily and customarily used by its customers or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks and credit cards for the purchase of any Merchant's services and products;

(b) Any Merchant changes its arrangements with any Processor in any way that is adverse to DIESEL;

(c) Any Merchant changes any Processor through which the Receivables are settled to another electronic check and/or credit card processor or permits any event to occur that could cause diversion of any Merchant's check and/or credit card transactions to another such processor;

(d) Any Merchant interrupts the operation of its business (other than adverse weather, natural disasters, or acts of God) or transfers, moves, sells, disposes, or otherwise conveys its business or assets without (i) the express prior written consent of DIESEL and (ii) the written agreement of any purchaser or transferee to the assumption of all of any Merchant's obligations under this Agreement pursuant to documentation satisfactory to DIESEL; or

(e) Any Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for any Merchant's goods or services with any means other than checks and/or credit cards that are settled through Processor. These protections are in addition to any other remedies available to DIESEL at law, in equity, or otherwise available pursuant to this Agreement.

(f) DIESEL considers any Event of Default listed in Section 34 to have taken place.

Protection 1: The full uncollected Receivables Purchased Amount plus all fees due under this Agreement may become due and payable in full immediately.

Protection 2. DIESEL may enforce the provisions of the Guarantee against Guarantor.

Protection 3. DIESEL may enforce its security interest in the Collateral identified in Section 33.

Protection 4. DIESEL may proceed to protect and enforce its rights and remedies by litigation or arbitration.

**I have read and agree to the terms and conditions set forth above:**

Name: JAMES WESLEY CASHWELL

Title: OWNER

Date: 06/21/2022

Name: _____

Title: _____

Date: 06/21/2022

4

**84**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM          INDEX NO. 523957/2022

NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**    RECEIVED NYSCEF: 03/25/2024

Protection 5. If requested by DIESEL, Merchant shall deliver to DIESEL an executed assignment of lease of each Merchant's premises in favor of DIESEL. Upon breach of any provision in this Section 17, DIESEL may exercise its rights under such assignment of lease.

Protection 6. DIESEL may debit any Merchant's depository accounts wherever situated by means of ACH debit or electronic or facsimile signature on a computer-generated check drawn on any Merchant's bank account or otherwise, in an amount consistent with the terms of this Agreement.

Protection 7. DIESEL will have the right, without waiving any of its rights and remedies and without notice to any Merchant and/or Guarantor, to notify each Merchant's credit card and/or check processor of the sale of Receivables hereunder and to direct such credit card processor to make payment to DIESEL of all or any portion of the amounts received by such credit card processor on behalf of each Merchant. Each Merchant hereby grants to DIESEL an irrevocable power-of-attorney, which power-of-attorney will be coupled with an interest, and hereby appoints DIESEL and its representatives as each Merchant's attorney-in-fact to take any and all action necessary to direct such new or additional credit card and/or check processor to make payment to DIESEL as contemplated by this Section.

**18. Protection of Information.** Each Merchant and each person signing this Agreement on behalf of each Merchant and/or as Owner, in respect of himself or herself personally, authorizes DIESEL to disclose information concerning each Merchant, Owner and/or Guarantor's credit standing and business conduct to agents, affiliates, subsidiaries, and credit reporting bureaus. Each Merchant, Guarantor, and Owner hereby waives to the maximum extent permitted by law any claim for damages against DIESEL or any of its affiliates relating to any (i) investigation undertaken by or on behalf of DIESEL as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**19. Confidentiality.** Each Merchant understands and agrees that the terms and conditions of the products and services offered by DIESEL, including this Agreement and any other DIESEL documents (collectively, "Confidential Information") are proprietary and confidential information of DIESEL. Accordingly, unless disclosure is required by law or court order, Merchant(s) shall not disclose Confidential Information of DIESEL to any person other than an attorney, accountant, financial advisor, or employee of any Merchant who needs to know such information for the purpose of advising any Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising any Merchant and first agrees in writing to be bound by the terms of this Section 19.

**20. D/B/As.** Each Merchant hereby acknowledges and agrees that DIESEL may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between DIESEL and each Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**21. Financial Condition and Financial Information.** Each Merchant represents, warrants, and covenants that its bank and financial statements, copies of which have been furnished to DIESEL, and future statements which will be furnished hereafter at the request of DIESEL, fairly represent the financial condition of each Merchant at such dates, and that since those dates there have been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of any Merchant. Each Merchant has a continuing affirmative obligation to advise DIESEL of any material adverse change in its financial condition, operation, or ownership.

**22. Governmental Approvals.** Each Merchant represents, warrants, and covenants that it is in compliance and shall comply with all laws and has valid permits, authorizations, and licenses to own, operate, and lease its properties and to conduct the business in which it is presently engaged.

**23. Authorization.** Each Merchant represents, warrants, and covenants that it and each person signing this Agreement on behalf of each Merchant has full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**24. Insurance.** Each Merchant represents, warrants, and covenants that it will maintain business-interruption insurance naming DIESEL as loss payee and additional insured in amounts and against risks as are satisfactory to DIESEL and shall provide DIESEL proof of such insurance upon request.

**25. Electronic Check Processing Agreement.** Each Merchant represents, warrants, and covenants that it will not, without DIESEL's prior written consent, change its Processor, add terminals, change its financial institution or bank account, or take any other action that could have any adverse effect upon any Merchant's obligations under this Agreement.

**I have read and agree to the terms and conditions set forth above:**

---

Name: JAMES WESLEY CASHWELL

Title: OWNER

Date: 06/21/2022

Name: _____

Title: _____

Date: 06/21/2022

5

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM          INDEX NO. 523957/2022
NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**     RECEIVED NYSCEF: 03/25/2024

**26. Change of Name or Location.** Each Merchant represents, warrants, and covenants that it will not conduct its business under any name other than as disclosed to DIESEL or change any place(s) of its business without prior written consent from DIESEL.

**27. Estoppel Certificate.** Each Merchant represents, warrants, and covenants that it will, at any time, and from time to time, upon at least two day's prior notice from DIESEL to that Merchant, execute, acknowledge, and deliver to DIESEL and/or to any other person or entity specified by DIESEL, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Receivables Purchased Amount or any portion thereof have been paid.

**28. No Bankruptcy.** Each Merchant represents, warrants, and covenants that as of the date of this Agreement, it does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against any Merchant. Each Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Each Merchant further warrants that there will be no statutory presumption that it would have been insolvent on the date of this Agreement.

**29. Unencumbered Receivables.** Each Merchant represents, warrants, and covenants that it has good, complete, and marketable title to all Receivables, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges, and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with this Agreement or adverse to the interests of DIESEL, other than any for which DIESEL has actual or constructive knowledge as of the date of this Agreement.

**30. Stacking.** Each Merchant represents, warrants, and covenants that it will not enter into with any party other than DIESEL any arrangement, agreement, or commitment that relates to or involves the Receivables, whether in the form of a purchase of, a loan against, collateral against, or the sale or purchase of credits against Receivables without the prior written consent of DIESEL.

**31. Business Purpose.** Each Merchant represents, warrants, and covenants that it is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and each Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family, or household purposes.

**32. Default Under Other Contracts.** Each Merchant represents, warrants, and covenants that its execution of and/or performance under this Agreement will not cause or create an event of default by any Merchant under any contract with another person or entity.

**33. Security Interest.** To secure each Merchant's payment and performance obligations to DIESEL under this Agreement and any future agreement with DIESEL, each Merchant hereby grants to DIESEL a security interest in collateral (the "Collateral"), that is defined as collectively: (a) all accounts, including without limitation, all deposit accounts, accounts-receivable, and other receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are defined by Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by any Merchant; and (b) all proceeds, as that term is defined by Article 9 of the UCC. The parties acknowledge and agree that any security interest granted to DIESEL under any other agreement between any Merchant or Guarantor and DIESEL (the "Cross-Collateral") will secure the obligations hereunder and under this Agreement. Negative Pledge: Each Merchant agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Cross-Collateral, as applicable.

Each Merchant agrees to execute any documents or take any action in connection with this Agreement as DIESEL deems necessary to perfect or maintain DIESEL's first priority security interest in the Collateral and the Cross-Collateral, including the execution of any account control agreements. Each Merchant hereby authorizes DIESEL to file any financing statements deemed necessary by DIESEL to perfect or maintain DIESEL's security interest, which financing statements may contain notification that each Merchant has granted a negative pledge to DIESEL with respect to the Collateral and the Cross-Collateral, and that any subsequent lienor may be tortiously interfering with DIESEL's rights. Each Merchant shall be liable for and DIESEL may charge and collect all costs and expenses, including but not limited to attorney fees, which may be incurred by DIESEL in protecting, preserving, and enforcing DIESEL's security interest and rights. Each Merchant further acknowledges that DIESEL may use another legal name and/or D/B/A or an agent when designating the Secured Party when DIESEL files the above-referenced financing statement(s).

**I have read and agree to the terms and conditions set forth above:**

DocuSigned by:
ECDABAE76FF6439

| | |
|---|---|
| Name: JAMES WESLEY CASHWELL | Name: |
| Title: OWNER | Title: |
| Date: 06/21/2022 | Date: 06/21/2022 |

**86**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM                    INDEX NO. 523957/2022
NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**   RECEIVED NYSCEF: 03/25/2024

**34. Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur:

(1) Any Merchant violates any term or covenant in this Agreement;

(2) Any representation or warranty by any Merchant in any Agreement with DIESEL that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made;

(3) Any Merchant fails to provide DIESEL with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period is specifically provided for elsewhere in this Agreement;

(4) the sending of notice of termination by any Merchant or Guarantor;

(5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of DIESEL other than a bankruptcy filing;

(6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of DIESEL;

(7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of DIESEL;

(8) Any Merchant uses multiple depository accounts without the prior written consent of DIESEL;

(9) Any Merchant changes the Account without the prior written consent of DIESEL;

(10) DIESEL is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant;

(11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by DIESEL;

(12) Any Merchant changes any Processor or adds terminals without the prior written consent of DIESEL;

(13) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement;

(14) Any Merchant fails to deposit its Receivables into the Account;

(15) Any Merchant causes any ACH debit to the Account by DIESEL to be blocked or stopped;

(16) Four or more ACH debits to the Account by DIESEL are returned for not sufficient funds (NSF) without advance written notice from any Merchant;

(17) Any Merchant prevents DIESEL from collecting any part of the Receivables Purchased Amount;

(18) Any Merchant causes any ACH debit to the Account to be stopped that would result in an ACH Return Code of R08 or R10 and that Merchant does not within two business days thereafter provide DIESEL with written notice thereof explaining why that Merchant caused the ACH debit to be stopped, which notice may be given by e-mail to Info@dieselfunding.com; or

(19) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with DIESEL.

**35. Remedies.** In case any Event of Default occurs and is not waived, DIESEL may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement, or other provision contained herein, or to enforce the discharge of each Merchant's obligations hereunder, or any other legal or equitable right or remedy. All rights, powers, and remedies of DIESEL in connection with this Agreement, including each Protection listed in Section 17, may be exercised at any time by DIESEL after the occurrence of an Event of Default, are cumulative and not exclusive, and will be in addition to any other rights, powers, or remedies provided by law or equity. In addition to the foregoing, in case any Event of Default occurs and is not waived, DIESEL will be entitled to the issuance of an injunction, restraining order, or other equitable relief in DIESEL's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to DIESEL as a result of the Event of Default, and each Merchant will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction without any prior notice to any Merchant or Guarantor and without DIESEL being required to furnish a bond or other undertaking in connection with the application.

**36. Required Notifications.** Each Merchant is required to give DIESEL written notice at least one day prior to any filing under Title 11 of the United States Code. Merchant(s) are required to give DIESEL at least seven days' written notice prior to the closing of any sale of all or substantially all of any Merchant's assets or stock.

**37. Assignment.** This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns, except that Merchant(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of DIESEL, which consent may be withheld in DIESEL's sole discretion. DIESEL may assign, transfer, or sell its rights under this Agreement, including, without limitation, its rights to receive the Receivables Purchased Amount, and its rights under

**I have read and agree to the terms and conditions set forth above:**

_____          _____

Name: JAMES WESLEY CASHWELL                         Name: _____

Title: OWNER                                         Title: _____

Date: 06/21/2022                                     Date: 06/21/2022

7

**87**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM          INDEX NO. 523957/2022
NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**   RECEIVED NYSCEF: 03/25/2024

Section 33 of this Agreement, the Guarantee, and any other agreement, instrument, or document executed in connection with the transactions contemplated by this Agreement (a "Related Agreement"), or delegate its duties hereunder or thereunder, either in whole or in part. From and after the effective date of any such assignment or transfer by DIESEL, whether or not any Merchant has actual notice thereof, this Agreement and each Related Agreement shall be deemed amended and modified (without the need for any further action on the part of any Merchant or DIESEL) such that the assignee shall be deemed a party to this Agreement and any such Related Agreement and, to the extent provided in the assignment document between DIESEL and such assignee (the "Assignment Agreement"), have the rights and obligations of DIESEL under this Agreement and such Related Agreements with respect to the portion of the Receivables Purchased Amount set forth in such Assignment Agreement, including but not limited to rights in the Receivables, Collateral and Additional Collateral, the benefit of each Guarantor's guaranty regarding the full and prompt performance of every obligation that is a subject of the Guarantee, DIESEL's rights under Section 17 of this Agreement (Protections Against Default), and to receive damages from any Merchant following a breach of this Agreement by any Merchant. In connection with such assignment, DIESEL may disclose all information that DIESEL has relating to any Merchant or its business. Each Merchant agrees to acknowledge any such assignment in writing upon DIESEL's request.

**38. Notices.** All notices, requests, consents, demands, and other communications hereunder to DIESEL shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to 633 NE 167th Street, Suite 831, North Miami Beach, FL 33162 and shall become effective only upon receipt. All notices, requests, consents, demands, and other communications hereunder to Merchant(s) and Guarantor(s) shall be delivered by certified mail, return receipt requested, or by overnight delivery with signature confirmation addressed to their addresses set forth in this Agreement and shall become effective only upon receipt. Written notice may also be given to any Merchant or Guarantor by e-mail to the E-mail Address listed on the first page of this Agreement. Each Merchant must set its spam or junk mail filter to accept e-mails sent by Info@dieselfunding.com and its domain. This Section is not applicable to service of process or notices in any legal proceedings.

**39. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, Diesel and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Diesel which consent may be withheld in Diesel's sole discretion. Diesel reserves the rights to assign this Agreement with or without prior written notice to Merchant. **This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Diesel elects, be instituted in any court sitting in the States of New York or Connecticut, (the "Acceptable Forums").** Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Diesel to transfer such proceeding to an Acceptable Forum.

**40. Jury Waiver.** The parties agree to waive trial by jury in any dispute between them.

**41. Counterclaim Waiver.** In any litigation or arbitration commenced by DIESEL, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**42. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against DIESEL within one year of its accrual will be time barred.

**43. Costs.** Each Merchant and each Guarantor must pay all of DIESEL's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement and the enforcement thereof, including but not limited to collection agency fees, attorney fees, which may include a contingency fee of up to 40% of the amount claimed, expert witness fees, and costs of suit.

**44. Prejudgment and Postjudgment Interest.** If DIESEL becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then DIESEL will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**I have read and agree to the terms and conditions set forth above:**

Name: JAMES WESLEY CASHWELL _____     Name: _____

Title: OWNER _____     Title: _____

Date: 06/21/2022 _____     Date: 06/21/2022 _____

**8**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM                    INDEX NO. 523957/2022
NYSCEF DOC. NO. 23            **STANDARD MERCHANT CASH ADVANCE AGREEMENT**   RECEIVED NYSCEF: 03/25/2024

**45. Legal Fees.** If DIESEL prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay DIESEL's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**46. Class Action Waiver.** DIESEL, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**47. PREJUDGMENT REMEDY WAIVER. EACH AND EVERY MERCHANT OR GUARANTOR OF THIS AGREEMENT AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTION 52- 278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT OR GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH THE PURCHASER HEREOF MAY BECOME ENTITILED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT AND (B) ALL RIGHTS TO REQUEST THAT THE PURCHASER HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANT OR GURANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE PURCHASER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT.**

**48. Arbitration.** Any action or dispute relating to this Agreement or involving DIESEL on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Merchant and each Guarantor consents to DIESEL making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in DIESEL's favor, subject to court or arbitrator approval, restraining each Merchant's accounts and/or receivables up to the amount due to DIESEL as a result of the Event of Default.

Each Merchant acknowledges and agrees that this Agreement is the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under this Agreement will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that this Agreement therefore evidences a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in this Agreement to the contrary, all matters of arbitration relating to this Agreement will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of DIESEL.

**49. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of this Agreement or any other address(es) provided in writing to DIESEL by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of this Agreement if it does not furnish a certified mail return receipt signed by DIESEL demonstrating that DIESEL was provided with notice of a change in the Contact Address.

I have read and agree to the terms and conditions set forth above:

Name: JAMES WESLEY CASHWELL _____   Name: _____

Title: OWNER _____   Title: _____

Date: 06/21/2022 _____   Date: 06/21/2022 _____

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM            INDEX NO. 523957/2022
NYSCEF DOC. NO. 23                                       RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**50. Survival of Representation, etc.** All representations, warranties, and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

**51. Waiver.** No failure on the part of DIESEL to exercise, and no delay in exercising, any right under this Agreement, shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

**52. Independent Sales Organizations/Brokers.** Each Merchant and each Guarantor acknowledge that it may have been introduced to DIESEL by or received assistance in entering into this Agreement or its Guarantee from an independent sales organization or broker ("ISO"). Each Merchant and each Guarantor agree that any ISO is separate from and is not an agent or representative of DIESEL. Each Merchant and each Guarantor acknowledge that DIESEL is not bound by any promises or agreements made by any ISO that are not contained within this Agreement. Each Merchant and each Guarantor exculpate from liability and agree to hold harmless and indemnify DIESEL and its officers, directors, members, shareholders, employees, and agents from and against all losses, damages, claims, liabilities, and expenses (including reasonable attorney and expert fees) incurred by any Merchant or any Guarantor resulting from any act or omission by any ISO. Each Merchant and each Guarantor acknowledge that any fee that they paid to any ISO for its services is separate and apart from any payment under this Agreement. Each Merchant and each Guarantor acknowledge that DIESEL does not in any way require the use of an ISO and that any fees charged by any ISO are not required as a condition or incident to this Agreement.

**53. Modifications; Agreements.** No modification, amendment, waiver, or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by all parties.

**54. Severability.** If any provision of this Agreement is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Agreement is deemed void, all other provisions will remain in effect.

**55. Headings.** Headings of the various articles and/or sections of this Agreement are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**56. Attorney Review.** Each Merchant acknowledges that it has had an opportunity to review this Agreement and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**57. Entire Agreement.** This Agreement, inclusive of all addenda, if any, executed simultaneously herewith constitutes the full understanding of the parties to the transaction herein and may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Agreement and any other document preceding it, this Agreement will govern. This Agreement does not affect any previous agreement between the parties unless such an agreement is specifically referenced herein. This Agreement will not be affected by any subsequent agreement between the parties unless this Agreement is specifically referenced therein.

**58. Counterparts; Fax and Electronic Signatures.** This Agreement may be executed electronically and in counterparts. Facsimile and electronic copies of this Agreement will have the full force and effect of an original.

<div align="center">

**SIGNATURES TO FOLLOW ON NEXT PAGE**

</div>

I have read and agree to the terms and conditions set forth above:

Name: JAMES WESLEY CASHWELL

Title: OWNER

Date: 06/21/2022

Name: _____

Title: _____

Date: 06/21/2022

**90**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM   INDEX NO. 523957/2022

NYSCEF DOC. NO. 23   **STANDARD MERCHANT CASH ADVANCE AGREEMENT**   RECEIVED NYSCEF: 03/25/2024

**FOR THE MERCHANT/OWNER (#1)**

DocuSigned by:

*JWesley Cashwell*

ECDABAE76FF6439...

By: JAMES WESLEY CASHWELL _____   OWNER _____   _____
           Print Name           Title           Signature

SS#: ▮▮▮▮ _____   Driver License Number: ▮▮▮▮ _____

**FOR THE MERCHANT/OWNER (#2)**

By: _____   _____   _____
           Print Name           Title           Signature

SS#: _____   Driver License Number: _____

Approved for DIESEL FUNDING LLC by: _____

11

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

RECEIVED NYSCEF: 03/25/2024

INDEX NO. 523957/2022

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## GUARANTEE

**G1. Personal Guarantee of Performance.** This is a personal guaranty of performance, dated _____06/21/2022_____, of the Standard Merchant Cash Advance Agreement, dated _____06/21/2022_____ ("Agreement"), inclusive of all addenda, if any, executed simultaneously therewith, by and between DIESEL FUNDING LLC ("DIESEL") and BUILD RETAIL INC ("Merchant"). Each undersigned Guarantor hereby guarantees each Merchant's performance of all of the representations, warranties, and covenants made by each Merchant to DIESEL in the Agreement, inclusive of all addenda, if any, executed simultaneously herewith, as the Agreement may be renewed, amended, extended, or otherwise modified (the "Guaranteed Obligations"). Each Guarantor's obligations are due at the time of any breach by any Merchant of any representation, warranty, or covenant made by any Merchant in the Agreement.

**G2. Communications.** DIESEL may use automated telephone dialing, text messaging systems, and e-mail to provide messages to Guarantor(s) about Merchant(s)'s account. Telephone messages may be played by a machine automatically when the telephone is answered, whether answered by an Owner, a Guarantor, or someone else. These messages may also be recorded by the recipient's answering machine or voice mail. Each Guarantor gives DIESEL permission to call or send a text message to any telephone number given to DIESEL in connection with this Agreement and to play pre-recorded messages and/or send text messages with information about this Agreement and/or any Merchant's account over the phone. Each Guarantor also gives DIESEL permission to communicate such information to them by e-mail. Each Guarantor agrees that DIESEL will not be liable to any of them for any such calls or electronic communications, even if information is communicated to an unintended recipient. Each Guarantor acknowledges that when they receive such calls or electronic communications, they may incur a charge from the company that provides them with telecommunications, wireless, and/or Internet services, and that DIESEL has no liability for any such charges.

**G3. Guarantor Waivers.** If DIESEL considers any Event of Default to have taken place under the Agreement, then DIESEL may enforce its rights under this Guarantee without first seeking to obtain payment from any Merchant, any other guarantor, or any Collateral, Additional Collateral, or Cross-Collateral DIESEL may hold pursuant to this Guarantee or any other agreement or guarantee. DIESEL does not have to notify any Guarantor of any of the following events and Guarantor(s) will not be released from its obligations under this Guarantee even if it is not notified of: (i) any Merchant's failure to pay timely any amount owed under the Agreement; (ii) any adverse change in any Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; (iv) DIESEL's acceptance of the Agreement with any Merchant; and (v) any renewal, extension, or other modification of the Agreement or any Merchant's other obligations to DIESEL. In addition, DIESEL may take any of the following actions without releasing any Guarantor from any obligations under this Guarantee: (i) renew, extend, or otherwise modify the Agreement or any Merchant's other obligations to DIESEL; (ii) if there is more than one Merchant, release a Merchant from its obligations to DIESEL such that at least one Merchant remains obligated to DIESEL; (iii) sell, release, impair, waive, or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guarantee of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under the Agreement. Until the Receivables Purchased Amount and each Merchant's other obligations to DIESEL under the Agreement and this Guarantee are paid in full, each Guarantor shall not seek reimbursement from any Merchant or any other guarantor for any amounts paid by it under the Agreement. Each Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against any Merchant, any other guarantor, or any collateral provided by any Merchant or any other guarantor, for any amounts paid by it or acts performed by it under this Guarantee: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**G4. Joint and Several Liability.** The obligations hereunder of the persons or entities constituting each Guarantor under this Guarantee are joint and several.

**G5. Injunctive Relief.** In case any Event of Default occurs and is not waived, DIESEL will be entitled to the issuance of an injunction, restraining order, or other equitable relief in DIESEL's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to DIESEL as a result of the Event of Default, and each Guarantor will be deemed to have consented to the granting of an application for the same to any court or arbitral tribunal of competent jurisdiction

I have read and agree to the terms and conditions set forth above:

_____
Name: JAMES WESLEY CASHWELL

Title: OWNER

Date: 06/21/2022

_____
Name: _____

Title: _____

Date: 06/21/2022

**12**

**92**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

INDEX NO. 523957/2022

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

without any prior notice to any Merchant or Guarantor and without DIESEL being required to furnish a bond or other undertaking in connection with the application.

**G6. Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, Diesel and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Diesel which consent may be withheld in Diesel's sole discretion. Diesel reserves the rights to assign this Agreement with or without prior written notice to Merchant. **This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Diesel elects, be instituted in any court sitting in the States of New York or Connecticut, (the "Acceptable Forums").** Merchant agrees that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by Diesel to transfer such proceeding to an Acceptable Forum.

**G7. Jury Waiver.** Each Guarantor agrees to waive trial by jury in any dispute with DIESEL.

**G8. Counterclaim Waiver.** In any litigation or arbitration commenced by DIESEL, each Merchant and each Guarantor will not be permitted to interpose any counterclaim.

**G9. Statutes of Limitations.** Each Merchant and each Guarantor agree that any claim that is not asserted against DIESEL within one year of its accrual will be time barred.

**G10. Costs.** Each Merchant and each Guarantor must pay all of DIESEL's reasonable costs associated with a breach by any Merchant of the covenants in this Agreement or this Guarantee and the enforcement thereof, including but not limited to collection agency fees, expert witness fees, and costs of suit.

**G11. Prejudgment and Postjudgment Interest.** If DIESEL becomes entitled to the entry of a judgment against any Merchant or any Guarantor, then DIESEL will be entitled to the recovery of prejudgment interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, and upon entry of any such judgment, it will accrue interest at a rate of 24% per annum (or 16% per annum if any Merchant is a sole proprietorship), or the maximum rate permitted by applicable law if less, which rate will govern over the statutory rate of interest up until actual satisfaction of the judgment.

**G12. Legal Fees.** If DIESEL prevails in any litigation or arbitration with any Merchant or any Guarantor, then that Merchant and/or Guarantor must pay DIESEL's reasonable attorney fees, which may include a contingency fee of up to 40% of the amount claimed.

**G13. Class Action Waiver.** DIESEL, each Merchant, and each Guarantor agree that they may bring claims against each other relating to this Agreement only in their individual capacities, and not as a plaintiff or class action member in any purported class or representative proceedings.

**G14. PREJUDGMENT REMEDY WAIVER. EACH AND EVERY MERCHANT OR GUARANTOR OF THIS AGREEMENT AND EACH OTHER PERSON OR ENTITY WHO MAY BECOME  LIABLE FOR ALL OR ANY PART OF THIS OBLIGATION, HEREBY ACKNOWLEDGE THAT THE TRANSACTION OF WHICH THIS AGREEMENT IS A PART IS A COMMERCIAL TRANSACTION, AND TO THE EXTENT ALLOWED UNDER CONNECTICUT GENERAL STATUTES SECTION 52- 278a TO 52-278m, INCLUSIVE, OR BY OTHER APPLICABLE LAW EACH AND EVERY MERCHANT OR GUARANTOR OF THIS AGREEMENT HEREBY WAIVE (A) ALL RIGHTS TO NOTICE AND PRIOR COURT HEARING OR COURT ORDER IN CONNECTION WITH ANY AND ALL PREJUDGMENT REMEDIES TO WHICH THE PURCHASER HEREOF MAY BECOME ENTITILED BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT AND (B) ALL RIGHTS TO REQUEST THAT THE PURCHASER HEREOF POST A BOND, WITH OR WITHOUT SURETY, TO PROTECT SAID MERCHANT OR GURANTOR AGAINST DAMAGES THAT MAY BE CAUSED BY ANY PREJUDGMENT REMEDY SOUGHT OR OBTAINED BY THE PURCHASER HEREOF BY VIRTUE OF ANY DEFAULT OR PROVISION OF THIS AGREEMENT.**

**G15. Arbitration.** Any action or dispute relating to this Agreement or this Guarantee or involving DIESEL on one side and any Merchant or any Guarantor on the other, including, but not limited to issues of arbitrability, will, at the option of any party to such action or dispute, be determined by arbitration before a single arbitrator. The arbitration will be administered either by Arbitration Services, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at

**I have read and agree to the terms and conditions set forth above:**

| | |
|---|---|
| Name: JAMES WESLEY CASHWELL | Name: |
| Title: OWNER | Title: |
| Date: 06/21/2022 | Date: 06/21/2022 |

13

**93**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM    INDEX NO. 523957/2022
NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**    RECEIVED NYSCEF: 03/25/2024

www.arbitrationservicesinc.com, or by Mediation & Commercial Arbitration, Inc. under its Commercial Arbitration Rules as are in effect at that time, which rules are available at www.mcarbitration.org. Once an arbitration is initiated with one of these arbitral forums, it must be maintained exclusively before that arbitral forum and the other arbitral forum specified herein may not be used. Any arbitration relating to this Agreement or this Guarantee must be conducted in the Counties of Nassau, New York, Queens, or Kings in the State of New York. Notwithstanding any provision of any applicable arbitration rules, any witness in an arbitration who does not reside in or have a place for the regular transaction of business located in New York City or the Counties of Nassau, Suffolk, or Westchester in the State of New York will be permitted to appear and testify remotely by telephone or video conferencing. In case any Event of Default occurs and is not waived, each Guarantor consents to DIESEL making an application to the arbitrator, without notice to any Merchant or any Guarantor, for the issuance of an injunction, restraining order, or other equitable relief in DIESEL's favor, subject to court or arbitrator approval, restraining each Guarantor's accounts and/or receivables up to the amount due to DIESEL as a result of the Event of Default.

Each Guarantor acknowledges and agrees that the Agreement and this Guarantee are the product of communications conducted by telephone and the Internet, which are instrumentalities of interstate commerce, and that the transactions contemplated under the Agreement and this Guarantee will be made by wire transfer and ACH, which are also instrumentalities of interstate commerce, and that the Agreement and this Guarantee therefore evidence a transaction affecting interstate commerce. Accordingly, notwithstanding any provision in the Agreement or this Guarantee to the contrary, all matters of arbitration relating to the Agreement or this Guarantee will be governed by and construed in accordance with the provisions of the Federal Arbitration Act, codified as Title 9 of the United States Code, however any application for injunctive relief in aid of arbitration or to confirm an arbitration award may be made under Article 75 of the New York Civil Practice Law and Rules. The arbitration agreement contained in this Section may also be enforced by any employee, agent, attorney, member, manager, officer, subsidiary, affiliate entity, successor, or assign of DIESEL.

**G16. Service of Process.** Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the Contact Address set forth on the first page of the Agreement or any other address(es) provided in writing to DIESEL by any Merchant or any Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete three days after dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the Contact Address set forth on the first page of the Agreement if it does not furnish a certified mail return receipt signed by DIESEL demonstrating that DIESEL was provided with notice of a change in the Contact Address.

**G17. Severability.** If any provision of this Guarantee is deemed invalid or unenforceable as written, it will be construed, to the greatest extent possible, in a manner which will render it valid and enforceable, and any limitation on the scope or duration of any such provision necessary to make it valid and enforceable will be deemed to be part thereof. If any provision of this Guarantee is deemed void, all other provisions will remain in effect.

**G18. Survival.** The provisions of Sections G2, G3, G4, G5, G6, G7, G8, G9, G10, G11, G12, G13, G14, G15, G16, G17, G18, G19, G20, G21, and G22 shall survive any termination of this Guarantee.

**G19. Headings.** Headings of the various articles and/or sections of this Guarantee are for convenience only and do not necessarily define, limit, describe, or construe the contents of such articles or sections.

**G20. Attorney Review.** Each Guarantor acknowledges that it has had an opportunity to review this Guarantee, the Agreement, and all addenda with counsel of its choosing before signing the documents or has chosen not to avail itself of the opportunity to do so.

**G21. Entire Agreement.** This Guarantee, inclusive of all addenda, if any, executed simultaneously herewith may not be amended, modified, or canceled except in writing signed by all parties. Should there arise any conflict between this Guarantee and any other document preceding it, this Guarantee will govern. This Guarantee does not affect any previous agreement between the parties unless such an agreement is specifically referenced in the Agreement or herein. This Guarantee will not be affected by any subsequent agreement between the parties unless this Guarantee is specifically referenced therein.

**G22. Counterparts; Fax and Electronic Signatures.** This Guarantee may be executed electronically and in counterparts. Facsimile and electronic copies of this Guarantee will have the full force and effect of an original.

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "STANDARD MERCHANT CASH ADVANCE AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS GUARANTEE. CAPITALIZED

**I have read and agree to the terms and conditions set forth above:**

Name: JAMES WESLEY CASHWELL          Name: _____

Title: OWNER                         Title: _____

Date: 06/21/2022                     Date: 06/21/2022

**14**

**94**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

INDEX NO. 523957/2022

NYSCEF DOC. NO. 23

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

TERMS NOT DEFINED IN THIS GUARANTEE SHALL HAVE THE MEANING SET FORTH IN THE STANDARD MERCHANT CASH ADVANCE AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

**SIGNATURES TO FOLLOW ON NEXT PAGE**

DocuSigned by:

*Wesley Cashwell*

ECDABAE76FF6439...

**I have read and agree to the terms and conditions set forth above:**

Name: JAMES WESLEY CASHWELL

Title: OWNER

Date: 06/21/2022

Name: _____

Title: _____

Date: 06/21/2022

**15**

**95**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

INDEX NO. 523957/2022

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

**THE UNDERSIGNED HEREBY ACCEPT THE TERMS OF THIS GUARANTEE**

**FOR THE GUARANTOR (#1)**

By: JAMES WESLEY CASHWELL          OWNER
      Print Name                            Title                                    Signature

SS#: ▮▮▮▮                                                 Driver License Number: ▮▮▮▮

**FOR THE GUARANTOR (#2)**

By: _____          _____          _____
      Print Name                            Title                                    Signature

SS#: _____          Driver License Number: _____

16

**96**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM
NYSCEF DOC. NO. 23

INDEX NO. 523957/2022
RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

### ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ESTIMATED PAYMENTS

This is an Addendum, dated _____06/21/2022_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____06/21/2022_____, between DIESEL FUNDING LLC ("DIESEL") and BUILD RETAIL INC _____ ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Instead of debiting the _____27_____ Specified Percentage of Merchant's Receivables, DIESEL may instead debit _____$ 7,432.18_____ ("Estimated Payment") from the Account every _____DAY_____. The Estimated Payment is intended to be an approximation of no more than the Specified Percentage.

Any Merchant may give written notice to DIESEL requesting that DIESEL conduct a reconciliation in order to ensure that the amount that DIESEL has collected equals the Specified Percentage of Merchant(s)'s Receivables under this Agreement. Any Merchant may give written notice requesting a reconciliation. A request for reconciliation may also be made by e-mail to Info@dieselfunding.com and such notice will be deemed to have been received if and when DIESEL sends a reply e-mail (but not a read receipt). If such reconciliation determines that DIESEL collected more than it was entitled to, then within seven days thereafter, DIESEL will credit to the Account all amounts to which DIESEL was not entitled and decrease the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation. If such reconciliation determines that DIESEL collected less than it was entitled to, then within seven days thereafter, DIESEL will debit from the Account all additional amounts to which DIESEL was entitled and increase the Estimated Payment so that it is consistent with the Specified Percentage of Merchant(s)'s Receivables from the date of the Agreement through the date of the reconciliation, with the increase being subject to any Cap in place on collections. In order to effectuate this reconciliation, any Merchant must produce with its request the login and password for the Account and any and all bank statements and merchant statements covering the period from the date of this Agreement through the date of the request for a reconciliation. DIESEL will complete each such reconciliation within two business days after receipt of a written request for one accompanied by the information and documents required for it. Nothing herein limits the amount of times that such a reconciliation may be requested.

**FOR THE MERCHANT/OWNER (#1)**

DocuSigned by:

JWesley Cashwell

ECDABAE76FF8439...

By: JAMES WESLEY CASHWELL _____     OWNER _____     _____
       Print Name                                    Title                                   Signature


**FOR THE MERCHANT/OWNER (#2)**

By: _____     _____     _____
       Print Name                       Title                                   Signature

17

**97**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM
DocuSign Envelope ID: F8C28C37-2765-40F6-898C-FFCDB28DED10

INDEX NO. 523957/2022

NYSCEF DOC. NO. 23          **STANDARD MERCHANT CASH ADVANCE AGREEMENT**          RECEIVED NYSCEF: 03/25/2024

### ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT FOR ADDITIONAL FEES

This is an Addendum, dated _____06/21/2022_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____06/21/2022_____, between DIESEL FUNDING LLC ("DIESEL") and _BUILD RETAIL INC_____ ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

Each Merchant may be held responsible for an NSF/ Rejected ACH Fee of $50.00 for each time an ACH debit to the Account by DIESEL is returned or otherwise rejected. No Merchant will be held responsible for such a fee if any Merchant gives DIESEL advance notice of no more than one business day in advance that the Account has insufficient funds to be debited by DIESEL and no Merchant is otherwise in default of the terms of the Agreement. Each such fee may be deducted from any payment collected by DIESEL or may be collected in addition to any other payment collected by DIESEL under this Agreement.

**FOR THE MERCHANT/OWNER (#1)**

By: _JAMES WESLEY CASHWELL_____     _OWNER_____     _____
          Print Name                            Title                                 Signature

**FOR THE MERCHANT/OWNER (#2)**

By: _____     _____     _____
          Print Name                            Title                                 Signature

18

**98**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM

NYSCEF DOC. NO. 23

INDEX NO. 523957/2022

RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT

This is an Addendum, dated _____06/21/2022_____, to the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____06/21/2022_____, between DIESEL FUNDING LLC ("DIESEL") and BUILD RETAIL INC _____ ("Merchant").

Merchant(s) instruct DIESEL to pay up to ____$ 380,727.52____ of the Purchase Price set forth in the Agreement to ____DIESEL FUNDING LLC_____ instead of to Merchant(s). The balance of the Purchase Price will be paid to Merchant(s).

Additional comments: _____
_____
_____
_____

**FOR THE MERCHANT/OWNER (#1)**

By: JAMES WESLEY CASHWELL          OWNER_____          _____
Print Name                              Title                              Signature

**FOR THE MERCHANT/OWNER (#2)**

By: _____          _____          _____
Print Name                              Title                              Signature

19

**99**

FILED: KINGS COUNTY CLERK 03/25/2024 03:33 PM
NYSCEF DOC. NO. 23

INDEX NO. 523957/2022
RECEIVED NYSCEF: 03/25/2024

**STANDARD MERCHANT CASH ADVANCE AGREEMENT**

## DECLARATION OF ORDINARY COURSE OF BUSINESS

Each undersigned hereby declares the following:

1.  I am duly authorized to sign the Standard Merchant Cash Advance Agreement ("Agreement"), dated _____06/21/2022_____, between DIESEL FUNDING LLC ("DIESEL") and _BUILD RETAIL INC_____ ("Merchant") on behalf of Merchant.
2.  This Declaration incorporates by reference the Agreement and every addendum to it.
3.  I acknowledge that I am authorized to sign the Agreement and every addendum to it on behalf of each Merchant.
4.  I acknowledge that I had sufficient time to review the Agreement and every addendum to it before signing it.
5.  I acknowledge that I had an opportunity to seek legal advice from counsel of my choosing before signing the Agreement and every addendum to it.
6.  I acknowledge that each Merchant is entering into the Agreement voluntarily and without any coercion.
7.  I acknowledge that each Merchant is entering into the Agreement in the ordinary course of its business.
8.  I acknowledge that the payments to be made from any Merchant to DIESEL under the Agreement are being made in the ordinary course of each Merchant's business.
9.  **I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.**

Executed on _____06/21/2022_____
(Date)

**FOR THE MERCHANT/OWNER (#1)**

DocuSigned by:
_J Wesley Cashwell_
ECDABAE76FF6439...

By: _JAMES WESLEY CASHWELL_____    _OWNER_____    _____
Print Name                          Title                          Signature

**FOR THE MERCHANT/OWNER (#2)**

By: _____    _____    _____
Print Name                          Title                          Signature

20

**Broughton Construction LLC**
**A/R Aging Detail**
As of September 7, 2022

# Exhibit I

| | Type | Date | Num | P. O. # | Name | Terms | Due Date | Class | Open Balance |
|---|---|---|---|---|---|---|---|---|---|
| **Current** | | | | | | | | | |
| Total Current | | | | | | | | | |
| **1 - 30** | | | | | | | | | |
| | Invoice | 08/25/2022 | 18-009-015 | | Clark Construction Group, LLC:18-009 MGUH | Net 45 | 09/24/2022 | | 11,485.48 |
| | Invoice | 08/25/2022 | 22-013-003 | | Howl at the Moon DC, LLC:22-013 Howl at the Moon | Net 30 | 09/24/2022 | | 5,473.30 |
| | Invoice | 08/25/2022 | 20-028-001 | | OPEFM:20-028 Hart MS HVAC Upgrade/Kitchen Impr | Net 30 | 09/24/2022 | | 160,676.97 |
| | Invoice | 08/26/2022 | 22-012B-02 | | Sylvan Construction Services, LLC:22-012B - Sylvan Pathway Construction | Net 30 | 09/25/2022 | | 30,317.00 |
| | Invoice | 08/26/2022 | 22-0031S-03 | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 09/25/2022 | | 4,850.00 |
| | Invoice | 08/26/2022 | FY22-0070-1 | PO667260 | OPEFM:22-001G - OnCall-DCAM-22-NC-SP-0070 COVID | Net 30 | 09/25/2022 | | 42,584.76 |
| | Invoice | 08/26/2022 | FY22-0057A2 | 663433 | OPEFM:22-001D - OnCall-DCAM-22-NC-SP-0057A Roof | Net 30 | 09/25/2022 | | 12,692.00 |
| | Invoice | 08/26/2022 | FY22-EM-001 | | OPEFM:22-001H - OnCall-DCAM-22-NC-EM-0070SES | Net 30 | 09/25/2022 | | 89,016.82 |
| | Invoice | 08/30/2022 | 21-012-006 | 647003 | OPEFM:21-012 Leckie Edu Campus New Marquee Sign | Net 30 | 09/29/2022 | | 17,583.55 |
| | Invoice | 08/30/2022 | 21-023-003 | 659524-666956 | OPEFM:21-023 Wheatley Child Development Center | Net 30 | 09/29/2022 | | 405,000.00 |
| | Invoice | 08/30/2022 | 21-023-004 | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 09/29/2022 | | 80,289.64 |
| | Invoice | 08/30/2022 | 21-023-005 | | Campus Apartments Management, LLC:22-022 - Howard University West Towers 19 | Net 30 | 09/29/2022 | | 179,600.00 |
| | Invoice | 08/30/2022 | 22-016B-001 | | Corenic Construction Group:22-016B - Outdoor Classroom (Chamberlain) | Net 30 | 09/29/2022 | | 3,150.00 |
| | Invoice | 08/30/2022 | 22-018-002 | | OPEFM:22-018 Martin Luther King Child Develo | Net 30 | 09/29/2022 | | 19,267.20 |
| | Invoice | 08/30/2022 | 22-017-001 | | OPEFM:22-017 CHML Playground - Roof Upgrades | Net 30 | 09/29/2022 | | 9,940.78 |
| | Invoice | 08/30/2022 | FY22-0057A3 | 663433 | OPEFM:22-001D - OnCall-DCAM-22-NC-SP-0057A Roof | Net 30 | 09/29/2022 | | 69,438.00 |
| | Invoice | 08/30/2022 | 22-009-002 | | OPEFM:22-009 Garfield Park Playground Reno | Net 30 | 09/29/2022 | | 33,616.53 |
| | Invoice | 09/01/2022 | 22-002-004 | 659705 | OPEFM:22-002 Hart MS Classroom Conversion | Net 30 | 10/01/2022 | | 76,277.38 |
| Total 1 - 30 | | | | | | | | | 1,251,259.41 |
| **31 - 60** | | | | | | | | | |
| | Invoice | 07/30/2022 | 22-001C-001 | | OPEFM:22-001C OnCall DCAM-22 Chevy Chase PGR | Net 30 | 08/29/2022 | | 9,628.40 |
| | Invoice | 07/30/2022 | 22-001D-001 | 663433 | OPEFM:22-001D - OnCall-DCAM-22-NC-SP-0057A Roof | Net 30 | 08/29/2022 | | 17,870.00 |
| | Invoice | 07/30/2022 | 22-001E-001 | | OPEFM:22-001E - OnCall-DCAM-22-NC-SP-0079 Roof | Net 30 | 08/29/2022 | | 9,919.44 |
| | Invoice | 07/31/2022 | 22-016A-001 | | Corenic Construction Group:22-016A - Outdoor Classroom (Collegiate) | Net 30 | 08/30/2022 | | 62,371.66 |
| | Invoice | 07/31/2022 | 001-Howard | | Campus Apartments Management, LLC:22-022 - Howard University West Towers 19 | Net 30 | 08/30/2022 | | 269,350.00 |
| | Invoice | 08/01/2022 | DPW-001 | | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 08/31/2022 | | 140,000.00 |
| | Invoice | 08/01/2022 | 21-023-002 | 659524-666956 | OPEFM:21-023 Wheatley Child Development Center | Net 30 | 08/31/2022 | | 63,987.08 |
| | Invoice | 08/01/2022 | 22-018-001 | | OPEFM:22-018 Martin Luther King Child Develo | Net 30 | 08/31/2022 | | 8,157.85 |
| Total 31 - 60 | | | | | | | | | 581,284.43 |
| **61 - 90** | | | | | | | | | |
| | Invoice | 06/10/2022 | 22-001F-001 | 665669 | OPEFM:22-001F -DCAM-22-NC-SP-0088 Ward-1 Covid | Net 30 | 07/10/2022 | | 99,990.32 |
| | Invoice | 07/01/2022 | 91401 | | Sylvan Construction Services, LLC:22-012A Sylvan Field Services & On-Call | | 07/01/2022 | | 125.00 |
| Total 61 - 90 | | | | | | | | | 100,115.32 |
| **> 90** | | | | | | | | | |
| | Invoice | 08/26/2019 | 19-023-005 | | District of Columbia Housing Authority:19-007 DCHA-Vacant Unit Repair/Make Ready | Net 45 | 10/10/2019 | | 236,313.89 |
| | Invoice | 10/26/2019 | 19-023-003 | 607714 | OPEFM:17-024 Office of Cable Television Design | Net 30 | 11/25/2019 | | 45,128.66 |
| | Invoice | 12/23/2019 | 19-022-002 | 607714 | OPEFM:17-024 Office of Cable Television Design | Net 30 | 01/22/2020 | | 308,996.00 |
| | Invoice | 12/23/2019 | 19-022-003 | | DPW:17-031 Net Facilities-Robert Garrett | Net 30 | 01/22/2020 | | 49,997.00 |
| | Invoice | 10/31/2021 | 13-PH-II | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 11/30/2021 | | 30,197.99 |
| | Invoice | 11/12/2021 | 13-PH-IIA | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 12/12/2021 | | 1,252.01 |
| | Invoice | 12/29/2021 | 20-023-016 | 627720-641947 | OPEFM:20-023 Tyler ES SChool New HVAC @ Cafe | Net 30 | 01/28/2022 | | 30,060.64 |
| | Invoice | 12/30/2021 | PG--BLITZ | | OPEFM:21-001 On Call Construction FY2021 | Net 30 | 01/29/2022 | | 108,044.16 |
| | Invoice | 12/30/2021 | BLITZ-GROUP | | OPEFM:21-001 On Call Construction FY2021 | Net 30 | 01/29/2022 | | 357,362.00 |
| | Invoice | 12/31/2021 | 14-PH-II | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 01/30/2022 | | 38,550.00 |
| | Invoice | 02/28/2022 | 21-010-005 | 647604 | OPEFM:21-010 St Elizabeth Hospital EPS Upgrade | Net 30 | 03/30/2022 | | 124,769.77 |
| | Invoice | 02/28/2022 | 21-012-005 | 647003 | OPEFM:21-012 Leckie Edu Campus New Marquee Sign | Net 30 | 03/30/2022 | | 53,180.10 |
| | Invoice | 02/28/2022 | 21-016-004 | 649585 | OPEFM:21-016 New Jersey Ave & O Street Park Fen | Net 30 | 03/30/2022 | | 4,339.09 |
| | Invoice | 02/28/2022 | 21-018-004 | 653965 | OPEFM:21-018 Johnson MS Roof Replacement | Net 30 | 03/30/2022 | | 237,318.96 |
| | Invoice | 02/28/2022 | 21-023-001 | 659524 | OPEFM:21-023 Wheatley Child Development Center | Net 30 | 03/30/2022 | | 172,302.25 |
| | Invoice | 02/28/2022 | 22-003-001 | 659706 | OPEFM:22-003 MacArthurBlvd School Modernization | Net 30 | 03/30/2022 | | 55,073.87 |
| | Invoice | 02/28/2022 | 22-001-001 | | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 03/30/2022 | | 70,284.16 |
| | Invoice | 03/30/2022 | 22-008-001 | 661653 | OPEFM:22-008 Duke Ellington-Construction Svcs | Net 30 | 04/29/2022 | | 204,300.00 |
| | Invoice | 03/30/2022 | 22-004-001 | 660662 | OPEFM:22-004 Texas Ave Dog Park | Net 30 | 04/29/2022 | | 34,156.11 |
| | Invoice | 03/30/2022 | 22-001-A GB | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 04/29/2022 | | 153,076.00 |
| | Invoice | 03/30/2022 | 21-010-006 | 647604 | OPEFM:21-010 St Elizabeth Hospital EPS Upgrade | Net 30 | 04/29/2022 | | 144,000.00 |
| | Invoice | 03/30/2022 | 21-024-001 | | Corvias:21-024 Corvias at Howard University | Net 30 | 04/29/2022 | | 159,987.57 |
| | Invoice | 03/30/2022 | 21-018-005 | 653965 | OPEFM:21-018 Johnson MS Roof Replacement | Net 30 | 04/29/2022 | | 501,110.10 |
| | Invoice | 03/30/2022 | 22-003-002 | 659706 | OPEFM:22-003 MacArthurBlvd School Modernization | Net 30 | 04/29/2022 | | 227,938.94 |
| | Invoice | 04/05/2022 | 22-001-002 | 661975-661445-66211-66019 | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 05/05/2022 | | 61,536.74 |
| | Invoice | 05/19/2022 | 20-010-020 | 644905-644906-645009 | OPEFM:20-010 John Peter Van Ness ES Addition | Net 30 | 06/18/2022 | | 81,612.28 |
| | Invoice | 05/19/2022 | 20-028-019 | 629886-644902 | OPEFM:20-028 Hart MS HVAC Upgrade/Kitchen Impr | Net 30 | 06/18/2022 | | 79,119.81 |
| | Invoice | 05/19/2022 | 22-001-003 | 661975-661445-66211-66019 | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 06/18/2022 | | 91,225.29 |
| | Invoice | 05/31/2022 | 22-009-001 | 664982 | OPEFM:22-009 Garfield Park Playground Reno | Net 30 | 06/30/2022 | | 44,901.87 |
| | Invoice | 05/31/2022 | 22-001A-002 | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 06/30/2022 | | 109,000.00 |
| | Invoice | 05/31/2022 | 22-001B-001 | | OPEFM:22-001B ON CALL DCAM 22 NC PLAYGROUND | Net 30 | 06/30/2022 | | 100,780.00 |
| | Invoice | 06/03/2022 | 21-016-004 | | OPEFM:21-016 New Jersey Ave & O Street Park Fen | Net 30 | 07/03/2022 | | 14,864.08 |
| Total > 90 | | | | | | | | | 3,930,912.04 |
| **TOTAL** | | | | | | | | | **5,863,571.20** |

**Broughton Construction, LLC**
**A/R Aging Detail**
**As of July 31, 2022**

| Type | Date | Num | P. O. # | Name | Terms | Due Date | Class | Open Balance |
|---|---|---|---|---|---|---|---|---|
| **Current** | | | | | | | | |
| Invoice | 07/31/2022 | 22-016A-001 | | Corenic Construction Group:22-016A - Outdoor Classroom (Collegiate) | Net 30 | 08/30/2022 | | 62,371.66 |
| Invoice | 07/31/2022 | 22-021-001 | | TPWR Developer LLC:22-021 TPWR Building 9 Walkway Repair&Im | Net 30 | 08/30/2022 | | 8,100.00 |
| Invoice | 07/31/2022 | 22-013-002 | | Howl at the Moon DC, LLC:22-013 Howl at the Moon | Net 30 | 08/30/2022 | | 46,350.00 |
| Invoice | 07/31/2022 | 22-016A-003 | 292989 | Arlington Co, VA Office of The Purchasing:21-007 Minor Building Repairs & Const Svc | Net 30 | 08/30/2022 | | 19,600.11 |
| **Total Current** | | | | | | | | 136,421.77 |
| **1 - 30** | | | | | | | | |
| Invoice | 07/01/2022 | 85700 | | Sylvan Construction Services, LLC:22-012A Sylvan Field Services & On-Call | | 07/26/2022 | | 2,469.00 |
| Invoice | 07/01/2022 | 91401 | | Sylvan Construction Services, LLC:22-012A Sylvan Field Services & On-Call | | 07/01/2022 | | 125.00 |
| Invoice | 07/01/2022 | 95957 | | Sylvan Construction Services, LLC:22-012A Sylvan Field Services & On-Call | | 07/01/2022 | | 3,564.61 |
| Invoice | 07/26/2022 | 22-012B-01 | | Sylvan Construction Services, LLC:22-012B - Sylvan Pathway Construction | | 07/26/2022 | | 15,226.00 |
| Invoice | 07/30/2022 | 22-001C-001 | | OPEFM:22-001C OnCall DCAM-22 Chevy Chase PGR | Net 30 | 08/29/2022 | | 9,628.40 |
| Invoice | 07/30/2022 | 22-001D-001 | | OPEFM:22-001D - OnCall-DCAM-22-NC-SP-0057A Roof | Net 30 | 08/29/2022 | | 17,870.00 |
| Invoice | 07/30/2022 | 22-001E-001 | | OPEFM:22-001E  - OnCall-DCAM-22-NC-SP-0079 Roof | Net 30 | 08/29/2022 | | 9,919.44 |
| **Total 1 - 30** | | | | | | | | 58,802.45 |
| **31 - 60** | | | | | | | | |
| Invoice | 06/03/2022 | 21-016-004 | | OPEFM:21-016 New Jersey Ave & O Street Park Fen | Net 30 | 07/03/2022 | | 14,864.08 |
| Invoice | 06/10/2022 | 22-001F-001 | 665669 | OPEFM:22-001F -DCAM-22-NC-SP-0088 Ward-1 Covid | Net 30 | 07/10/2022 | | 99,990.32 |
| Invoice | 06/30/2022 | 22-013-001 | | Howl at the Moon DC, LLC:22-013 Howl at the Moon | Net 30 | 07/30/2022 | | 0.36 |
| **Total 31 - 60** | | | | | | | | 114,854.76 |
| **61 - 90** | | | | | | | | |
| Invoice | 05/19/2022 | 20-010-020 | 644905-644906-645009 | OPEFM:20-010 John Peter Van Ness ES Addition | Net 30 | 06/18/2022 | | 96,041.35 |
| Invoice | 05/19/2022 | 20-028-019 | 629886-644902 | OPEFM:20-028 Hart MS HVAC Upgrade/Kitchen Impr | Net 30 | 06/18/2022 | | 135,697.50 |
| Invoice | 05/19/2022 | 22-001-003 | 661975-661445-66211-66019 | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 06/18/2022 | | 91,225.29 |
| Invoice | 05/31/2022 | 22-009-001 | 664982 | OPEFM:22-009 Garfield Park Playground Reno | Net 30 | 06/30/2022 | | 44,901.87 |
| Invoice | 05/31/2022 | 22-009-003 | 659705 | OPEFM:22-002 Hart MS Classroom Conversion | Net 30 | 06/30/2022 | | 185,344.58 |
| Invoice | 05/31/2022 | 22-001A-002 | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 06/30/2022 | | 109,000.00 |
| Invoice | 05/31/2022 | 22-001B-001 | | OPEFM:22-001B ON CALL DCAM 22 NC PLAYGROUND | Net 30 | 06/30/2022 | | 100,780.00 |
| **Total 61 - 90** | | | | | | | | 762,990.59 |
| **> 90** | | | | | | | | |
| Invoice | 08/26/2019 | 19-023-005 | | District of Columbia Housing Authority:19-007 DCHA-Vacant Unit Repair/Make Ready | Net 45 | 10/10/2019 | | 236,313.89 |
| Credit Memo | 09/30/2019 | 19-022-007 | | The George Washington University:19-011 George Washington On Call FY2019 | | 09/30/2019 | | -18,262.00 |
| Invoice | 10/26/2019 | 19-023-003 | 607714 | OPEFM:17-024 Office of Cable Television Design | Net 30 | 11/25/2019 | | 45,128.66 |
| Invoice | 12/23/2019 | 19-022-002 | 607714 | OPEFM:17-024 Office of Cable Television Design | Net 30 | 01/22/2020 | | 308,996.00 |
| Invoice | 12/23/2019 | 19-022-003 | | DPW:17-031  Net Facilities-Robert Garrett | Net 30 | 01/22/2020 | | 49,997.00 |
| Invoice | 03/01/2021 | 19-016-004 | 607714 | OPEFM:19-016 OCTFME Emergency Power Systems Upg | Net 30 | 03/31/2021 | | 86,735.34 |
| Invoice | 10/31/2021 | 13-PH-II | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 11/30/2021 | | 30,197.99 |
| Invoice | 11/12/2021 | 13-PH-IIA | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 12/12/2021 | | 1,252.01 |
| Invoice | 12/13/2021 | 20-010-019 | 644905-644906-645009 | OPEFM:20-010 John Peter Van Ness ES Addition | Net 30 | 01/12/2022 | | 100,720.12 |
| Invoice | 12/29/2021 | 20-023-016 | 627720-641947 | OPEFM:20-023 Tyler ES SChool New HVAC@ Cafe | Net 30 | 01/28/2022 | | 30,060.64 |
| Invoice | 12/30/2021 | PG--BLITZ | | OPEFM:21-001 On Call Construction FY2021 | Net 30 | 01/29/2022 | | 108,044.16 |
| Invoice | 12/30/2021 | BLITZ-GROUP | | OPEFM:21-001 On Call Construction FY2021 | Net 30 | 01/29/2022 | | 357,362.00 |
| Invoice | 12/31/2021 | 14-PH-II | | Kennedy Street Community Partners, LLC:19-003-002The Todd A. Lee Kennedy St P-II | Net 30 | 01/30/2022 | | 38,550.00 |
| Invoice | 02/28/2022 | 21-010-005 | 647604 | OPEFM:21-010 St Elizabeth Hospital EPS Upgrade | Net 30 | 03/30/2022 | | 222,421.07 |
| Invoice | 02/28/2022 | 21-012-005 | 647003 | OPEFM:21-012 Leckie Edu Campus New Marquee Sign | Net 30 | 03/30/2022 | | 53,180.10 |
| Invoice | 02/28/2022 | 21-016-004 | 649585 | OPEFM:21-016 New Jersey Ave & O Street Park Fen | Net 30 | 03/30/2022 | | 4,339.09 |
| Invoice | 02/28/2022 | 21-018-004 | 653965 | OPEFM:21-018 Johnson MS Roof Replacement | Net 30 | 03/30/2022 | | 274,146.21 |
| Invoice | 02/28/2022 | 21-023-001 | 659524 | OPEFM:21-023 Wheatley Child Development Center | Net 30 | 03/30/2022 | | 178,364.65 |
| Invoice | 02/28/2022 | 22-003-001 | 659706 | OPEFM:22-003 MacArthurBlvd School Modernization | Net 30 | 03/30/2022 | | 123,130.97 |
| Invoice | 02/28/2022 | 22-001-001 | | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 03/30/2022 | | 76,270.00 |
| Invoice | 03/30/2022 | 22-008-001 | 661653 | OPEFM:22-008 Duke Ellington-Construction Svcs | Net 30 | 04/29/2022 | | 204,300.00 |
| Invoice | 03/30/2022 | 22-004-001 | 660662 | OPEFM:22-004 Texas Ave Dog Park | Net 30 | 04/29/2022 | | 48,106.11 |
| Invoice | 03/30/2022 | 22-001-A GB | 660251 | OPEFM:22-001A DCAM-22-NC Group B | Net 30 | 04/29/2022 | | 153,076.00 |
| Invoice | 03/30/2022 | 21-010-006 | 647604 | OPEFM:21-010 St Elizabeth Hospital EPS Upgrade | Net 30 | 04/29/2022 | | 144,000.00 |
| Invoice | 03/30/2022 | 21-024-001 | | Corvias:21-024 Corvias at Howard University | | 03/30/2022 | | 159,987.57 |
| Invoice | 03/30/2022 | 21-018-005 | 653965 | OPEFM:21-018 Johnson MS Roof Replacement | Net 30 | 04/29/2022 | | 501,110.10 |
| Invoice | 03/30/2022 | 20-028-018 | 629886-644902 | OPEFM:20-028 Hart MS HVAC Upgrade/Kitchen Impr | Net 30 | 04/29/2022 | | 72,557.91 |
| Invoice | 03/30/2022 | 22-003-002 | 659706 | OPEFM:22-003 MacArthurBlvd School Modernization | Net 30 | 04/29/2022 | | 227,938.94 |
| Invoice | 04/05/2022 | 22-001-002 | 661975-661445-66211-66019 | OPEFM:22-001 On Call Construction FY2022 | Net 30 | 05/05/2022 | | 61,536.74 |
| **Total > 90** | | | | | | | | 3,879,561.27 |
| **TOTAL** | | | | | | | | 4,952,630.84 |



**4812 Georgia Avenue NW**
**Washington, DC 20011**

**RETURN SERVICE REQUESTED**

BROUGHTON CONSTRUCTION
CASEY B STRINGER
* HOLD MAIL *

*Statement Ending 07/29/2022*

BROUGHTON CONSTRUCTION                *Page 1 of 8*
*Customer Number: XXXXXX9611*

### Managing Your Accounts

| | | |
|---|---|---|
|  | Website | www.industrial-bank.com |
| | Phone Number | 202-722-2000 |
|  | Mailing Address | 4812 Georgia Avenue, N.W. Washington, DC 20011 |

Effective June 1, 2021 Industrial Bank will adjust all branch lobby and drive-thru hours to the following:
**Monday – Friday   9am – 4pm & Saturday   9am – 1pm.**

We appreciate your continued support and encourage you to leverage the available access choices, such as mobile banking, online banking, online bill-pay, debit card rewards and e-Statements.

### Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| ENTERPRISE CHECKING | XXXXXX9611 | $75,983.21 |



## uChoose® Rewards Debit Card Program

 Earning points is easy.  The tough part is deciding which rewards to choose.

 Simply use your Industrial Bank Visa debit card for eligible purchases to earn points and login to uchooserewards.com to redeem your points.

 Points can be redeemed for gift cards, merchandise, travel, cash and more!

 You are automatically enrolled but you need to register your card to redeem points.

 Register your Industrial Bank Visa debit card today at www.uchooserewards.com.

## ENTERPRISE CHECKING-XXXXXX9611

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 07/01/2022 | **Beginning Balance** | **$82,754.19** | Minimum Balance | $0.00 |
| | 6 Credit(s) This Period | $306,013.65 | Average Ledger Balance | $0.00 |
| | 36 Debit(s) This Period | $312,784.63 | Average Available Balance | $0.00 |
| 07/29/2022 | **Ending Balance** | **$75,983.21** | | |
| | Service Charges | $2.00 | | |



## ENTERPRISE CHECKING-XXXXXX9611 (continued)

### Deposits

| Date | Description | Amount |
|------|-------------|--------|
| 07/08/2022 | DEPOSIT | $5,947.31 |
| 07/12/2022 | DEPOSIT | $490.96 |
| 07/13/2022 | DEPOSIT | $252,500.00 |
| 07/27/2022 | DEPOSIT | $1,167.00 |
| | | 4 item(s) totaling $260,105.27 |

### Other Credits

| Date | Description | Amount |
|------|-------------|--------|
| 07/19/2022 | Howl USA LLC DEPOSIT XXXXXX1785 | $43,493.00 |
| 07/20/2022 | BKCD STLMT TSYS/TRANSFIRST 39300982938127 BROUGHTON CONSTRUCTION 071822 | $2,415.38 |
| | | 2 item(s) totaling $45,908.38 |

### Electronic Debits

| Date | Description | Amount |
|------|-------------|--------|
| 07/11/2022 | DISCOUNT TSYS/TRANSFIRST 39300982938127 BROUGHTON CONSTRUCTION DISCOUNT | $141.40 |
| 07/11/2022 | COMCAST 8299400 441002602 9156230 | $296.05 |
| 07/13/2022 | BEITZELL FENCE SALE | $35,076.10 |
| 07/15/2022 | LOWES LAR SYNCB LOWES EPAY XXXXX8458 | $61.00 |
| 07/18/2022 | VERIZON PAYMENTREC 8503904430001 | $602.29 |
| 07/18/2022 | COMCAST CORP CABLE SVCS 9710534 | $1,001.10 |
| 07/19/2022 | VERIZON WIRELESS PAYMENTS 022128833800002 | $211.63 |
| 07/19/2022 | VERIZON WIRELESS PAYMENTS 022128833800001 | $1,159.15 |
| | | 8 item(s) totaling $38,548.72 |

### Other Debits

| Date | Description | Amount |
|------|-------------|--------|
| 07/08/2022 | SERVICE CHARGE | $2.00 |
| 07/12/2022 | STOP ITEM CHARGE(S) | $15.00 |
| | | 2 item(s) totaling $17.00 |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|-----------|------|--------|-----------|------|--------|
| 8903 | 07/08/2022 | $7,103.00 | 9000 | 07/19/2022 | $5,420.00 |
| 8972* | 07/22/2022 | $39,718.80 | 9001 | 07/18/2022 | $33,000.00 |
| 8978* | 07/11/2022 | $450.50 | 9002 | 07/21/2022 | $40,537.03 |
| 8979 | 07/08/2022 | $54.59 | 9003 | 07/21/2022 | $20,340.00 |
| 8980 | 07/12/2022 | $47.90 | 9004 | 07/18/2022 | $1,014.20 |
| 8983* | 07/12/2022 | $33,050.00 | 9005 | 07/22/2022 | $19,000.00 |
| 8990* | 07/25/2022 | $4,320.00 | 9006 | 07/26/2022 | $220.00 |
| 8991 | 07/22/2022 | $29,550.00 | 9008* | 07/28/2022 | $54.59 |
| 8992 | 07/20/2022 | $658.90 | 9010* | 07/28/2022 | $926.99 |
| 8993 | 07/19/2022 | $13,601.53 | 9011 | 07/29/2022 | $800.00 |
| 8994 | 07/25/2022 | $7,167.60 | 9012 | 07/29/2022 | $835.02 |
| 8998* | 07/19/2022 | $2,223.26 | 9014* | 07/29/2022 | $5,252.50 |
| 8999 | 07/18/2022 | $4,972.50 | 9016* | 07/29/2022 | $3,900.00 |

\* Indicates skipped check number    26 item(s) totaling $274,218.91

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 07/08/2022 | $81,541.91 | 07/18/2022 | $224,804.83 | 07/25/2022 | $86,805.31 |
| 07/11/2022 | $80,653.96 | 07/19/2022 | $245,682.26 | 07/26/2022 | $86,585.31 |
| 07/12/2022 | $48,032.02 | 07/20/2022 | $247,438.74 | 07/27/2022 | $87,752.31 |
| 07/13/2022 | $265,455.92 | 07/21/2022 | $186,561.71 | 07/28/2022 | $86,770.73 |
| 07/15/2022 | $265,394.92 | 07/22/2022 | $98,292.91 | 07/29/2022 | $75,983.21 |



## ENTERPRISE CHECKING-XXXXXX9611 (continued)

### Overdraft and Returned Item Fees

|  | Total for this period | Total year-to-date |
|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 |

### Service Charge Summary

| Description | Amount |
|---|---|
| TOTAL CHARGE FOR ENTERPRISE CHECKING: | $2.00 |
| Total Service Charge | $2.00 |

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 135 of 175

SQ-000151

NAME: _____

NEW: _____

       Street and Number                City              State            Zip Code

TYPE OF ACCOUNTS MAINTAINED AND ACCOUNT NUMBERS:

☐ Checking _____    ☐ Installment Loan _____    ☐ Safe deposit (# _____)

☐ Savings _____    ☐ Certificate _____    ☐ Other (describe below) _____

SPECIAL
INSTRUCTIONS: _____

Date: _____    Authorized Sginature: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CUT ALONG BROKEN LINE AND MAIL OR TAKE TO BANK

## RECONCILEMENT FORM

### CHECKS OUTSTANDING

| NUMBER | AMOUNT |
|--------|--------|
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |

**TO PROVE BALANCE AS SHOWN ON YOUR STATEMENT**

1. Deduct all bank charges from your checkbook.

2. All checks issued from your personalized checkbook are posted numerically (as issued). Sort your checks numerically.

3. Check off on the stubs of your checkbook each check listed as paid by the Bank and make a list of the numbers and amounts of those still outstanding in the spaces provided at the left. Be sure to include all checks still outstanding from your previous statement. To the sum of the outstanding checks add the balance as shown in your checkbook.

4. List below all deposits which do not appear on the statement and add to this total the balance as shown by the statement.

The two results should agree and if so, this statement as rendered is correct.

| | |
|---|---|
| | DEPOSITS NOT SHOWN ON STATEMENT |
| TOTAL CHECKS OUTSTANDING | |
| BAL. PER CHECKBOOK | BANK BALANCE PER STATEMENT |
| TOTAL | TOTAL |

**WORK SPACE**

## CREDIT LINE DISCLOSURE STATEMENT

We figure the finance charge on your account by applying the daily periodic rate to your average daily principal balance. To determine the daily principal balance, we take the previous month statement, add the credit limit amount, subtract the available credit limit - this gives the beginning principal balance. We take the current month statement, add the balance last statement, subtract the principal previous statement - this gives the unpaid finance charge. Take the balance last statement, subtract the unpaid finance charge - this gives the daily principal balance, add advance amount, subtract any payments, subtract the finance charge paid current year from the current statement. Add each day's principal balance together, divide by the days this cycle - this gives the average daily balance.

The annual percentage rate disclosed on the front of this statement represents the daily periodic rate expressed on an annualized basis as a yearly rate.

If the credit plan name disclosed on the front of this statement includes the coding VR, then your plan has a variable rate. This feature means that your daily periodic rate, and its corresponding annual percentage rate, may vary.

The payments on your account will be applied first to any unpaid and accrued finance charges, to your outstanding principal balance, then to any late charges, NSF charges, annual membership fees or other charges.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR CREDIT LINE STATEMENT:

Send your inquiry in writing so that we receive it within 60 days after the statement was mailed to you. Send your inquiry to the address shown on the front of the statement.

Your written inquiry must include:

1. Your name and account number;

2. A description of the error and why (to the extent you can explain) you believe it is an error; and

3. The dollar amount of the suspected error.

If you have authorized us to automatically pay your loan from your checking account, you can stop or reverse any automatic payment made towards reducing your loan balance in the amount of the suspected error pending a resolution of the suspected error. If you desire to avail yourself of automatic payment rights, your notification in the form set forth above must be received by us within 60 days after the statement is sent to you.

You remain obligated to pay the parts of your balance not in dispute, but do not have to pay any amount in dispute during the time we are resolving the dispute. During that same time, we may not take any action to collect disputed amounts or report disputed amounts as delinquent.

This is a summary of your rights. A full statement of your rights and our responsibilities under the Federal Fair Credit Billing Act will be sent to you both upon request and in response to a billing error notice.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR ELECTRONIC TRANSFERS:

Telephone or write us at the number or address listed on the front of this statement as soon as you can, If you think your statement or any of your automated teller machine receipts is wrong, or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number.

2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

### PREAUTHORIZED CREDITS

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at the telephone number shown on the front of this statement to find out whether or not the deposit was made.

**IMPORTANT:** Every statement should be checked with your own records. If no errors are reported within **60** days, your account will be considered correct.



| #8903 | 07/08/2022 | $7,103.00 |
|---|---|---|



| #8972 | 07/22/2022 | $39,718.80 |
|---|---|---|

| #8978 | 07/11/2022 | $450.50 |
|---|---|---|



| #8979 | 07/08/2022 | $54.59 |
|---|---|---|

| #8980 | 07/12/2022 | $47.90 |
|---|---|---|

| #8983 | 07/12/2022 | $33,050.00 |
|---|---|---|



| #8990 | 07/25/2022 | $4,320.00 |
|---|---|---|



| #8991 | 07/22/2022 | $29,550.00 |
|---|---|---|



| #8992 | 07/20/2022 | $658.90 |
|---|---|---|



| #8993 | 07/19/2022 | $13,601.53 |
|---|---|---|

SQ-000153



| #8994 | 07/25/2022 | $7,167.60 |



| #8998 | 07/19/2022 | $2,223.26 |



| #8999 | 07/18/2022 | $4,972.50 |



| #9000 | 07/19/2022 | $5,420.00 |



| #9001 | 07/18/2022 | $33,000.00 |



| #9002 | 07/21/2022 | $40,537.03 |



| #9003 | 07/21/2022 | $20,340.00 |



| #9004 | 07/18/2022 | $1,014.20 |



| #9005 | 07/22/2022 | $19,000.00 |



| #9006 | 07/26/2022 | $220.00 |





| #9008 | 07/28/2022 | $54.59 |
|---|---|---|

| #9010 | 07/28/2022 | $926.99 |
|---|---|---|

| #9011 | 07/29/2022 | $800.00 |
|---|---|---|



| #9012 | 07/29/2022 | $835.02 |
|---|---|---|

| #9014 | 07/29/2022 | $5,252.50 |
|---|---|---|



| #9016 | 07/29/2022 | $3,900.00 |
|---|---|---|

Case 25-10054-ELG Document 15 Filed 08/12/28 Page 139 of 175

SQ-000155

THIS PAGE LEFT INTENTIONALLY BLANK



**INDUSTRIAL BANK**

**4812 Georgia Avenue NW**
**Washington, DC 20011**

**RETURN SERVICE REQUESTED**

BROUGHTON CONSTRUCTION
CASEY B STRINGER
* HOLD MAIL *

*Statement Ending 06/30/2022*

BROUGHTON CONSTRUCTION          *Page 1 of 10*
*Customer Number: XXXXXX9611*

### Managing Your Accounts

| | | |
|---|---|---|
| 💻 | Website | www.industrial-bank.com |
| 👤 | Phone Number | 202-722-2000 |
| ✉ | Mailing Address | 4812 Georgia Avenue, N.W. Washington, DC 20011 |

Effective June 1, 2021 Industrial Bank will adjust all branch lobby and drive-thru hours to the following:
**Monday – Friday   9am – 4pm & Saturday   9am – 1pm.**

We appreciate your continued support and encourage you to leverage the available access choices, such as mobile banking, online banking, online bill-pay, debit card rewards and e-Statements.

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| ENTERPRISE CHECKING | XXXXXX9611 | $82,754.19 |



## uChoose® Rewards Debit Card Program

 Earning points is easy. The tough part is deciding which rewards to choose.

 Simply use your Industrial Bank Visa debit card for eligible purchases to earn points and login to uchooserewards.com to redeem your points.

 Points can be redeemed for gift cards, merchandise, travel, cash and more!

 You are automatically enrolled but you need to register your card to redeem points.

 Register your Industrial Bank Visa debit card today at www.uchooserewards.com.

## ENTERPRISE CHECKING-XXXXXX9611

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 06/01/2022 | **Beginning Balance** | **$512,313.01** | Minimum Balance | $0.00 |
| | 8 Credit(s) This Period | $1,286,839.32 | Average Ledger Balance | $0.00 |
| | 66 Debit(s) This Period | $1,716,398.14 | Average Available Balance | $0.00 |
| 06/30/2022 | **Ending Balance** | **$82,754.19** | | |
| | Service Charges | $2.00 | | |



Member **FDIC**
EQUAL HOUSING LENDER

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 141 of 175

SQ-000157

## ENTERPRISE CHECKING-XXXXXX9611 (continued)

### Deposits

| Date | Description | Amount |
|---|---|---|
| 06/09/2022 | DEPOSIT | $500,000.00 |
| 06/13/2022 | DEPOSIT | $64,507.40 |
| 06/23/2022 | DEPOSIT | $2,462.00 |
| | | 3 item(s) totaling $566,969.40 |

### Other Credits

| Date | Description | Amount |
|---|---|---|
| 06/08/2022 | RETURNED CHECK# 8897, FICTITIOUS | $29,470.96 |
| 06/08/2022 | LOC ADVANCE (xxx281) | $280,000.00 |
| 06/13/2022 | LOC ADVANCE (xxx281) | $360,000.00 |
| 06/22/2022 | RETURNED CHECK# 8914, FRAUD | $20,928.00 |
| 06/28/2022 | RETURNED CHECK# 8897, FRAUD | $29,470.96 |
| | | 5 item(s) totaling $719,869.92 |

### Electronic Debits

| Date | Description | Amount |
|---|---|---|
| 06/02/2022 | THE SHERWIN WILL ONLINE PAY SW 000006257221 | $2,140.12 |
| 06/06/2022 | SAGE SOFTWARE COLLECTION | $920.35 |
| 06/06/2022 | ERIEINSURANCEWEB PAYMENT 017540001307791 | $25,213.47 |
| 06/08/2022 | HOME DEPOT COMM ONLINE PMT 600768432120430 | $10,934.11 |
| 06/09/2022 | COMCAST 8299400 441002602 8135937 | $296.05 |
| 06/10/2022 | DISCOUNT TSYS/TRANSFIRST 39300982938127 BROUGHTON CONSTRUCTION DISCOUNT | $200.30 |
| 06/16/2022 | VERIZON PAYMENTREC 8503904430001 | $602.29 |
| 06/17/2022 | VERIZON WIRELESS PAYMENTS 022128833800002 | $638.23 |
| 06/17/2022 | COMCAST CORP CABLE SVCS 9568377 | $1,001.10 |
| 06/17/2022 | VERIZON WIRELESS PAYMENTS 022128833800001 | $2,140.35 |
| 06/22/2022 | AMEX EPAYMENT ACH PMT S1882 | $9,222.81 |
| 06/24/2022 | HOME DEPOT COMM ONLINE PMT 610782308111785 | $9,055.56 |
| | | 12 item(s) totaling $62,364.74 |

### Other Debits

| Date | Description | Amount |
|---|---|---|
| 06/09/2022 | LOAN PAYMENT June's Loan Payment ONLY- DBERRY | $14,031.40 |
| 06/09/2022 | LOAN PAYMENT June's Loan Payment ONLY- DBERRY | $22,157.08 |
| 06/09/2022 | SERVICE CHARGE | $2.00 |
| 06/30/2022 | STOP ITEM CHARGE(S) | $15.00 |
| | | 4 item(s) totaling $36,205.48 |

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|
| 8893 | 06/08/2022 | $1,501.91 | 8952 | 06/29/2022 | $1,647.50 |
| 8897* | 06/08/2022 | $29,470.96 | 8953 | 06/13/2022 | $20,928.00 |
| 8897 | 06/28/2022 | $29,470.96 | 8954 | 06/08/2022 | $25,000.00 |
| 8898 | 06/14/2022 | $284.97 | 8955 | 06/10/2022 | $60,000.00 |
| 8907* | 06/24/2022 | $1,192.98 | 8956 | 06/09/2022 | $300,000.00 |
| 8914* | 06/22/2022 | $20,928.00 | 8957 | 06/17/2022 | $5,227.97 |
| 8920* | 06/01/2022 | $2,569.40 | 8958 | 06/15/2022 | $200.00 |
| 8931* | 06/01/2022 | $22,483.17 | 8959 | 06/14/2022 | $100,000.00 |
| 8936* | 06/07/2022 | $9,277.51 | 8960 | 06/17/2022 | $3,800.00 |
| 8938* | 06/02/2022 | $34,435.44 | 8961 | 06/22/2022 | $5,000.00 |
| 8939 | 06/09/2022 | $30,202.00 | 8962 | 06/16/2022 | $14,409.40 |
| 8941* | 06/01/2022 | $153,000.00 | 8963 | 06/21/2022 | $66.90 |
| 8942 | 06/03/2022 | $50,000.00 | 8964 | 06/23/2022 | $220.00 |
| 8943 | 06/07/2022 | $11,456.85 | 8965 | 06/13/2022 | $30,000.00 |
| 8944 | 06/07/2022 | $937.50 | 8966 | 06/22/2022 | $2,153.50 |
| 8945 | 06/13/2022 | $9,347.50 | 8967 | 06/21/2022 | $3,323.24 |
| 8949* | 06/13/2022 | $76.15 | 8968 | 06/22/2022 | $8,052.41 |
| 8950 | 06/10/2022 | $2,335.00 | 8970* | 06/22/2022 | $7,645.21 |
| 8951 | 06/08/2022 | $8,258.40 | 8971 | 06/15/2022 | $29,470.96 |



*Statement Ending 06/30/2022*

BROUGHTON CONSTRUCTION            *Page 3 of 10*
*Customer Number: XXXXXX9611*

## ENTERPRISE CHECKING-XXXXXX9611 (continued)

### Checks Cleared (continued)

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|
| 8973* | 06/17/2022 | $50,000.00 | 8982 | 06/21/2022 | $4,602.50 |
| 8974 | 06/17/2022 | $330,000.00 | 8984* | 06/23/2022 | $30,000.00 |
| 8975 | 06/21/2022 | $9,350.00 | 8985 | 06/27/2022 | $26,370.00 |
| 8976 | 06/24/2022 | $9,391.25 | 8986 | 06/28/2022 | $17,568.63 |
| 8977 | 06/28/2022 | $10,450.00 | 8987 | 06/27/2022 | $19,300.00 |
| 8981* | 06/22/2022 | $26,421.75 | 8988 | 06/27/2022 | $50,000.00 |

\* Indicates skipped check number                    50 item(s) totaling $1,617,827.92

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 06/01/2022 | $334,260.44 | 06/10/2022 | $504,960.95 | 06/22/2022 | $255,503.11 |
| 06/02/2022 | $297,684.88 | 06/13/2022 | $869,116.70 | 06/23/2022 | $227,745.11 |
| 06/03/2022 | $247,684.88 | 06/14/2022 | $768,831.73 | 06/24/2022 | $208,105.32 |
| 06/06/2022 | $221,551.06 | 06/15/2022 | $739,160.77 | 06/27/2022 | $112,435.32 |
| 06/07/2022 | $199,879.20 | 06/16/2022 | $724,149.08 | 06/28/2022 | $84,416.69 |
| 06/08/2022 | $434,184.78 | 06/17/2022 | $331,341.43 | 06/29/2022 | $82,769.19 |
| 06/09/2022 | $567,496.25 | 06/21/2022 | $313,998.79 | 06/30/2022 | $82,754.19 |

### Overdraft and Returned Item Fees

|  | Total for this period | Total year-to-date |
|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 |

### Service Charge Summary

| Description | Amount |
|---|---|
| TOTAL CHARGE FOR ENTERPRISE CHECKING: | $2.00 |
| Total Service Charge | $2.00 |

SQ-000159

NAME: _____

NEW: _____

| Street and Number | City | State | Zip Code |

TYPE OF ACCOUNTS MAINTAINED AND ACCOUNT NUMBERS:

☐ Checking _____  ☐ Installment Loan _____  ☐ Safe deposit (#_____)

☐ Savings _____  ☐ Certificate _____  ☐ Other (describe below) _____

SPECIAL INSTRUCTIONS: _____

Date: _____  Authorized Sginature: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CUT ALONG BROKEN LINE AND MAIL OR TAKE TO BANK

## RECONCILEMENT FORM

### CHECKS OUTSTANDING

| NUMBER | AMOUNT |
|--------|--------|
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |

### TO PROVE BALANCE AS SHOWN ON YOUR STATEMENT

1. Deduct all bank charges from your checkbook.

2. All checks issued from your personalized checkbook are posted numerically (as issued). Sort your checks numerically.

3. Check off on the stubs of your checkbook each check listed as paid by the Bank and make a list of the numbers and amounts of those still outstanding in the spaces provided at the left. Be sure to include all checks still outstanding from your previous statement. To the sum of the outstanding checks add the balance as shown in your checkbook.

4. List below all deposits which do not appear on the statement and add to this total the balance as shown by the statement.

The two results should agree and if so, this statement as rendered is correct.

| TOTAL CHECKS OUTSTANDING | | DEPOSITS NOT SHOWN ON STATEMENT | |
|---|---|---|---|
| BAL. PER CHECKBOOK | | BANK BALANCE PER STATEMENT | |
| TOTAL | | TOTAL | |

**WORK SPACE**

## CREDIT LINE DISCLOSURE STATEMENT

We figure the finance charge on your account by applying the daily periodic rate to your average daily principal balance. To determine the daily principal balance, we take the previous month statement, add the credit limit amount, subtract the available credit limit - this gives the beginning principal balance. We take the current month statement, add the balance last statement, subtract the principal previous statement - this gives the unpaid finance charge. Take the balance last statement, subtract the unpaid finance charge - this gives the daily principal balance, add advance amount, subtract any payments, subtract the finance charge paid current year from the current statement. Add each day's principal balance together, divide by the days this cycle - this gives the average daily balance.

The annual percentage rate disclosed on the front of this statement represents the daily periodic rate expressed on an annualized basis as a yearly rate.

If the credit plan name disclosed on the front of this statement includes the coding VR, then your plan has a variable rate. This feature means that your daily periodic rate, and its corresponding annual percentage rate, may vary.

The payments on your account will be applied first to any unpaid and accrued finance charges, to your outstanding principal balance, then to any late charges, NSF charges, annual membership fees or other charges.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR CREDIT LINE STATEMENT:

Send your inquiry in writing so that we receive it within 60 days after the statement was mailed to you. Send your inquiry to the address shown on the front of the statement.

Your written inquiry must include:

1. Your name and account number;

2. A description of the error and why (to the extent you can explain) you believe it is an error; and

3. The dollar amount of the suspected error.

If you have authorized us to automatically pay your loan from your checking account, you can stop or reverse any automatic payment made towards reducing your loan balance in the amount of the suspected error pending a resolution of the suspected error. If you desire to avail yourself of automatic payment rights, your notification in the form set forth above must be received by us within 60 days after the statement is sent to you.

You remain obligated to pay the parts of your balance not in dispute, but do not have to pay any amount in dispute during the time we are resolving the dispute. During that same time, we may not take any action to collect disputed amounts or report disputed amounts as delinquent.

This is a summary of your rights. A full statement of your rights and our responsibilities under the Federal Fair Credit Billing Act will be sent to you both upon request and in response to a billing error notice.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR ELECTRONIC TRANSFERS:

Telephone or write us at the number or address listed on the front of this statement as soon as you can. If you think your statement or any of your automated teller machine receipts is wrong, or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number.

2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

### PREAUTHORIZED CREDITS

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at the telephone number shown on the front of this statement to find out whether or not the deposit was made.

**IMPORTANT:** Every statement should be checked with your own records. If no errors are reported within **60** days, your account will be considered correct.





**#8893          06/08/2022                    $1,501.91**



**#8897          06/08/2022                   $29,470.96**



**#8897          06/28/2022                   $29,470.96**



**#8898          06/14/2022                      $284.97**



**#8907          06/24/2022                    $1,192.98**



**#8914          06/22/2022                   $20,928.00**



**#8920          06/01/2022                    $2,569.40**



**#8931          06/01/2022                   $22,483.17**



**#8936          06/07/2022                    $9,277.51**



**#8938          06/02/2022                   $34,435.44**



| #8939 | 06/09/2022 | $30,202.00 |



| #8941 | 06/01/2022 | $153,000.00 |



| #8942 | 06/03/2022 | $50,000.00 |



| #8943 | 06/07/2022 | $11,456.85 |



| #8944 | 06/07/2022 | $937.50 |



| #8945 | 06/13/2022 | $9,347.50 |



| #8949 | 06/13/2022 | $76.15 |



| #8950 | 06/10/2022 | $2,335.00 |



| #8951 | 06/08/2022 | $8,258.40 |



| #8952 | 06/29/2022 | $1,647.50 |





**#8953      06/13/2022        $20,928.00**



**#8954      06/08/2022        $25,000.00**



**#8955      06/10/2022        $60,000.00**



**#8956      06/09/2022        $300,000.00**



**#8957      06/17/2022        $5,227.97**



**#8958      06/15/2022        $200.00**

**#8959      06/14/2022        $100,000.00**

**#8960      06/17/2022        $3,800.00**



**#8961      06/22/2022        $5,000.00**



**#8962      06/16/2022        $14,409.40**



**#8963     06/21/2022     $66.90**



**#8964     06/23/2022     $220.00**



**#8965     06/13/2022     $30,000.00**



**#8966     06/22/2022     $2,153.50**



**#8967     06/21/2022     $3,323.24**



**#8968     06/22/2022     $8,052.41**



**#8970     06/22/2022     $7,645.21**



**#8971     06/15/2022     $29,470.96**



**#8973     06/17/2022     $50,000.00**



**#8974     06/17/2022     $330,000.00**



**#8975          06/21/2022                          $9,350.00**



**#8976          06/24/2022                          $9,391.25**



**#8977          06/28/2022                          $10,450.00**



**#8981          06/22/2022                          $26,421.75**



**#8982          06/21/2022                          $4,602.50**



**#8984          06/23/2022                          $30,000.00**



**#8985          06/27/2022                          $26,370.00**



**#8986          06/28/2022                          $17,568.63**



**#8987          06/27/2022                          $19,300.00**



**#8988          06/27/2022                          $50,000.00**

Case 25-10054-ELG Document 15 Filed 08/12/26 Page 149 of 175

SQ-000165

THIS PAGE LEFT INTENTIONALLY BLANK

**M&T** Bank

SQ-000172

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS**<br>(301) 926-4535 |

00   0 06547M NM  017

000000                                            P

**BROUGHTON CONSTRUCTION COMPANY,LLC**
**BROUGHTON CONSTRUCTION CO LLC**
**1220 12TH ST SE STE 150**
**WASHINGTON DC 20003-3718**

| ACCOUNT TYPE | |
|---|---|
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▓▓▓4250 | **06/01/22 - 06/30/22** |

| | |
|---|---|
| **BEGINNING BALANCE** | **$174,413.38** |
| **DEPOSITS & CREDITS** | **2,411,109.61** |
| **LESS CHECKS & DEBITS** | **1,784,502.40** |
| **LESS SERVICE CHARGES** | **87.81** |
| **ENDING BALANCE** | **$800,932.78** |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 06/01/2022 | BEGINNING BALANCE | | | $174,413.38 |
| 06/01/2022 | DEPOSIT | $2,043.00 | | |
| 06/01/2022 | FORD MOTOR CR FORDCREDIT   056076985 | | $346.74 | |
| 06/01/2022 | TOYOTA FINANCIAL RETAIL_PAY 51399752050222 | | 614.99 | 175,494.65 |
| 06/02/2022 | INCOMING CHIPS FUNDS TRANSFER<br>FRESH AIR DUCT CLEANING LLC | 250,000.00 | | |
| 06/02/2022 | DEPOSIT | 50,000.00 | | |
| 06/02/2022 | DEPOSIT | 3,750.00 | | |
| 06/02/2022 | CARDMEMBER SERV TEL PYMT   ***********4204 | | 4,000.00 | |
| 06/02/2022 | Delta Bridge Fun Delta Brid DEB552463 | | 23,333.00 | |
| 06/02/2022 | Payroll4Const COLLECTION   5530 | | 34,907.57 | 417,004.08 |
| 06/03/2022 | INCOMING CHIPS FUNDS TRANSFER<br>FRESH AIR DUCT CLEANING LLC | 250,000.00 | | |
| 06/03/2022 | Contractors Reti DraftReque Contractors Pla | | 1,003.40 | |
| 06/03/2022 | CFG MERCHANT SOL 8446623467 3179-30154#74 | | 15,000.00 | |
| 06/03/2022 | CFG MERCHANT SOL 8446623467 7 | | 24,000.00 | |
| 06/03/2022 | Delta Bridge Fun Delta Brid DEB554457 | | 32,308.00 | |
| 06/03/2022 | KABBAGE PAYMENT        8944535 | | 41,884.39 | |
| 06/03/2022 | CHECK NUMBER     9413 | | 50,000.00 | 502,808.29 |
| 06/06/2022 | WEB XFER TO CHK  00009840892328 | | 50,000.00 | |
| 06/06/2022 | Adom Realty Inve Adom Realt     IEWO6ABXE | | 2,000.00 | |
| 06/06/2022 | CHECK NUMBER     9408 | | 13,601.53 | |
| 06/06/2022 | CHECK NUMBER     9414 | | 170.00 | 437,036.76 |
| 06/07/2022 | DEPOSIT | 33,316.09 | | |
| 06/07/2022 | CHECK NUMBER     9409 | | 202.99 | 470,149.86 |
| 06/08/2022 | CHECK NUMBER     9405 | | 1,225.00 | |
| 06/08/2022 | CHECK NUMBER     9412 | | 50,000.00 | |
| 06/08/2022 | CHECK NUMBER     9416 | | 271,264.34 | |
| 06/08/2022 | SERVICE CHARGE FOR ACCOUNT 000009839984250 | | 87.81 | 147,572.71 |
| 06/09/2022 | DEPOSIT | 60,000.00 | | |
| 06/09/2022 | DC-D.C. GOVERNME SOARACH   109001410072B10 | 14,233.50 | | |
| 06/09/2022 | Delta Bridge Fun Delta Brid DEB565384 | | 23,333.00 | |
| 06/09/2022 | Payroll4Const COLLECTION   5530 | | 36,274.59 | |
| 06/09/2022 | CHECK NUMBER     9404 | | 2,381.50 | |
| 06/09/2022 | CHECK NUMBER     9415 | | 60,571.20 | 99,245.92 |

**PAGE 1 OF 4**

# M&T Bank

SQ-000173

| | |
|---|---|
| **ACCOUNT TYPE** | |
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ■4250 | 06/01/22 - 06/30/22 |

**FOR INQUIRIES CALL:**   **DIAMOND FARMS**
                      **(301) 926-4535**

### BROUGHTON CONSTRUCTION COMPANY,LLC

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 06/10/2022 | Contractors Reti DraftReque Contractors Pla | | 745.53 | |
| 06/10/2022 | CFG MERCHANT SOL 8446623467 3179-30154#75 | | 15,000.00 | |
| 06/10/2022 | CFG MERCHANT SOL 8446623467 8 | | 24,000.00 | |
| 06/10/2022 | Delta Bridge Fun Delta Brid DEB567413 | | 32,308.00 | |
| 06/10/2022 | CHECK NUMBER       9410 | | 13,372.99 | 13,819.40 |
| 06/13/2022 | Hines PMD PAYMENT       2560 | 56,203.47 | | 70,022.87 |
| 06/14/2022 | INCOMING FEDWIRE FUNDS TRANSFER SQUARE ADVANCE | 485,000.00 | | |
| 06/14/2022 | DC-D.C. GOVERNME SOARACH    109001410577B10 | 94,965.85 | | 649,988.72 |
| 06/15/2022 | DEPOSIT | 8,750.00 | | |
| 06/15/2022 | Square Advance BROUGHTON    BROUGHTON CONST | 2,500.00 | | 661,238.72 |
| 06/16/2022 | OUTGOING FEDWIRE FUNDS TRANSFER JANICE M ADAMS | | 200,000.00 | |
| 06/16/2022 | TOYOTA FINANCIAL RETAIL_PAY 52578368051722 | | 1,004.35 | |
| 06/16/2022 | Delta Bridge Fun Delta Brid DEB578294 | | 23,333.00 | |
| 06/16/2022 | Payroll4Const COLLECTION   5530 | | 37,905.26 | 398,996.11 |
| 06/17/2022 | CFG MERCHANT SOL 8446623467 3179-30154#76 | | 15,000.00 | |
| 06/17/2022 | CFG MERCHANT SOL 8446623467 9 | | 24,000.00 | |
| 06/17/2022 | Delta Bridge Fun Delta Brid DEB580336 | | 32,308.00 | 327,688.11 |
| 06/21/2022 | ARLINGTON COUNTY PAYMENT   242475 | 10,435.62 | | |
| 06/21/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | 308,977.90 |
| 06/22/2022 | DEPOSIT | 90,000.00 | | |
| 06/22/2022 | KABBAGE LOAN         8956440 | 73,000.00 | | |
| 06/22/2022 | DEPOSIT | 30,000.00 | | |
| 06/22/2022 | OUTGOING FEDWIRE FUNDS TRANSFER TAMLA KIRKLAND | | 315,000.00 | 186,977.90 |
| 06/23/2022 | Contractors Reti DraftReque Contractors Pla | | 696.80 | |
| 06/23/2022 | Delta Bridge Fun Delta Brid DEB588790 | | 23,333.00 | |
| 06/23/2022 | Payroll4Const COLLECTION   5530 | | 37,777.44 | 125,170.66 |
| 06/24/2022 | DEPOSIT | 50,000.00 | | |
| 06/24/2022 | Contractors Reti DraftReque Contractors Pla | | 706.45 | |
| 06/24/2022 | CFG MERCHANT SOL 8446623467 3179-30154#77 | | 15,000.00 | |
| 06/24/2022 | CFG MERCHANT SOL 8446623467 10 | | 24,000.00 | |
| 06/24/2022 | Delta Bridge Fun Delta Brid DEB590926 | | 32,308.00 | 103,156.21 |
| 06/27/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | 74,010.38 |
| 06/28/2022 | INCOMING FEDWIRE FUNDS TRANSFER PROVIDENT GROUP -TUBMAN QUAD | 105,792.86 | | |
| 06/28/2022 | INCOMING FEDWIRE FUNDS TRANSFER CORVIAS CAMPUS LIVING HU LLC | 650.00 | | 180,453.24 |
| 06/29/2022 | DEPOSIT | 500,000.00 | | |

**PAGE 2 OF 4**

**M&T Bank**

SQ-000174

| | |
|---|---|
| FOR INQUIRIES CALL: | **DIAMOND FARMS** |
| | **(301) 926-4535** |

| ACCOUNT TYPE |
|---|
| **COMMERCIAL CHECKING** |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮▮▮4250 | **06/01/22 - 06/30/22** |

**BROUGHTON CONSTRUCTION COMPANY,LLC**

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 06/29/2022 | DC-D.C. GOVERNME SOARACH    109001412418B10 | 223,535.69 | | 903,988.93 |
| 06/30/2022 | Hines PMD PAYMENT          2564 | 13,183.53 | | |
| 06/30/2022 | DEPOSIT | 3,750.00 | | |
| 06/30/2022 | OUTGOING FEDWIRE FUNDS TRANSFER SPB GLOBAL | | 50,000.00 | |
| 06/30/2022 | Delta Bridge Fun Delta Brid DEB601849 | | 23,333.00 | |
| 06/30/2022 | Payroll4Const COLLECTION    5530 | | 38,656.68 | |
| 06/30/2022 | CHECK NUMBER        9435 | | 8,000.00 | 800,932.78 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 24 | 11 | |

## CHECKS PAID SUMMARY

| CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 9404 | 06/09/22 | 2,381.50 | 9410 | 06/10/22 | 13,372.99 | 9415 | 06/09/22 | 60,571.20 |
| 9405 | 06/08/22 | 1,225.00 | 9412* | 06/08/22 | 50,000.00 | 9416 | 06/08/22 | 271,264.34 |
| 9408* | 06/06/22 | 13,601.53 | 9413 | 06/03/22 | 50,000.00 | 9435* | 06/30/22 | 8,000.00 |
| 9409 | 06/07/22 | 202.99 | 9414 | 06/06/22 | 170.00 | | | |

\* - GAP IN CHECK SEQUENCE
R - CHECK RETURNED

| | |
|---|---|
| NUMBER OF CHECKS PAID | 11 |
| AMOUNT OF CHECKS PAID | $470,789.55 |

**PAGE 3 OF 4**

**GTR WASHINGTON COMMERCIAL BANK**
**7799 LEESBURG PIKE SUITE 600 NORTH TOWER**

# HOW TO BALANCE YOUR M&T BANK ACCOUNT    SQ-000175

## TO BALANCE YOUR ACCOUNT WITH THIS STATEMENT COMPLETE STEPS 1, 2, & 3.

**STEP 1** | **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your register.
Also place a checkmark next to the item in your register.

**STEP 2** | **Add** to your register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3** | **Subtract** from your register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

## TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4** | **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | | | | OUTSTANDING CHECKS AND OTHER DEBITS | | |
|---|---|---|---|---|---|---|
| NUMBER | AMOUNT | | | NUMBER | AMOUNT | |
| 1 | $ | | | 13 | $ | |
| 2 | | | | 14 | | |
| 3 | | | | 15 | | |
| 4 | | | | 16 | | |
| 5 | | | | 17 | | |
| 6 | | | | 18 | | |
| 7 | | | | 19 | | |
| 8 | | | | 20 | | |
| 9 | | | | 21 | | |
| 10 | | | | 22 | | |
| 11 | | | | SUBTOTAL OF COLUMN 2 | | |
| 12 | | | | SUBTOTAL OF COLUMN 1 + | | |
| SUBTOTAL OF COLUMN 1 | $ | | | TOTAL OUTSTANDING CHECKS AND DEBITS | $ | |

**STEP 5** | **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.

$ |

**STEP 6** | **Enter the total of any deposits or other credits** shown on your register which are not shown on this statement.

$ |

**STEP 7** | **Enter the total of STEPS 5 & 6.**

$ |

**STEP 8** | **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4).**

$ |

**STEP 9** | **Subtract STEP 8 from STEP 7** and enter the difference here.

$ |

This amount should be your current account balance.

If you have questions, think your statement is incorrect, or for information regarding Treasury Management Services, please contact your M&T Relationship Manager or the Commercial Service Team at 1-800-724-2240, Monday through Friday, 8am - 6pm ET.



M&T Bank

L018 (11/16)                                                                                              ©2016 M&T Bank, Member FDIC.



**INDUSTRIAL BANK**

4812 Georgia Avenue NW
Washington, DC 20011

**RETURN SERVICE REQUESTED**

BROUGHTON CONSTRUCTION
CASEY B STRINGER
* HOLD MAIL *

*Statement Ending 08/31/2022*

BROUGHTON CONSTRUCTION                    *Page 1 of 6*
*Customer Number: XXXXXX9611*

### Managing Your Accounts

| | | |
|---|---|---|
| 🖥 | Website | www.industrial-bank.com |
| 🎧 | Phone Number | 202-722-2000 |
| ✉ | Mailing Address | 4812 Georgia Avenue, N.W. Washington, DC 20011 |

Effective June 1, 2021 Industrial Bank will adjust all branch lobby and drive-thru hours to the following:
**Monday – Friday   9am – 4pm & Saturday   9am – 1pm.**

We appreciate your continued support and encourage you to leverage the available access choices, such as mobile banking, online banking, online bill-pay, debit card rewards and e-Statements.

## Summary of Accounts

| Account Type | Account Number | Ending Balance |
|---|---|---|
| ENTERPRISE CHECKING | XXXXXX9611 | $285,852.89 |



## uChoose® Rewards Debit Card Program

 Earning points is easy.  The tough part is deciding which rewards to choose.

 Simply use your Industrial Bank Visa debit card for eligible purchases to earn points and login to uchooserewards.com to redeem your points.

 Points can be redeemed for gift cards, merchandise, travel, cash and more!

 You are automatically enrolled but you need to register your card to redeem points.

 Register your Industrial Bank Visa debit card today at **www.uchooserewards.com.**

## ENTERPRISE CHECKING-XXXXXX9611

### Account Summary

| Date | Description | Amount | Description | Amount |
|---|---|---|---|---|
| 07/30/2022 | **Beginning Balance** | **$75,983.21** | Minimum Balance | $0.00 |
| | 5 Credit(s) This Period | $439,659.61 | Average Ledger Balance | $0.00 |
| | 25 Debit(s) This Period | $229,789.93 | Average Available Balance | $0.00 |
| 08/31/2022 | **Ending Balance** | **$285,852.89** | | |
| | Service Charges | $2.00 | | |



Member **FDIC**

EQUAL HOUSING LENDER

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 155 of 175

SQ-000167

# ENTERPRISE CHECKING-XXXXXX9611 (continued)

## Deposits

| Date | Description | Amount |
|---|---|---|
| 08/04/2022 | DEPOSIT | $100,000.00 |
| 08/05/2022 | DEPOSIT | $6,033.61 |
| 08/17/2022 | DEPOSIT | $15,226.00 |
| 08/31/2022 | DEPOSIT | $250,000.00 |
| | | 4 item(s) totaling $371,259.61 |

## Other Credits

| Date | Description | Amount |
|---|---|---|
| 08/11/2022 | Incoming Wire 59186369 HOWL DC LLC BK AMER NYC 228B85724FW43956 | $68,400.00 |
| | | 1 item(s) totaling $68,400.00 |

## Electronic Debits

| Date | Description | Amount |
|---|---|---|
| 08/09/2022 | COMCAST 8299400 441002602 6910644 | $296.05 |
| 08/10/2022 | DISCOUNT TSYS/TRANSFIRST 39300982938127 BROUGHTON CONSTRUCTION DISCOUNT | $290.56 |
| 08/16/2022 | VERIZON PAYMENTREC 8503904430001 | $606.28 |
| 08/17/2022 | VERIZON WIRELESS PAYMENTS 022128833800002 | $212.20 |
| 08/17/2022 | COMCAST CORP CABLE SVCS 3965186 | $1,001.10 |
| 08/17/2022 | VERIZON WIRELESS PAYMENTS 022128833800001 | $1,342.28 |
| | | 6 item(s) totaling $3,748.47 |

## Other Debits

| Date | Description | Amount |
|---|---|---|
| 08/09/2022 | SERVICE CHARGE | $2.00 |
| 08/11/2022 | Wire Fee 59186369 | $10.00 |
| 08/17/2022 | LOAN PAYMENT AUGUST LOAN PAYMENT ONLY- DBERRY | $15,825.77 |
| | | 3 item(s) totaling $15,837.77 |

## Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|
| 8995 | 08/02/2022 | $20,000.00 | 9018 | 08/12/2022 | $500.00 |
| 8996 | 08/04/2022 | $1,246.95 | 9019 | 08/08/2022 | $11,888.70 |
| 8997 | 08/02/2022 | $13,946.63 | 9020 | 08/08/2022 | $31,148.63 |
| 9007* | 08/01/2022 | $127.20 | 9021 | 08/15/2022 | $1,590.00 |
| 9009* | 08/01/2022 | $18,866.42 | 9022 | 08/08/2022 | $22,238.20 |
| 9013* | 08/03/2022 | $106.88 | 9023 | 08/08/2022 | $5,000.00 |
| 9015* | 08/03/2022 | $15,569.00 | 9024 | 08/05/2022 | $22,157.08 |
| 9017* | 08/09/2022 | $10,818.00 | 9026* | 08/18/2022 | $35,000.00 |

\* Indicates skipped check number                                          16 item(s) totaling $210,203.69

## Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 08/01/2022 | $56,989.59 | 08/08/2022 | $19,721.13 | 08/15/2022 | $74,614.52 |
| 08/02/2022 | $23,042.96 | 08/09/2022 | $8,605.08 | 08/16/2022 | $74,008.24 |
| 08/03/2022 | $7,367.08 | 08/10/2022 | $8,314.52 | 08/17/2022 | $70,852.89 |
| 08/04/2022 | $106,120.13 | 08/11/2022 | $76,704.52 | 08/18/2022 | $35,852.89 |
| 08/05/2022 | $89,996.66 | 08/12/2022 | $76,204.52 | 08/31/2022 | $285,852.89 |

## Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date |
|---|---|---|
| **Total Overdraft Fees** | $0.00 | $0.00 |
| **Total Returned Item Fees** | $0.00 | $0.00 |



*Statement Ending 08/31/2022*

BROUGHTON CONSTRUCTION                    *Page 3 of 6*

*Customer Number: XXXXXX9611*

## ENTERPRISE CHECKING-XXXXXX9611 (continued)

**Service Charge Summary**

| Description | Amount |
| --- | --- |
| TOTAL CHARGE FOR ENTERPRISE CHECKING: | $2.00 |
| Total Service Charge | $2.00 |

BROUGHTON CONSTRUCTION

Customer Number: XXXXXX9611

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 157 of 175

SQ-000169

NAME: _____

NEW: _____
            Street and Number                   City                   State               Zip Code

TYPE OF ACCOUNTS MAINTAINED AND ACCOUNT NUMBERS:

☐ Checking _____   ☐ Installment Loan _____   ☐ Safe deposit (# _____)

☐ Savings _____   ☐ Certificate _____   ☐ Other (describe below) _____

SPECIAL INSTRUCTIONS: _____

Date: _____   Authorized Sginature: _____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
CUT ALONG BROKEN LINE AND MAIL OR TAKE TO BANK

## RECONCILEMENT FORM

### CHECKS OUTSTANDING

| NUMBER | AMOUNT |
|--------|--------|
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |
|        |        |

**TO PROVE BALANCE AS SHOWN ON YOUR STATEMENT**

1. Deduct all bank charges from your checkbook.

2. All checks issued from your personalized checkbook are posted numerically (as issued). Sort your checks numerically.

3. Check off on the stubs of your checkbook each check listed as paid by the Bank and make a list of the numbers and amounts of those still outstanding in the spaces provided at the left. Be sure to include all checks still outstanding from your previous statement. To the sum of the outstanding checks add the balance as shown in your checkbook.

4. List below all deposits which do not appear on the statement and add to this total the balance as shown by the statement.

The two results should agree and if so, this statement as rendered is correct.

| | | DEPOSITS NOT SHOWN ON STATEMENT | |
|--|--|--|--|
| TOTAL CHECKS OUTSTANDING | | | |
| BAL. PER CHECKBOOK | | BANK BALANCE PER STATEMENT | |
| TOTAL | | TOTAL | |

**WORK SPACE**

## CREDIT LINE DISCLOSURE STATEMENT

We figure the finance charge on your account by applying the daily periodic rate to your average daily principal balance. To determine the daily principal balance, we take the previous month statement, add the credit limit amount, subtract the available credit limit - this gives the beginning principal balance. We take the current month statement, add the balance last statement, subtract the principal previous statement - this gives the unpaid finance charge. Take the balance last statement, subtract the unpaid finance charge - this gives the daily principal balance, add advance amount, subtract any payments, subtract the finance charge paid current year from the current statement. Add each day's principal balance together, divide by the days this cycle - this gives the average daily balance.

The annual percentage rate disclosed on the front of this statement represents the daily periodic rate expressed on an annualized basis as a yearly rate.

If the credit plan name disclosed on the front of this statement includes the coding VR, then your plan has a variable rate. This feature means that your daily periodic rate, and its corresponding annual percentage rate, may vary.

The payments on your account will be applied first to any unpaid and accrued finance charges, to your outstanding principal balance, then to any late charges, NSF charges, annual membership fees or other charges.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR CREDIT LINE STATEMENT:

Send your inquiry in writing so that we receive it within 60 days after the statement was mailed to you. Send your inquiry to the address shown on the front of the statement.

Your written inquiry must include:

1. Your name and account number;

2. A description of the error and why (to the extent you can explain) you believe it is an error; and

3. The dollar amount of the suspected error.

If you have authorized us to automatically pay your loan from your checking account, you can stop or reverse any automatic payment made towards reducing your loan balance in the amount of the suspected error pending a resolution of the suspected error. If you desire to avail yourself of automatic payment rights, your notification in the form set forth above must be received by us within 60 days after the statement is sent to you.

You remain obligated to pay the parts of your balance not in dispute, but do not have to pay any amount in dispute during the time we are resolving the dispute. During that same time, we may not take any action to collect disputed amounts or report disputed amounts as delinquent.

This is a summary of your rights. A full statement of your rights and our responsibilities under the Federal Fair Credit Billing Act will be sent to you both upon request and in response to a billing error notice.

### IN CASE OF ERRORS OR INQUIRIES ABOUT YOUR ELECTRONIC TRANSFERS:

Telephone or write us at the number or address listed on the front of this statement as soon as you can. If you think your statement or any of your automated teller machine receipts is wrong, or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number.

2. Describe the error or transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.

3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will credit your account for the amount you think is in error so that you will have use of the money during the time it takes us to complete our investigation.

### PREAUTHORIZED CREDITS

If you have arranged to have direct deposits made to your account at least once every 60 days from the same person or company, you can call us at the telephone number shown on the front of this statement to find out whether or not the deposit was made.

**IMPORTANT:** Every statement should be checked with your own records. If no errors are reported within **60** days, your account will be considered correct.





#8995            08/02/2022            $20,000.00



#8996            08/04/2022            $1,246.95



#8997            08/02/2022            $13,946.63



#9007            08/01/2022            $127.20



#9009            08/01/2022            $18,866.42



#9013            08/03/2022            $106.88



#9015            08/03/2022            $15,569.00



#9017            08/09/2022            $10,818.00



#9018            08/12/2022            $500.00



#9019            08/08/2022            $11,888.70

Case 25-10054-ELG Document 15 Filed 08/12/26 Page 159 of 175

SQ-000171





| #9020 | 08/08/2022 | $31,148.63 | | #9021 | 08/15/2022 | $1,590.00 |





| #9022 | 08/08/2022 | $22,238.20 | | #9023 | 08/08/2022 | $5,000.00 |





| #9024 | 08/05/2022 | $22,157.08 | | #9026 | 08/18/2022 | $35,000.00 |

# M&T Bank

SQ-000176

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS**<br>**(301) 926-4535** |

00   0 06547M NM  017

000000                                              P

**BROUGHTON CONSTRUCTION COMPANY,LLC**
**BROUGHTON CONSTRUCTION CO LLC**
**1220 12TH ST SE STE 150**
**WASHINGTON DC 20003-3718**

| ACCOUNT TYPE | |
|---|---|
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ███4250 | **07/01/22 - 07/31/22** |

| | |
|---|---|
| **BEGINNING BALANCE** | **$800,932.78** |
| **DEPOSITS & CREDITS** | **1,528,348.84** |
| **LESS CHECKS & DEBITS** | **2,031,138.38** |
| **LESS SERVICE CHARGES** | **258.02** |
| **ENDING BALANCE** | **$297,885.22** |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 07/01/2022 | BEGINNING BALANCE | | | $800,932.78 |
| 07/01/2022 | FORD MOTOR CR FORDCREDIT   056076985 | | $346.74 | |
| 07/01/2022 | TOYOTA FINANCIAL RETAIL_PAY 53557622060222 | | 614.99 | |
| 07/01/2022 | Contractors Reti DraftReque Contractors Pla | | 1,412.16 | |
| 07/01/2022 | CFG MERCHANT SOL 8446623467 3179-30154#78 | | 15,000.00 | |
| 07/01/2022 | CFG MERCHANT SOL 8446623467 11 | | 24,000.00 | |
| 07/01/2022 | Delta Bridge Fun Delta Brid DEB604120 | | 32,308.00 | |
| 07/01/2022 | CHECK NUMBER      9420 | | 25,000.00 | |
| 07/01/2022 | CHECK NUMBER      9432 | | 170.00 | 702,080.89 |
| 07/05/2022 | HINES PMD PAYMENT      1151 | $10,039.60 | | |
| 07/05/2022 | Adom Realty Inve Adom Realt      IZ5ZWOLE8 | | 2,000.00 | |
| 07/05/2022 | FERGUSON ENTERPR BT0701    000000182736452 | | 2,962.80 | |
| 07/05/2022 | PPP REPAYMENTS PPPPAYMENT   9422021 | | 11,912.97 | |
| 07/05/2022 | KABBAGE PAYMENT      8964015 | | 24,459.09 | |
| 07/05/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 07/05/2022 | CHECK NUMBER      9423 | | 7,560.00 | |
| 07/05/2022 | CHECK NUMBER      9427 | | 188,200.00 | |
| 07/05/2022 | CHECK NUMBER      9430 | | 30,000.00 | 415,879.80 |
| 07/06/2022 | INCOMING FEDWIRE FUNDS TRANSFER<br>DELTA BRIDGE FUNDING LLC | 406,388.00 | | |
| 07/06/2022 | OUTGOING FEDWIRE FUNDS TRANSFER<br>FRESH AIR DUCT CLEANING LLC | | 325,000.00 | |
| 07/06/2022 | FIRST CITIZENS B CREDITCARD 043000091548862 | | 3,329.00 | |
| 07/06/2022 | CHECK NUMBER      9426 | | 8,930.00 | 485,008.80 |
| 07/07/2022 | DEPOSIT | 6,250.00 | | |
| 07/07/2022 | Delta Bridge Fun Delta Brid DEB612486 | | 23,333.00 | |
| 07/07/2022 | Payroll4Const COLLECTION    5530 | | 38,202.53 | |
| 07/07/2022 | CHECK NUMBER      9421 | | 7,000.00 | 422,723.27 |
| 07/08/2022 | HOME DEPOT COMM ONLINE PMT  610794330926560 | | 10,001.78 | |
| 07/08/2022 | CFG MERCHANT SOL 8446623467 3179-30154#79 | | 15,000.00 | |
| 07/08/2022 | CFG MERCHANT SOL 8446623467 12 | | 24,000.00 | 373,721.49 |
| 07/11/2022 | THE SHERWIN WILL ONLINE PAY SW 000006376713 | | 4,011.62 | |
| 07/11/2022 | AMEX EPAYMENT ACH PMT      S0062 | | 20,000.00 | |
| 07/11/2022 | CHECK NUMBER      9428 | | 381.80 | |
| 07/11/2022 | CHECK NUMBER      9429 | | 16,502.02 | |

**PAGE 1 OF 5**

# M&T Bank

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS** |
| | **(301) 926-4535** |

| ACCOUNT TYPE |
|---|
| **COMMERCIAL CHECKING** |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮4250 | **07/01/22 - 07/31/22** |

### BROUGHTON CONSTRUCTION COMPANY,LLC

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 07/11/2022 | CHECK NUMBER      9447 | | 22,157.08 | |
| 07/11/2022 | CHECK NUMBER      9448 | | 12,918.93 | |
| 07/11/2022 | SERVICE CHARGE FOR ACCOUNT 000009839984250 | | 258.02 | 297,492.02 |
| 07/12/2022 | WEB XFER TO CHK  00009840892328 | | 10,000.00 | |
| 07/12/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 07/12/2022 | CHECK NUMBER      9431 | | 6,000.00 | |
| 07/12/2022 | CHECK NUMBER      9439 | | 170.00 | |
| 07/12/2022 | CHECK NUMBER      9444 | | 2,310.00 | 249,866.19 |
| 07/13/2022 | DC-D.C. GOVERNME SOARACH    109001413632B10 | 272,368.96 | | |
| 07/13/2022 | Delta Bridge Fun Delta Brid DEB622598 | | 39,375.00 | 482,860.15 |
| 07/14/2022 | INCOMING FEDWIRE FUNDS TRANSFER JAYCEE DEVELOPMENT LLC | 250,000.00 | | |
| 07/14/2022 | Delta Bridge Fun Delta Brid DEB625657 | | 23,333.00 | |
| 07/14/2022 | Payroll4Const COLLECTION    5530 | | 37,197.46 | |
| 07/14/2022 | CHECK NUMBER      9422 | | 263.20 | |
| 07/14/2022 | CHECK NUMBER      9437 | | 8,972.65 | |
| 07/14/2022 | CHECK NUMBER      9440 | | 1,368.20 | |
| 07/14/2022 | CHECK NUMBER      9446 | | 7,941.00 | |
| 07/14/2022 | CHECK NUMBER      9450 | | 250,000.00 | 403,784.64 |
| 07/15/2022 | Contractors Reti DraftReque Contractors Pla | | 1,084.95 | |
| 07/15/2022 | AMEX EPAYMENT ACH PMT      S4896 | | 10,000.00 | |
| 07/15/2022 | CFG MERCHANT SOL 8446623467 3179-30154#80 | | 15,000.00 | |
| 07/15/2022 | CFG MERCHANT SOL 8446623467 13 | | 24,000.00 | |
| 07/15/2022 | CHECK NUMBER      9419 | | 245.92 | |
| 07/15/2022 | CHECK NUMBER      9434 | | 35,650.00 | |
| 07/15/2022 | CHECK NUMBER      9441 | | 1,187.57 | |
| 07/15/2022 | CHECK NUMBER      9452 | | 30,000.00 | 286,616.20 |
| 07/18/2022 | TOYOTA FINANCIAL RETAIL_PAY 54732433061722 | | 1,004.35 | |
| 07/18/2022 | Contractors Reti DraftReque Contractors Pla | | 1,203.65 | |
| 07/18/2022 | CHECK NUMBER      9443 | | 855.66 | |
| 07/18/2022 | CHECK NUMBER      9451 | | 21,881.45 | 261,671.09 |
| 07/19/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | 232,525.26 |
| 07/20/2022 | DC-D.C. GOVERNME SOARACH    109001414535B10 | 179,002.51 | | |
| 07/20/2022 | WEB XFER TO CHK  00009840892328 | | 5,000.00 | |
| 07/20/2022 | Delta Bridge Fun Delta Brid DEB635921 | | 39,375.00 | 367,152.77 |
| 07/21/2022 | DC-D.C. GOVERNME SOARACH    109001414664B10 | 54,658.83 | | |
| 07/21/2022 | Delta Bridge Fun Delta Brid DEB639016 | | 23,333.00 | |
| 07/21/2022 | Payroll4Const COLLECTION    5530 | | 37,436.90 | |
| 07/21/2022 | CHECK NUMBER      9453 | | 53,567.10 | 307,474.60 |

**PAGE 2 OF 5**

**M&T** Bank

**FOR INQUIRIES CALL:** **DIAMOND FARMS**
(301) 926-4535

| ACCOUNT TYPE | |
|---|---|
| COMMERCIAL CHECKING | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▇4250 | 07/01/22 - 07/31/22 |

**BROUGHTON CONSTRUCTION COMPANY,LLC**

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 07/22/2022 | INCOMING FEDWIRE FUNDS TRANSFER KENNEDY STREET COMMUNITY PARTNER LL | 130,000.00 | | |
| 07/22/2022 | CFG MERCHANT SOL 8446623467 3179-30154#81 | | 15,000.00 | |
| 07/22/2022 | AMEX EPAYMENT ACH PMT     S5276 | | 16,590.40 | |
| 07/22/2022 | CFG MERCHANT SOL 8446623467 14 | | 24,000.00 | |
| 07/22/2022 | CHECK NUMBER     9436 | | 477.11 | |
| 07/22/2022 | CHECK NUMBER     9455 | | 77,617.80 | 303,789.29 |
| 07/25/2022 | Contractors Reti DraftReque Contractors Pla | | 1,314.92 | |
| 07/25/2022 | CHECK NUMBER     9424 | | 123.40 | |
| 07/25/2022 | CHECK NUMBER     9442 | | 816.05 | |
| 07/25/2022 | CHECK NUMBER     9445 | | 220.00 | |
| 07/25/2022 | CHECK NUMBER     9454 | | 3,810.00 | 297,504.92 |
| 07/26/2022 | DEPOSIT | 46,000.00 | | |
| 07/26/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 07/26/2022 | CHECK NUMBER     9438 | | 4,000.00 | 310,359.09 |
| 07/27/2022 | DC-D.C. GOVERNME SOARACH   109001415319AS0 | 42,645.94 | | |
| 07/27/2022 | CARDMEMBER SERV ELECT PYMT ***********4204 | | 2,000.00 | |
| 07/27/2022 | Ford Credit CarPayment     BROUGHTON CONST | | 3,823.80 | |
| 07/27/2022 | Delta Bridge Fun Delta Brid DEB649230 | | 39,375.00 | 307,806.23 |
| 07/28/2022 | Payroll4Const COLLECTION   5530 | | 436.97 | |
| 07/28/2022 | Delta Bridge Fun Delta Brid DEB652271 | | 23,333.00 | |
| 07/28/2022 | Payroll4Const COLLECTION   5530 | | 38,528.24 | 245,508.02 |
| 07/29/2022 | DC-D.C. GOVERNME SOARACH   109001415606B10 | 130,995.00 | | |
| 07/29/2022 | CFG MERCHANT SOL 8446623467 3179-30154#82 | | 15,000.00 | |
| 07/29/2022 | CFG MERCHANT SOL 8446623467 15 | | 24,000.00 | |
| 07/29/2022 | CHECK NUMBER     9466 | | 9,617.80 | |
| 07/29/2022 | CHECK NUMBER     9468 | | 30,000.00 | 297,885.22 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 11 | 35 | |

## CHECKS PAID SUMMARY

| CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 9419 | 07/15/22 | 245.92 | 9426* | 07/06/22 | 8,930.00 | 9432 | 07/01/22 | 170.00 |
| 9420 | 07/01/22 | 25,000.00 | 9427 | 07/05/22 | 188,200.00 | 9434* | 07/15/22 | 35,650.00 |
| 9421 | 07/07/22 | 7,000.00 | 9428 | 07/11/22 | 381.80 | 9436* | 07/22/22 | 477.11 |
| 9422 | 07/14/22 | 263.20 | 9429 | 07/11/22 | 16,502.02 | 9437 | 07/14/22 | 8,972.65 |
| 9423 | 07/05/22 | 7,560.00 | 9430 | 07/05/22 | 30,000.00 | 9438 | 07/26/22 | 4,000.00 |
| 9424 | 07/25/22 | 123.40 | 9431 | 07/12/22 | 6,000.00 | 9439 | 07/12/22 | 170.00 |

* - GAP IN CHECK SEQUENCE
R - CHECK RETURNED

**PAGE 3 OF 5**

**GTR WASHINGTON COMMERCIAL BANK**
**7799 LEESBURG PIKE SUITE 600 NORTH TOWER**

# M&T Bank

SQ-000179

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS** |
| | **(301) 926-4535** |

| ACCOUNT TYPE | |
|---|---|
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮▮▮4250 | **07/01/22 - 07/31/22** |

**BROUGHTON CONSTRUCTION COMPANY,LLC**

## CHECKS PAID SUMMARY

| CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 9440 | 07/14/22 | 1,368.20 | 9446 | 07/14/22 | 7,941.00 | 9453 | 07/21/22 | 53,567.10 |
| 9441 | 07/15/22 | 1,187.57 | 9447 | 07/11/22 | 22,157.08 | 9454 | 07/25/22 | 3,810.00 |
| 9442 | 07/25/22 | 816.05 | 9448 | 07/11/22 | 12,918.93 | 9455 | 07/22/22 | 77,617.80 |
| 9443 | 07/18/22 | 855.66 | 9450* | 07/14/22 | 250,000.00 | 9466* | 07/29/22 | 9,617.80 |
| 9444 | 07/12/22 | 2,310.00 | 9451 | 07/18/22 | 21,881.45 | 9468* | 07/29/22 | 30,000.00 |
| 9445 | 07/25/22 | 220.00 | 9452 | 07/15/22 | 30,000.00 | | | |

\* - GAP IN CHECK SEQUENCE
R - CHECK RETURNED

| | |
|---|---|
| NUMBER OF CHECKS PAID | 35 |
| AMOUNT OF CHECKS PAID | $865,914.74 |

**PAGE 4 OF 5**

**GTR WASHINGTON COMMERCIAL BANK**
**7799 LEESBURG PIKE SUITE 600 NORTH TOWER**

# HOW TO BALANCE YOUR M&T BANK ACCOUNT   SQ-000180

## TO BALANCE YOUR ACCOUNT WITH THIS STATEMENT COMPLETE STEPS 1, 2, & 3.

**STEP 1**   **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your register.
Also place a checkmark next to the item in your register.

**STEP 2**   **Add** to your register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3**   **Subtract** from your register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

## TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4**   **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | | | OUTSTANDING CHECKS AND OTHER DEBITS | | |
|---|---|---|---|---|---|
| NUMBER | AMOUNT | | NUMBER | AMOUNT | |
| 1 | $ | | 13 | $ | |
| 2 | | | 14 | | |
| 3 | | | 15 | | |
| 4 | | | 16 | | |
| 5 | | | 17 | | |
| 6 | | | 18 | | |
| 7 | | | 19 | | |
| 8 | | | 20 | | |
| 9 | | | 21 | | |
| 10 | | | 22 | | |
| 11 | | | SUBTOTAL OF COLUMN 2 | | |
| 12 | | | SUBTOTAL OF COLUMN 1 + | | |
| SUBTOTAL OF COLUMN 1 | $ | | TOTAL OUTSTANDING CHECKS AND DEBITS | $ | |

**STEP 5**   **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.   $

**STEP 6**   **Enter the total of any deposits or other credits** shown on your register which are not shown on this statement.   $

**STEP 7**   **Enter the total of STEPS 5 & 6.**   $

**STEP 8**   **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4**).   $

**STEP 9**   **Subtract STEP 8 from STEP 7** and enter the difference here.   $

This amount should be your current account balance.

If you have questions, think your statement is incorrect, or for information regarding Treasury Management Services, please contact your M&T Relationship Manager or the Commercial Service Team at 1-800-724-2240, Monday through Friday, 8am - 6pm ET.



M&T Bank

L018 (11/16)                                                                                                    ©2016 M&T Bank, Member FDIC.

# M&T Bank

SQ-000181

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS** |
| | **(301) 926-4535** |

00   0 06547M NM  017

000000                                              P

**BROUGHTON CONSTRUCTION COMPANY,LLC**
**BROUGHTON CONSTRUCTION CO LLC**
**1220 12TH ST SE STE 150**
**WASHINGTON DC 20003-3718**

| ACCOUNT TYPE | |
|---|---|
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▉4250 | **08/01/22 - 08/31/22** |

| | |
|---|---|
| **BEGINNING BALANCE** | **$297,885.22** |
| **DEPOSITS & CREDITS** | **1,471,934.78** |
| **LESS CHECKS & DEBITS** | **1,683,992.06** |
| **LESS SERVICE CHARGES** | **141.14** |
| **ENDING BALANCE** | **$85,686.80** |

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/01/2022 | BEGINNING BALANCE | | | $297,885.22 |
| 08/01/2022 | DC-D.C. GOVERNME SOARACH   109001415835B10 | $109,067.20 | | |
| 08/01/2022 | FORD MOTOR CR FORDCREDIT   056076985 | | $346.74 | |
| 08/01/2022 | TOYOTA FINANCIAL RETAIL_PAY 55690647070222 | | 614.99 | |
| 08/01/2022 | Contractors Reti DraftReque Contractors Pla | | 697.77 | |
| 08/01/2022 | QLA -- StandardC LeasingSrv QDSQLA004341969 | | 830.40 | |
| 08/01/2022 | PPP REPAYMENTS PPPPAYMENT   9429394 | | 11,984.00 | |
| 08/01/2022 | CHECK NUMBER       9460 | | 14,580.00 | 377,898.52 |
| 08/02/2022 | INCOMING FEDWIRE FUNDS TRANSFER CFG MERCHANT SOLUTIONS LLC | 501,421.00 | | |
| 08/02/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 08/02/2022 | CHECK NUMBER       9456 | | 4,828.50 | |
| 08/02/2022 | CHECK NUMBER       9457 | | 10,164.45 | 835,180.74 |
| 08/03/2022 | KABBAGE PAYMENT        8989120 | | 31,404.93 | |
| 08/03/2022 | Delta Bridge Fun Delta Brid DEB662503 | | 39,375.00 | |
| 08/03/2022 | CHECK NUMBER       9449 | | 10,019.00 | 754,381.81 |
| 08/04/2022 | OUTGOING FEDWIRE FUNDS TRANSFER FRESH AIR DUCT CLEANING LLC | | 325,000.00 | |
| 08/04/2022 | Delta Bridge Fun Delta Brid DEB665529 | | 23,333.00 | |
| 08/04/2022 | Payroll4Const COLLECTION   5530 | | 39,066.15 | |
| 08/04/2022 | CHECK NUMBER       9458 | | 1,320.00 | |
| 08/04/2022 | CHECK NUMBER       9459 | | 2,928.78 | 362,733.88 |
| 08/05/2022 | Contractors Reti DraftReque Contractors Pla | | 697.77 | |
| 08/05/2022 | CFGMS - MAS 8446623467     844-662-3467 | | 18,000.00 | |
| 08/05/2022 | CFG MERCHANT SOL 8446623467 16 | | 24,000.00 | |
| 08/05/2022 | CHECK NUMBER       9461 | | 163.02 | |
| 08/05/2022 | CHECK NUMBER       9465 | | 1,046.50 | |
| 08/05/2022 | CHECK NUMBER       9471 | | 100,000.00 | 218,826.59 |
| 08/08/2022 | CHECK NUMBER       9433 | | 1,158.12 | |
| 08/08/2022 | CHECK NUMBER       9463 | | 1,450.00 | |
| 08/08/2022 | CHECK NUMBER       9467 | | 17,633.94 | |
| 08/08/2022 | CHECK NUMBER       9472 | | 162.00 | |
| 08/08/2022 | CHECK NUMBER       9474 | | 170.00 | |
| 08/08/2022 | CHECK NUMBER       9476 | | 220.00 | |
| 08/08/2022 | CHECK NUMBER       9477 | | 170.00 | |

**PAGE 1 OF 4**

GTR WASHINGTON COMMERCIAL BANK
7799 LEESBURG PIKE SUITE 600 NORTH TOWER

# M&T Bank

| | | | | |
|---|---|---|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS** | | **ACCOUNT TYPE** | |
| | (301) 926-4535 | | **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ▮4250 | 08/01/22 - 08/31/22 |

**BROUGHTON CONSTRUCTION COMPANY,LLC**

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/08/2022 | SERVICE CHARGE FOR ACCOUNT 000009839984250 | | 141.14 | 197,721.39 |
| 08/09/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 08/09/2022 | CHECK NUMBER        9464 | | 6,200.00 | |
| 08/09/2022 | CHECK NUMBER        9469 | | 2,970.00 | 159,405.56 |
| 08/10/2022 | ARLINGTON COUNTY PAYMENT    245812 | 19,600.11 | | |
| 08/10/2022 | Delta Bridge Fun Delta Brid DEB675747 | | 39,375.00 | |
| 08/10/2022 | CHECK NUMBER        9470 | | 1,158.12 | 138,472.55 |
| 08/11/2022 | DC-D.C. GOVERNME SOARACH   109001417261B10 | 115,149.19 | | |
| 08/11/2022 | CARDMEMBER SERV ELECT PYMT   ***********4204 | | 1,500.00 | |
| 08/11/2022 | Delta Bridge Fun Delta Brid DEB678714 | | 23,333.00 | |
| 08/11/2022 | Payroll4Const COLLECTION    5530 | | 43,165.65 | |
| 08/11/2022 | CHECK NUMBER        9462 | | 658.90 | 184,964.19 |
| 08/12/2022 | WEB XFER TO CHK   00009840892328 | | 10,000.00 | |
| 08/12/2022 | CFGMS - MAS 8446623467     844-662-3467#2 | | 18,000.00 | |
| 08/12/2022 | CFG MERCHANT SOL 8446623467 17 | | 24,000.00 | 132,964.19 |
| 08/15/2022 | KABBAGE LOAN          8999734 | 54,000.00 | | |
| 08/15/2022 | Contractors Reti DraftReque Contractors Pla | | 697.77 | 186,266.42 |
| 08/16/2022 | DC-D.C. GOVERNME SOARACH   109001417855B10 | 7,790.00 | | |
| 08/16/2022 | TOYOTA FINANCIAL RETAIL_PAY 56855683071722 | | 1,004.35 | |
| 08/16/2022 | HOME DEPOT COMM ONLINE PMT  600827984031535 | | 13,117.50 | |
| 08/16/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 08/16/2022 | CHECK NUMBER        9478 | | 50,000.00 | 100,788.74 |
| 08/17/2022 | DEPOSIT | 35,000.00 | | |
| 08/17/2022 | DC-D.C. GOVERNME SOARACH   109001418002B10 | 20,850.00 | | |
| 08/17/2022 | Delta Bridge Fun Delta Brid DEB688841 | | 39,375.00 | 117,263.74 |
| 08/18/2022 | FIRST CITIZENS B CREDITCARD 043000097566514 | | 3,050.00 | |
| 08/18/2022 | Delta Bridge Fun Delta Brid DEB691802 | | 23,333.00 | |
| 08/18/2022 | Payroll4Const COLLECTION    5530 | | 44,104.79 | 46,775.95 |
| 08/19/2022 | CFGMS - MAS 8446623467     844-662-3467#3 | | 18,000.00 | |
| 08/19/2022 | CFG MERCHANT SOL 8446623467 18 | | 24,000.00 | 4,775.95 |
| 08/22/2022 | DC-D.C. GOVERNME SOARACH   109001418346B10 | 146,088.28 | | |
| 08/22/2022 | Contractors Reti DraftReque Contractors Pla | | 697.77 | |
| 08/22/2022 | CHECK NUMBER        9480 | | 2,590.00 | 147,576.46 |
| 08/23/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | 118,430.63 |
| 08/24/2022 | DEPOSIT | 100,000.00 | | |
| 08/24/2022 | Adom Realty Inve Adom Realt     IK76N9LAL | | 2,100.00 | |
| 08/24/2022 | Delta Bridge Fun Delta Brid DEB701967 | | 39,375.00 | 176,955.63 |
| 08/25/2022 | NEW YORK LIFE INS. PREM.    28342263      P | | 400.00 | |
| 08/25/2022 | AMEX EPAYMENT ACH PMT      S6120 | | 22,687.16 | |

**PAGE 2 OF 4**

# M&T Bank

SQ-000183

| | |
|---|---|
| **FOR INQUIRIES CALL:** | **DIAMOND FARMS** |
| | **(301) 926-4535** |

| ACCOUNT TYPE | |
|---|---|
| **COMMERCIAL CHECKING** | |

| ACCOUNT NUMBER | STATEMENT PERIOD |
|---|---|
| ████4250 | **08/01/22 - 08/31/22** |

**BROUGHTON CONSTRUCTION COMPANY,LLC**

## ACCOUNT ACTIVITY

| POSTING DATE | TRANSACTION DESCRIPTION | DEPOSITS & OTHER CREDITS (+) | WITHDRAWALS & OTHER DEBITS (-) | DAILY BALANCE |
|---|---|---|---|---|
| 08/25/2022 | Delta Bridge Fun Delta Brid DEB704903 | | 23,333.00 | |
| 08/25/2022 | Payroll4Const COLLECTION    5530 | | 45,594.14 | 84,941.33 |
| 08/26/2022 | CFGMS - MAS 8446623467      844-662-3467#4 | | 18,000.00 | |
| 08/26/2022 | CFG MERCHANT SOL 8446623467 19 | | 24,000.00 | |
| 08/26/2022 | CHECK NUMBER      9479 | | 660.87 | 42,280.46 |
| 08/29/2022 | DEPOSIT | 8,015.00 | | 50,295.46 |
| 08/30/2022 | INCOMING FEDWIRE FUNDS TRANSFER DELTA BRIDGE FUNDING LLC | 354,954.00 | | |
| 08/30/2022 | Square Advance SQ225206 B   SQ225206 BROUGH | | 29,145.83 | |
| 08/30/2022 | CHECK NUMBER      9473 | | 227.50 | |
| 08/30/2022 | CHECK NUMBER      9475 | | 116.56 | 375,759.57 |
| 08/31/2022 | Contractors Reti DraftReque Contractors Pla | | 697.77 | |
| 08/31/2022 | Delta Bridge Fun Delta Brid DEB715031 | | 39,375.00 | |
| 08/31/2022 | CHECK NUMBER      9482 | | 250,000.00 | 85,686.80 |
| | NUMBER OF DEPOSITS/CHECKS PAID | 12 | 26 | |

## CHECKS PAID SUMMARY

| CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT | CHECK NO. | DATE | AMOUNT |
|---|---|---|---|---|---|---|---|---|
| 9433 | 08/08/22 | 1,158.12 | 9463 | 08/08/22 | 1,450.00 | 9474 | 08/08/22 | 170.00 |
| 9449* | 08/03/22 | 10,019.00 | 9464 | 08/09/22 | 6,200.00 | 9475 | 08/30/22 | 116.56 |
| 9456* | 08/02/22 | 4,828.50 | 9465 | 08/05/22 | 1,046.50 | 9476 | 08/08/22 | 220.00 |
| 9457 | 08/02/22 | 10,164.45 | 9467* | 08/08/22 | 17,633.94 | 9477 | 08/08/22 | 170.00 |
| 9458 | 08/04/22 | 1,320.00 | 9469* | 08/09/22 | 2,970.00 | 9478 | 08/16/22 | 50,000.00 |
| 9459 | 08/04/22 | 2,928.78 | 9470 | 08/10/22 | 1,158.12 | 9479 | 08/26/22 | 660.87 |
| 9460 | 08/01/22 | 14,580.00 | 9471 | 08/05/22 | 100,000.00 | 9480 | 08/22/22 | 2,590.00 |
| 9461 | 08/05/22 | 163.02 | 9472 | 08/08/22 | 162.00 | 9482* | 08/31/22 | 250,000.00 |
| 9462 | 08/11/22 | 658.90 | 9473 | 08/30/22 | 227.50 | | | |

\* - GAP IN CHECK SEQUENCE
R - CHECK RETURNED

| | |
|---|---|
| NUMBER OF CHECKS PAID | 26 |
| AMOUNT OF CHECKS PAID | $480,596.26 |

**PAGE 3 OF 4**

**GTR WASHINGTON COMMERCIAL BANK**
**7799 LEESBURG PIKE SUITE 600 NORTH TOWER**

SQ-000184

# HOW TO BALANCE YOUR M&T BANK ACCOUNT

## TO BALANCE YOUR ACCOUNT WITH THIS STATEMENT COMPLETE STEPS 1, 2, & 3.

**STEP 1** | **Place a checkmark ( ✔ )** beside each item listed on this statement which has a corresponding entry in your register.
Also place a checkmark next to the item in your register.

**STEP 2** | **Add** to your register:
(a) Any deposits and other credits shown on this statement which you have not already entered.
(b) Any interest this statement shows credited to your account.

**STEP 3** | **Subtract** from your register:
(a) Any checks or other withdrawals shown on this statement which you did not enter into your register.
(b) Any automatic loan payments or ATM or other electronic debits shown on this statement which you have not already subtracted.
(c) Any service charges shown on this statement which you have not already subtracted.

## TO DETERMINE THE CURRENT BALANCE IN YOUR ACCOUNT:

**STEP 4** | **List** any outstanding checks or debits written in your register, but not yet appearing on your statement.

| OUTSTANDING CHECKS AND OTHER DEBITS | | OUTSTANDING CHECKS AND OTHER DEBITS | |
|---|---|---|---|
| NUMBER | AMOUNT | NUMBER | AMOUNT |
| 1 | $ | 13 | $ |
| 2 | | 14 | |
| 3 | | 15 | |
| 4 | | 16 | |
| 5 | | 17 | |
| 6 | | 18 | |
| 7 | | 19 | |
| 8 | | 20 | |
| 9 | | 21 | |
| 10 | | 22 | |
| 11 | | SUBTOTAL OF COLUMN 2 | |
| 12 | | SUBTOTAL OF COLUMN 1 + | |
| SUBTOTAL OF COLUMN 1 | $ | TOTAL OUTSTANDING CHECKS AND DEBITS | $ |

**STEP 5** | **Enter** on this line **the Ending Balance** shown in the summary on the front of this statement.

$ 

**STEP 6** | **Enter the total of any deposits or other credits** shown on your register which are not shown on this statement.

$ 

**STEP 7** | **Enter the total of STEPS 5 & 6.**

$ 

**STEP 8** | **Enter TOTAL OUTSTANDING CHECKS & DEBITS** (from **STEP 4).**

$ 

**STEP 9** | **Subtract STEP 8 from STEP 7** and enter the difference here.

$ 

This amount should be your current account balance.

If you have questions, think your statement is incorrect, or for information regarding Treasury Management Services, please contact your M&T Relationship Manager or the Commercial Service Team at 1-800-724-2240, Monday through Friday, 8am - 6pm ET.



M&T Bank

L018 (11/16)                                                                          ©2016 M&T Bank. Member FDIC.

SQ-000185

BROUGHTON CHECKING – ██9611 ❤

# Account Information

## Balance

| | |
|---|---|
| Previous Day Transactions (-$54,220.20 / +$111,893.36) | $57,673.16 |
| Current Balance | $296,211.03 |
| Total Float | $0.00 |
| Holds | $0.00 |
| Pending Transactions (-$0.00 / +$0.00) | $0.00 |
| Other Transfers | $0.00 |
| Today's Float | $0.00 |
| Available Balance | $296,211.03 |
| Total Funds Available | $296,211.03 |

## Activity

| | |
|---|---|
| Last Deposit (Aug 31, 2022) | $250,000.00 |
| Last Check (Sep 06, 2022) | $40,000.00 |

## Interest

| | |
|---|---|
| Last Interest Payment | $0.00 |



Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 170 of 175    SQ-000186

| Date ⌄ | Description | Debit (-) | Credit (+) | Balance |
|---|---|---|---|---|
| 09/06/2022 | CHECK 9483 (View) 📧 | −$10,000.00 | | $134,752.21 |
| 09/06/2022 | KABBAGE PAYMENT 9021592 | −$29,824.41 | | $144,752.21 |
| 09/06/2022 | SQUARE ADVANCE SQ225206 B SQ225206 BROUGH | −$29,145.83 | | $174,576.62 |
| 09/06/2022 | ADOM REALTY INVE ADOM REALT IWKLMWK7B | −$2,000.00 | | $203,722.45 |
| 09/06/2022 | CONTRACTORS RETI DRAFTREQUE CONTRACTORS PLA | −$697.77 | | $205,722.45 |
| 09/06/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001420434B10 | | $10,743.70 | $206,420.22 |
| 09/02/2022 | CFG MERCHANT SOL 8446623467 20 | −$24,000.00 | | $195,676.52 |
| 09/02/2022 | CFGMS - MAS 8446623467 844-662-3467#5 | −$18,000.00 | | $219,676.52 |
| 09/01/2022 | PAYROLL4CONST COLLECTION 5530 | −$47,020.57 | | $237,676.52 |
| 09/01/2022 | NIELSONCO BROUGHTON 052000113 | −$38,199.00 | | $284,697.09 |
| 09/01/2022 | TOYOTA FINANCIAL RETAIL_PAY 57810632080222 | −$614.99 | | $322,896.09 |
| 09/01/2022 | FORD MOTOR CR FORDCREDIT 056076985 | −$346.74 | | $323,511.08 |
| 09/01/2022 | ▶ HINES PMD PAYMENT 2623 | | $8,100.00 | $323,857.82 |
| 09/01/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001419908AS0 | | $230,071.02 | $315,757.82 |
| 08/31/2022 | CHECK 9482 (View) 📧 | −$250,000.00 | | $85,686.80 |
| 08/31/2022 | DELTA BRIDGE FUN DELTA BRID DEB715031 | −$39,375.00 | | $335,686.80 |
| 08/31/2022 | CONTRACTORS RETI DRAFTREQUE CONTRACTORS PLA | −$697.77 | | $375,061.80 |
| 08/30/2022 | CHECK 9475 (View) 📧 | −$116.56 | | $375,759.57 |
| 08/30/2022 | CHECK 9473 (View) 📧 | −$227.50 | | $375,876.13 |
| 08/30/2022 | SQUARE ADVANCE SQ225206 B SQ225206 BROUGH | −$29,145.83 | | $376,103.63 |
| 08/30/2022 | ▶ INCOMING FEDWIRE FUNDS TRANSFER & | | $354,954.00 | $405,249.46 |

Help ⌃

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 171 of 175    SQ-000187

| Date | Description | Debit (-) | Credit (+) | Balance |
|------|-------------|-----------|-----------|---------|
| 08/29/2022 | ▶ DEPOSIT (View) | | $8,015.00 | $50,295.46 |
| 08/26/2022 | CHECK 9479 (View) | −$660.87 | | $42,280.46 |
| 08/26/2022 | CFG MERCHANT SOL 8446623467 19 | −$24,000.00 | | $42,941.33 |
| 08/26/2022 | CFGMS - MAS 8446623467 844-662-3467#4 | −$18,000.00 | | $66,941.33 |
| 08/25/2022 | PAYROLL4CONST COLLECTION 5530 | −$45,594.14 | | $84,941.33 |
| 08/25/2022 | DELTA BRIDGE FUN DELTA BRID DEB704903 | −$23,333.00 | | $130,535.47 |
| 08/25/2022 | AMEX EPAYMENT ACH PMT S6120 | −$22,687.16 | | $153,868.47 |
| 08/25/2022 | NEW YORK LIFE INS. PREM. 28342263 P | −$400.00 | | $176,555.63 |
| 08/24/2022 | DELTA BRIDGE FUN DELTA BRID DEB701967 | −$39,375.00 | | $176,955.63 |
| 08/24/2022 | ADOM REALTY INVE ADOM REALT IK76N9LAL | −$2,100.00 | | $216,330.63 |
| 08/24/2022 | ▶ DEPOSIT (View) | | $100,000.00 | $218,430.63 |
| 08/23/2022 | SQUARE ADVANCE SQ225206 B SQ225206 BROUGH | −$29,145.83 | | $118,430.63 |
| 08/22/2022 | CHECK 9480 (View) | −$2,590.00 | | $147,576.46 |
| 08/22/2022 | CONTRACTORS RETI DRAFTREQUE CONTRACTORS PLA | −$697.77 | | $150,166.46 |
| 08/22/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001418346B10 | | $146,088.28 | $150,864.23 |
| 08/19/2022 | CFG MERCHANT SOL 8446623467 18 | −$24,000.00 | | $4,775.95 |
| 08/19/2022 | CFGMS - MAS 8446623467 844-662-3467#3 | −$18,000.00 | | $28,775.95 |
| 08/18/2022 | PAYROLL4CONST COLLECTION 5530 | −$44,104.79 | | $46,775.95 |
| 08/18/2022 | DELTA BRIDGE FUN DELTA BRID DEB691802 | −$23,333.00 | | $90,880.74 |
| 08/18/2022 | FIRST CITIZENS B CREDITCARD 043000097566514 | −$3,050.00 | | $114,213.74 |
| 08/17/2022 | DELTA BRIDGE FUN DELTA BRID DEB688841 | −$39,375.00 | | $117,263.74 |

Help ∧

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 172 of 175    SQ-000188

| Date | Description | Debit (-) | Credit (+) | Balance |
|------|-------------|-----------|-----------|---------|
| 08/17/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001418002B10 | | $20,850.00 | $156,638.74 |
| 08/17/2022 | ▶ DEPOSIT (View) | | $35,000.00 | $135,788.74 |
| 08/16/2022 | CHECK 9478 (View) | −$50,000.00 | | $100,788.74 |
| 08/16/2022 | SQUARE ADVANCE SQ225206 B SQ225206 BROUGH | −$29,145.83 | | $150,788.74 |
| 08/16/2022 | HOME DEPOT COMM ONLINE PMT 600827984031535 | −$13,117.50 | | $179,934.57 |
| 08/16/2022 | TOYOTA FINANCIAL RETAIL_PAY 56855683071722 | −$1,004.35 | | $193,052.07 |
| 08/16/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001417855B10 | | $7,790.00 | $194,056.42 |
| 08/15/2022 | CONTRACTORS RETI DRAFTREQUE CONTRACTORS PLA | −$697.77 | | $186,266.42 |
| 08/15/2022 | ▶ KABBAGE LOAN 8999734 | | $54,000.00 | $186,964.19 |
| 08/12/2022 | CFG MERCHANT SOL 8446623467 17 | −$24,000.00 | | $132,964.19 |
| 08/12/2022 | CFGMS - MAS 8446623467 844-662-3467#2 | −$18,000.00 | | $156,964.19 |
| 08/12/2022 | WEB XFER TO CHK 00009840892328 | −$10,000.00 | | $174,964.19 |
| 08/11/2022 | CHECK 9462 (View) | −$658.90 | | $184,964.19 |
| 08/11/2022 | PAYROLL4CONST COLLECTION 5530 | −$43,165.65 | | $185,623.09 |
| 08/11/2022 | DELTA BRIDGE FUN DELTA BRID DEB678714 | −$23,333.00 | | $228,788.74 |
| 08/11/2022 | CARDMEMBER SERV ELECT PYMT ***********4204 | −$1,500.00 | | $252,121.74 |
| 08/11/2022 | ▶ DC-D.C. GOVERNME SOARACH 109001417261B10 | | $115,149.19 | $253,621.74 |
| 08/10/2022 | CHECK 9470 (View) | −$1,158.12 | | $138,472.55 |
| 08/10/2022 | DELTA BRIDGE FUN DELTA BRID DEB675747 | −$39,375.00 | | $139,630.67 |
| 08/10/2022 | ▶ ARLINGTON COUNTY PAYMENT 245812 | | $19,600.11 | $179,005.67 |
| 08/09/2022 | CHECK 9469 (View) | −$2,970.00 | | $159,405.56 |

Help ∧

Case 25-10054-ELG   Document 15   Filed 08/12/26   Page 173 of 175   SQ-000189

SQ-000190

| Date ⌄ | Description | Debit (-) | Credit (+) | Balance |
|---|---|---|---|---|
| 08/09/2022 | CHECK 9464 (View) 🔲 | –$6,200.00 | | $162,375.56 |
| 08/09/2022 | SQUARE ADVANCE SQ225206 B SQ225206 BROUGH | –$29,145.83 | | $168,575.56 |
| 08/08/2022 | SERVICE CHARGE FOR ACCOUNT 000009839984250 | –$141.14 | | $197,721.39 |
| 08/08/2022 | CHECK 9477 (View) 🔲 | –$170.00 | | $197,862.53 |
| 08/08/2022 | CHECK 9476 (View) 🔲 | –$220.00 | | $198,032.53 |
| 08/08/2022 | CHECK 9474 (View) 🔲 | –$170.00 | | $198,252.53 |
| 08/08/2022 | CHECK 9472 (View) 🔲 | –$162.00 | | $198,422.53 |
| 08/08/2022 | CHECK 9467 (View) 🔲 | –$17,633.94 | | $198,584.53 |
| 08/08/2022 | CHECK 9463 (View) 🔲 | –$1,450.00 | | $216,218.47 |
| 08/08/2022 | CHECK 9433 (View) 🔲 | –$1,158.12 | | $217,668.47 |

Last login at 9:19 am ET on Tuesday, September 06, 2022

Privacy | Security Assurance | Digital Services Agreement | ESign Agreement | Accessibility | Site Map | mtb.com

MEMBER **FDIC**    Equal Housing Lender NMLS#381076    **Entrust**

©2022 M&T Bank. All Rights Reserved.

Help ⌃

Case 25-10054-ELG    Document 15    Filed 08/12/26    Page 175 of 175    SQ-000191